UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KELLY BROWN and TIFFANY STEWART,
Individually and on behalf of all others similarly
situated, as Class/Collective representatives,

                             Plaintiffs,

v.

BARNES AND NOBLE, INC.,

                             Defendant.

Case No. 16-CV-07333 (RA)

---

## BARNES & NOBLE'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................. 1

II. FACTUAL BACKGROUND ................................................................ 1

    A.  Café Managers' Job Description, Duties, and Expectations ................. 2

    B.  Café Training Managers ..................................................................... 6

    C.  Barnes & Noble Has Introduced Declarations from Twelve Café Managers
        Who Provide Significant Detail About Their Individual Experiences ................. 6

III. DISCUSSION ................................................................................... 13

    A.  Plaintiffs' Evidentiary Burden When Seeking Conditional Certification ........... 14

    B.  Plaintiffs Have Failed to Meet Their Burden of Either Establishing an
        Unlawful Policy or Proffering Sufficient Evidence of a De Facto Unlawful
        Policy ................................................................................................ 16

        1.  Plaintiffs' Declarations Do Not Provide Meaningful Evidence For
            the Court to Consider With Respect to the FLSA's Executive
            Exemption ................................................................................ 17

        2.  Plaintiffs' Performance Evaluations Undermine the Probative
            Value of Their Declarations and Show that Management of the
            Café Was Their  Primary Duty ................................................... 21

            a.  Kelly Brown's Performance Evaluation ..................................... 21

            b.  Christopher Corrado's Performance Evaluation ......................... 23

            c.  Margaret Mann's Performance Evaluation ................................. 23

        3.  Plaintiff Brown's Document Production Also Undermines Her
            Declaration and Reveals Significant Evidence of Her Performing
            Managerial Duties .................................................................... 25

        4.  The Declarations of the Non-Plaintiff Café Managers Cast Even
            More Doubt on the Evidentiary Support for Plaintiffs' Motion ............. 26

            a.  Café Managers Have Diverse Experiences and Authority in
                the Area of Hiring for the Café ................................................. 26

# TABLE OF CONTENTS
(continued)

**Page**

      b.    Café Managers Also Have Varying Degrees of Responsibility and Involvement in Creating the Café Schedule and Addressing Staffing Issues .................................... 28

      c.    Café Managers Also Have Varying Experiences and Abilities with Respect to Delegating Tasks ................................ 29

C.    Plaintiffs' Proposed Notice is Deficient in Several Respects ............................ 30

IV.    CONCLUSION .................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ahmed v. T.J. Maxx Corp.*,
   No. 10–Civ–3609, 2013 WL 2649544 (E.D.N.Y. June 8, 2013) ...........................................15

*Arevalo v. D.J.'s Underground, Inc.*,
   No. DKC 09-3199, 2010 WL 4026112 (D. Md. Oct. 13, 2010)...........................................32

*Bah v. Shoe Mania, Inc.*,
   No. 08-CV-9380, 2009 WL 1357223 (S.D.N.Y. May 13, 2009) ...........................................31

*Campbell v. PriceWaterhouse Coopers, LLP*,
   No. S-06-2376, 2008 WL 2345035 (E.D. Cal. June 5, 2008)...........................................33

*In re Family Dollar FLSA Lit.*,
   988 F. Supp. 2d 567 (W.D.N.C. 2013) ...................................................................19

*Fernandez v. Sharp Management Corp.*,
   No. 16CV-0551, 2016 WL 5940918 (S.D.N.Y. Oct. 13, 2016) ...........................................30

*Gellhaus v. Wal-Mart Stores, Inc.*,
   769 F. Supp. 2d 1071 (E.D. Tex. 2011)...................................................................28

*Gordon v. Kaleida Health*,
   Civ. No. 08-cv-378S, 2009 WL 3334784 (W.D.N.Y. Oct. 14, 2009) .....................................32

*Guan v. Long Island Bus. Inst., Inc.*,
   No. 15-CV-2215, 2016 WL 4257549 (E.D.N.Y. Aug. 11, 2016) ...........................................31

*Guillen v. Marshalls of MA, Inc.*,
   750 F. Supp. 2d 469 (S.D.N.Y. 2010)...................................................................14, 15, 16

*Guillen v. Marshalls of MA, Inc.*,
   841 F.Supp. 2d 797 (S.D.N.Y. 2012)...................................................................15, 16

*Hallissey v. Am. Online, Inc.*,
   No. 99-CIV-3785, 2008 WL 465112 (S.D.N.Y. Feb. 19, 2008) .....................................30, 31

*Heitzenrater v. Officemax, Inc.*,
   No. 12-CV-900S, 2014 WL 448502 (W.D.N.Y. Feb. 4, 2014)...........................................14

*Hintergerger v. Catholic Health Sys.*,
   No. 08-cv-380S, 2009 WL 3464134 (W.D.N.Y. Oct. 21, 2009)...........................................32

*Hoffman-LaRoche Inc. v. Sperling*,
  493 U.S. 165 (1989).................................................................30

*Jenkins v. The TJX Cos. Inc.*,
  10-CV-03753, 2012 U.S. Dist. LEXIS 46394 (E.D.N.Y. Mar. 31, 2012)..............15

*Jenkins v. TJX Cos. Inc.*,
  853 F. Supp. 2d 317 (E.D.N.Y. 2012) ...............................................14, 15

*Khan v. Airport Mgmt. Servs.*,
  No. 10–Civ–7735, 2011 WL 5597371 (S.D.N.Y. Nov. 16, 2011) .........................14

*Lujan v. Cabana Mgmt., Inc.*,
  No. 10-CV-755 ILG, 2011 WL 317984 (E.D.N.Y. Feb. 1, 2011).........................31

*Murray v. Stuckey's Inc.*,
  939 F.2d 614 (8th Cir. 1991) .......................................................17

*Myers v. Hertz Corp*,
  624 F.3d 537 (2d Cir. 2010).........................................................14

*Rosario v. Valentine Ave. Discount Store, Co.*,
  828 F. Supp. 2d 508 (E.D.N.Y. 2011) ................................................31

*Slamna v. API Rest. Corp.*,
  No. 12 Civ. 757, 2013 WL 3340290 (S.D.N.Y. July 2, 2013) ..........................31

*Smith v. Heartland Auto. Servs., Inc.*,
  404 F. Supp. 2d 1144 (D. Minn. 2005)...............................................17

*Vasquez v. Vitamin Shoppe Industries, Inc.*,
  10- cv-8820, 2011 U.S. Dist. LEXIS 74376 (S.D.N.Y. July 11, 2011)................14, 16

*Whitehorn v. Wolfgang's Steakhouse, Inc.*,
  767 F. Supp. 2d 445 (S.D.N.Y. 2011).................................................31

**STATUTES, RULES & REGULATIONS**

29 C.F.R. § 541.100(a)................................................................18

29 C.F.R. § 541.100(a)(4).............................................................27

29 C.F.R. § 541.102...................................................................19

29 C.F.R. § 541.105................................................................27, 28

29 C.F.R. § 541.106(a)................................................................19

29 C.F.R. § 541.700(a)................................................................18

29 C.F.R. § 541.700(c) ................................................................................................. 19

29 U.S.C. § 213(a)(1) .................................................................................................. 18

Fed. R. Civ. P. 23 ........................................................................................................ 31

## I.  <u>INTRODUCTION</u>

Despite their light burden at the conditional certification stage, Plaintiffs have fallen well-short of meeting it.  Courts in this District, in this Circuit, and outside of this Circuit require employees who claim to have been misclassified as exempt, and seek conditional certification of a collective action, to show that there is "significant evidence of a de-facto illegal policy," or that the employer maintains a facially unlawful policy that applies to the proposed class.  Plaintiffs have failed to establish either.  Rather, they have submitted six declarations containing their own identical, conclusory statements about only those job duties they believe will support their claim of being misclassified as exempt, while ignoring the rest.  Courts regularly deny conditional certification where plaintiffs' evidence consists of generalized claims of performing non-exempt duties or merely being subject to the same lawful job description.  Accordingly, Plaintiffs' Motion, which relies on the theory that "[a]ll salaried exempt CMs are subject to the same or similar job description, corporate policies, training, and work rules regardless of their location," and that the six Plaintiffs who have submitted declarations performed allegedly non-exempt duties, is insufficient to establish that they are similarly situated to the approximately 1,100 Café Mangers throughout the country that they seek to represent.

## II.  <u>FACTUAL BACKGROUND</u>

Barnes & Noble owns and operates 634 bookstores in fifty states.[1]  (Cardwell Decl., Ex. X, ¶ 12).[2]  583 of those stores contain a Barnes & Noble Café, where Barnes & Noble offers its customers coffee and other drinks, food, and baked goods.  (Cardwell ¶ 3).   Excluding California, Barnes & Noble has employed approximately 1,100 individuals as Café Managers in

---

[1] Barnes & Noble includes California stores within this count even though Café Managers in California are not, and have not been within the past three years, classified as exempt.
[2] All exhibit references are to the exhibits attached to the Declaration of Daniel H. Aiken, and are identified by letter.

the past three years.  (Cardwell ¶ 4).  Each café is managed by a Café Manager, who supervises hourly café employees called "Café Servers."  (Cardwell ¶ 5).  Many, but not all, Cafés also employ a "Lead Café Server," which is an intermediate role between the Café Manager and the Café Servers.  (Cardwell ¶ 6).  Café Leads are responsible for the same tasks as Café Servers, but they also assist the Café Manager with some administrative, supervising, or training functions, depending on how the individual Café Manager chooses to delegate tasks.  (Cardwell ¶ 6).  Some cafés have one Lead, while others have two.  Some do not have a Lead at all.  (Cardwell ¶ 7). The number of Leads in a café—including whether a café has one at all—depends on the sales volume of the Barnes & Noble book store within which the café sits, as well as the sales volume of the café.  (Cardwell ¶ 8).  The Lead also reports directly to the Café Manager.  (Cardwell ¶ 9).

Café Managers report directly to the Store Manager.  Contrary to the statements in Plaintiffs' Motion, there are no other layers of management between the Café Manager and the Store Manager.  (Cardwell ¶ 10).

### A.    Café Managers' Job Description, Duties, and Expectations

Café Managers are primarily responsible for the management of the café, both operationally and financially.  Each café is a separate profit center, and Café Managers are responsible for managing the café's P&L, including by driving sales and reducing product shrink and waste. (Exs. L-W, containing non-Plaintiff Café Manager declarations).  Revenue for each café varies significantly, within a range of about $100,000 and $1.7 million.  (Cardwell Decl., Ex. X, ¶ 12).  The average salary of Café Managers in 2016 was $37,680, but Café Managers are also eligible for performance bonuses based on their success in meeting their café's sales and gross margin goals.  (Cardwell Decl., Ex. X, ¶ 13).  Between 2012 and 2015, the Plaintiffs received the following amounts in bonuses:

| Name | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|
| Stewart, Tiffany E | $5,625.00 | $2,322.00 | | | **$7,947.00** |
| Roman, Anthony J | $5,275.92 | $1,652.00 | | | **$6,927.92** |
| DeVito, Rosa | $3,087.00 | $3,182.00 | | | **$6,269.00** |
| Mann, Margaret M | $7,425.00 | $5,774.00 | $7,800.00 | | **$20,999.00** |
| Souza, Irene M | $3,958.50 | $4,085.00 | | | **$8,043.50** |
| Brown, Kelly C | | $960.00 | | | **$960.00** |
| Corrado, Christopher W | | | $280.00 | $3,251.00 | **$3,531.00** |
| Murphy, Tamira | | | $2,100.00 | | **$2,100.00** |

(Cardwell Decl., Ex. X, ¶ 14).

Café Managers are also responsible for hiring and training their own teams, and for continuously supervising and coaching their team members. (Job Description, Ex. A). Café Managers are empowered, and expected, to make all decisions necessary to ensure the successful management of their café. (*Id.*) The specific amount of authority and discretion for each individual Café Manager varies depending on several factors, including the Store Manager's approach to supervising the café, the Café Manager's experience and ability level, the sales volume of the café, and the number of café employees on the café staff. (See Exs. L-W).

The Café Manager job description summarizes the position and sets forth the "Essential Functions," as follows:

> **Job Summary**
>
> As a café manager, you are responsible for the daily operations of the Café, ensuring consistency with our bookselling culture, world-class customer service focus, digital initiatives, and merchandising standards. You lead by example and foster an employee-centric environment and focus café servers on maximizing sales and productivity through the delivery of our four core service principles in the Café. You select, hire and develop café servers, ensuring a talent bench which reflects the communities we serve.

## Essential Functions

- Manage and execute the daily operations of the Café; execute e-Planner to standard; customize, communicate, delegate, perform, and follow up on all tasks as the business demands

- Drive sales by coaching and counseling café servers to deliver the four core service principles in the Café: provide timely and friendly café service, upsell, maintain product presentation standards, and maintain Café cleanliness

- Deliver positive financial results through efficient execution of initiatives; use financial reports to identify additional sales, in-stock, and trend opportunities

- Plan and assign work to optimize payroll budget

- Understand and execute Integrated Store Operations (ISO) standards

- Coach and communicate with the café servers about all our products and services, enthusiastically model selling behavior, share product knowledge, and provide recommendations about ways to connect our customers with the right products

- Select, interview, and recommend the hiring of new café servers; oversee and monitor the new hire orientation and training process, ensuring a smooth acclimation to the store and our bookselling culture in partnership with the store manager

- Prepare and deliver performance reviews to café servers; coach and counsel them on performance issues and take appropriate corrective action in partnership with the store manager (SM)

- Protect company assets by controlling both internal and external shrink

- Maintain a calm demeanor and manage issues professionally and according to store operating and company standards, setting a positive example

- Act with integrity and trust, promoting our bookselling culture and core values

- Resolve customer complains in accordance with all operational guidelines, surfacing issues to the SM as necessary

- Maintain facility's condition and take immediate action to correct any maintenance issues

- Ensure that product quality and Café standards are executed and maintained; manage inventory levels, receiving, purchasing, waste control, and equipment maintenance and repair

(Ex. A)

In addition to the job description, Barnes & Noble provides Café Managers with a "Café Manager Competency Model" that identifies general descriptions of the types of behaviors that Barnes & Noble believes are "important for successful job performance." (Café Manager Competency Model, Ex. B). The competencies include five core competencies applicable to all employees (Approachability, Business Acumen, Customer Focus, Drive for Results, and Integrity and Trust) and also the five competencies that are important for succeeding, specifically, in the Café Manager position:

**Composure**:   Remains calm under pressure; does not get irritated or defensive when dealing with tough situations; can handle stress and manage the unexpected; acts as a settling influence in a crisis.

**Delegation**:  Delegates both routine and important tasks clearly and comfortably; communicates decisions; shares both responsibility and accountability; tends to trust people to perform; lets direct reports and others finish their own work.

**Directing Others**:  Is good at establishing clear directions; sets stretching goals and objectives for others; distributes the workload in a well-planned and organized manner; maintains two-way dialogue with others on work and results; brings out the best in people; is a clear communicator.

**Functional/Technical Skills**:  Has the functional and technical knowledge and skills to do the job at a high level of accomplishment.

**Hiring and Staffing**: Hires the best people internally or externally; is not afraid of selecting strong people; assembles talented staffs.

**Organizing**:  Can marshal resources to get things done; can orchestrate multiple activities at once to accomplish a goals; uses resources effectively and efficiently.

(Ex. B).

### B.   Café Training Managers

Some Café Managers also perform the role of Café Training Manager for their District. Café Training Managers are responsible for training newly hired Café Managers on properly managing the Café and its employees, as well as the continued development of current Café

Managers.  (Ex. S, Downs Decl. ¶ 6).  In providing training to newly hired Café Managers, Café

Training Managers spend most of their time on topics such as reviewing and understanding

financial reports about the café, strategies for increasing sales, managing inventory and ordering,

managing and directing the daily activities of café employees, and loss prevention.  (Ex. R, Egan

Decl. ¶ 6; Downs ¶ 6).  The length of the Café Manager training depends on the trainee's

background and skill set, including whether the person is already familiar with some of the

basics of working in the café.  (Ex. V, Wakefield Decl. ¶ 6; Ex. U, Grenat Decl. ¶ 10).  In terms

of continued development, Café Training Managers decide for themselves how to handle that

responsibility.  For example, Katie Downs holds monthly conference calls in which she and the

Café Managers in her district "discuss strategic selling ideas and upcoming café promotions."

(Downs ¶ 6).  Plaintiff Margaret Mann also served as a Café Training Manager, though she failed

to mention it in her declaration.  In Mann's 2013/2014 performance review, her manager praised

her work as Café Training Manager:  "You had such a busy year training 13 people.  You are a

highly respected trainer, frequently asked by our [Learning & Development] department to  . . .

aid in the certification of new [Café Training Managers]."  (Mann Performance Review,

2013/14, Ex. C).

### C.  Barnes & Noble Has Introduced Declarations from Twelve Café Managers Who Provide Significant Detail About Their Individual Experiences.

Included with Barnes & Noble's submission are the declarations of twelve current Café

Managers, representing eleven different states.  Their declarations provide significant,

individualized detail concerning their unique experiences in managing their cafes.  Although

each declaration confirms that a Café Manager is responsible for the overall management of the

café, including managing the café's P&L as a distinct profit center, product ordering, and the

direction and supervision of the café employees, the declarations also show significant variation

in the authority and discretion that each Café Managers holds in the areas of hiring, creating the café work schedule, employee discipline, and task delegation.  By way of introduction, the declarations of the following non-Plaintiff Café Managers are submitted herewith:

- **Tara Scully**, (Ex. P), Store # 2264 in The Villages, Florida.  Scully has been a Café Manager for about 16 years and currently supervises five to eight café employees, on average, including one Café Lead. (Scully ¶¶ 2 & 8).   Scully describes the hiring process in her café as a "collaborative effort," though she makes the ultimate hiring decisions. (Scully ¶ 11).  Unlike other Café Managers, Scully delegates the task of initial candidate screening to her Café Lead, while Scully and her Store Manager will conduct the in-person interviews.  (Scully ¶ 11).  Also unlike other Café Managers, Scully reports that she does not often deal with hiring because she experiences low turnover among her café staff.  (Scully ¶ 11).  The Assistant Store Manager is now responsible for preparing the schedule for the Café, but Scully still has significant input into creating the schedule and making any changes that she believes are necessary to account for days that she expects to be busier than normal, such as when the Store is hosting an event.  (Scully ¶ 18).  Until late 2015, when Barnes & Noble began using an scheduling program called Dayforce, Scully was responsible for preparing the café schedule on her own.  (*Id.*).  Apart from formal scheduling, Scully makes decisions regarding "optimum staffing levels for the café" throughout the week.  (Scully ¶ 19).  For example, if the café is short-staffed, Scully is responsible for, and has authority to, call in a café worker who was not scheduled or to pull in a Bookseller from the main floor who knows who to work in the café.  (*Id.*).  Scully disciplines employees through coaching and verbal counseling, and has dealt with recommending an improvement plan only rarely.  (Scully ¶¶ 13 & 20).

- **Erika Pitts**, (Ex. L), Store #2337 in Chatanooga, Tennessee.  Pitts has been a Café Manager since 2014.  (Pitts ¶ 5).  She manages a high volume café, supervising four Café Servers and two Café Leads.  (Pitts ¶ 6).  In her store, hiring for the café is done through a "collaborative process with the store's management team."  She has significant input into the hiring decision, including by conducting the first interview, but another manager makes the ultimate decision to hire.  (Pitts ¶ 7).   Pitts is responsible for handling staffing issues, such as call-outs, that arise and has the authority to assign a café server to cover a shift or to use a Bookseller who is trained to work in the café.  (Pitts ¶ 9).  Pitts does not make the schedule for her café, but she reviews and changes the schedule after it is created to ensure proper coverage.  (Pitts ¶ 10).  Pitts writes and delivers the performance reviews for all café employees and has the authority to resolve customer complaints in her discretion, including by issuing a refund.  (Pitts ¶¶ 13 & 18).  Pitts also has "the authority to discipline [her] Leads and Servers as necessary without manager approval." (Pitts ¶ 14).  Pitts usually chooses to address performance issues through informal coaching.  (*Id.*)  In the one instances where she recommended that an employee be placed on an improvement plan (the highest level of discipline before termination), her Store Manager followed her recommendation.  (*Id.*)

- **Christina Perleberg**, (Ex. M), Store #2606 in Fargo, North Dakota.  Perleberg has been a Café Manager since August 2015, but she has worked in the Café as a Café Server and a Café Lead since 2010.  (Perleberg ¶ 2).  Perleberg manages a medium volume Café, supervising eight Café servers and two Café Leads.  (Perleberg ¶¶ 4 & 7).  Perleberg is "responsible for hiring employees in the café."  (Perleberg ¶ 17).  She reviews applications, conducts screening interviews, as well as in-person interviews, and then makes the final decision on hiring after receiving input from others on the management team.  (*Id.*).  On the other hand, Perleberg has "little involvement" in preparing the schedule for the café and will work with her Store Manager to address ad hoc staffing issues that arise during the day.  (Perleberg ¶ 12).  Perleberg has the discretion and authority to discipline café employees, including by providing coaching or issuing a more formal verbal counseling.  (Perleberg ¶¶ 15-16).  If Perleberg believes more serious discipline is warranted, she recommends it to her Store Manager "who has always adopted [her] recommendations."  (Perleberg ¶ 16). Perleberg also has the discretion and authority to address customer complaints, including by offering a refund.  (Perleberg ¶ 20).

- **Melissa Stanley**, (Ex. O), Store # 2958 in Amherst, New York.  Stanley has been a Café Manager since 2010.  (Stanley ¶ 2).  She supervises nine Café Servers and one Café Lead. (Stanley ¶ 8).  Stanley was responsible for preparing her café's schedule up until late 2015, when Barnes & Noble began using Dayforce, which the Assistant Store Manager now handles, but still with Stanley's input.  (Stanley ¶ 13).  Stanley makes the ultimate hiring decision with respect to café employees, though she views the hiring process as a team effort with her Store Manager.  (Stanley ¶ 9).  With respect to employee discipline, Stanley states that she "occasionally discipline[s] employees . . . without managerial approval" and that she has issued verbal warnings for various infractions.  (Stanley ¶ 12).  Stanley has partnered with her Store Manager on more serious disciplinary issues, but there have not been any terminations of a café employee during her tenure.  (Stanley ¶ 12).  Stanley is responsible for evaluating and writing reviews for her café employees, which her Store Manager reviews but makes only minor changes due to the Store Manager's trust in Stanley's "judgment in evaluating my café employees."  (Stanley ¶ 11).  Stanley also conducts the performance review meeting with her subordinates in the cafe.  (Stanley ¶ 11).

- **Cullen Bealer**, (Ex. N), Store # 2161 in Jefferson City, Missouri.  Bealer has been a Café Manager since 2011.  (Bealer ¶ 2).  He manages a lower volume café and, therefore, does not have a Café Lead.  (Bealer ¶ 6).  Bealer supervises five Café Servers, on average. (*Id.*).  Bealer is "the primary person responsible for hiring Café Servers."  (Bealer ¶ 7). He conducts the screening process and initial in-person interview.  (*Id.*)  If he approves of the candidate, Bealer will set up a second interview with the Store Manager.  (*Id.*)  Bealer makes the ultimate hiring decision but nevertheless works with the management team in making his decisions.  (*Id.*).  Bealer was responsible for preparing the café scheduling prior to the implementation of Day Force, but now the Store Manager and Assistant Store Manager handle that task.  (Bealer ¶ 11).  Bealer does not handle call-outs on his own but, rather, teams up with the Manager on Duty ("MOD").  (Bealer ¶ 12).  Bealer has

issued employee discipline up to a verbal counseling without managerial approval; when he believes an improvement plan is called for, he will discuss and work with his Store Manager and HR, as appropriate. (Bealer ¶ 10). Bealer is also responsible for preparing employee evaluations, which his Store Manager approves with only minor changes, and for delivering the reviews to the café employees. (Bealer ¶ 9).

- **Emily Lorbach**, (Ex. Q), Store # 2361 in Oakbrook, Illinois. Lorbach has been a Café Manager since July 2015. (Lorbach ¶ 2). Prior to that, she worked as a Barnes & Noble Store Manager for about four-and-a-half years. (Lorbach ¶ 3). Lorbach manages a high volume store in which she supervises six to seven café employees, including two full-time Café Leads. (Lorbach ¶6). Due to the high volume of sales in her Café, Lorbach's job involves a "heavy emphasis on retail sales of coffee and specialty foods and candy, which involve a separate ordering process," which Lorbach handles in addition to the normal ordering for the cafe. (Lorbach ¶ 9). This also requires Lorbach to pay "additional attention to merchandising standards and product knowledge, which [she] is responsible for overseeing." (*Id.*) Lorbach has "primary responsibility for hiring employees for the café." (Lorbach ¶ 10). Although her declaration emphasizes a collaborative approach to hiring within her store, Lorbach asks as a gatekeeper over candidates in that she will not schedule a second interview with another manager if she does not approve of the candidate. (*Id.*). Similarly, Lorbach holds an effective veto power over candidates in that her decisions not to hire a candidate have been "uniformly accepted by my fellow managers." (*Id.*). With respect to employee discipline, Lorbach does not issue verbal counseling on her own but, rather, prefers to collaborate with her Store Manager, even though she may not be "required" to seek Store Manager approval. (Lorbach ¶ 11). Short of verbal counseling, Lorbach may also determine that a situation "calls for additional training," which is up to her to provide. (*Id.*). Given Lorbach's experience as a Store Manager, Lorbach's current manager entrusts the entire employee evaluation process to Lorbach. (Lorbach ¶ 13). Lorbach may provide input but does not handle scheduling for the café; and she does not handle employee call-outs—the MOD is responsible for arranging coverage for the café when needed. (Lorbach ¶¶ 14-15). When Lorbach was a Store Manager, however, the Café Managers who reported to her "usually prepared their own schedules for the café." (Lorbach ¶ 16).

- **Kyle Egan**, (Ex. R), Store # 2280 in Seattle, Washington. Egan has been a Café Manager since 2012. (Egan ¶ 7). He also serves as a Café Training Manager for his District. (Egan ¶ 2). Egan supervises ten Café Servers, and one Café Lead. (Egan ¶ 5). Egan is responsible for the hiring in his café, including posting open positions, screening candidates, conducting one of two in-person interviews, and "usually" making the ultimate hiring decision, although other members of the management team may also make the decision. (Egan ¶ 10). Egan was responsible for scheduling prior to the implantation of Dayforce, but the Assistant Store Manager now inputs the schedule into the program. (Egan ¶ 17). Egan still has significant input into the schedule: after the schedule is prepared, Egan reviews it to ensure that the Café has appropriate coverage, that employees who are trained in opening or closing procedures are assigned to open or close, and to account for days on which the café is expecting to be busier than usual.

9

(*Id.*).  Egan takes a collaborative approach to addressing call-outs and other staffing issues by working with the MOD to find coverage while also considering the store's goals with respect to payroll and budgeting.  (Egan ¶ 18).  Egan is responsible for preparing performance reviews for café employees, which he delivers after his Store Manager and District Manager sign off on them.  (Egan ¶ 11).  Egan also "has the authority to discipline employees as appropriate," which has included issuing a verbal counseling for tardiness and not following the dress code.  (Egan ¶ 19).  Egan will recommend an improvement plan in "rare situations," in which case he will coordinate issuing that discipline with his Store Manager.  (*Id.*).

- **Katie Downs**, (Ex. S), Store # 2060 in Frisco, Texas.  Downs has been a Café Manager for eleven years, in four different stores within Texas.  (Downs ¶ 2).  Downs also serves as a Café Training Manager for her District.  (Downs ¶ 6).  She currently supervises eight Café Servers and one Café Lead.  (Downs ¶ 9).  According to Downs, her current experience differs significantly from when she was a Café Manager at other stores, "especially depending on the volume of the store."  (Downs ¶ 29).  For example, when she ran the Café in the Lewisville, Texas store, she did not have a Café Lead, so she "took on more responsibility for day-to-day tasks that I currently delegate to a Lead."  (Downs ¶ 29).  As mentioned above, Downs, as a Café Training Manager, has taken the initiative to hold monthly conference calls with Café Managers in her District so that they can all exchange strategic ideas.  (Downs ¶ 6).  Although, like other Café Managers, Downs is responsible for training new café employees, she currently delegates training of new Café Servers to her Café Lead.  (Downs ¶ 11).  Downs also states that she is eligible for another bonus—in addition to her Café Manager bonus—based on how many Café Managers she trains in one year.  (Downs ¶ 18).  Downs is responsible for hiring café employees in her store, but she delegates the initial screening and first interview to her Lead.  (Downs ¶ 12).  She conducts the second interview and makes the ultimate hiring decision, after discussing it with her Store Manager "as a matter of courtesy and working as a cohesive management team.  (Downs 12).  Downs is also solely responsible for preparing the schedule for the café, and for determining how to arrange coverage for the café if it is short-staffed.  (Downs ¶¶ 21-22).

- **Tra Dinh**, (Ex. T), Store # 2206 in Millbury, Massachusetts.  Dinh has been a Café Manager since 2011.  (Dinh ¶ 2).  She supervises five Café Servers and Two Café Leads.  (Dinh ¶ 7).  Dinh is responsible for the hiring process, including making the hiring decision.  (Dinh ¶ 11).  She is also responsible for training new café employees and delegates parts of the training to her Café Leads.  (Dinh ¶ 12).  Unlike other Café Managers, such as Scully, Dinh has engaged in a significant amount of hiring and training of new café employees—about 15-20 in the past two years.  (Dinh ¶ 12).  Dinh is the primary author of the café employees' performance reviews, and she meets with each café employee to discuss their performance, in addition to the constant informal coaching she provides all year.  (Dinh ¶¶ 17-18).  In addition to coaching, Dinh also issues verbal counseling for issues such as tardiness, and has recommended improvement plans for more serious issues, which her Store Manager has "always adopted."  (Dinh ¶ 19).  Dinh has the authority to deal with customer complaints, which happen "occasionally,"

including the authority to issue a refund, if she determines doing so is appropriate. (Dinh ¶ 22). In Dinh's store, the Assistant Store Manager generates the café schedule, but Dinh reviews it to ensure adequate coverage and staffing and suggests changes accordingly, which the Assistant Store Manager "always accepts." (Dinh ¶ 13).

- **Rebecca Nelms**, (Ex. W), Store # 2939 in Lincoln, Nebraska. Nelms has worked as a Café Manager for less than one year. (Nelms ¶ 2). She supervises between six and fifteen café employees, depending on the season and turnover, including one Café Lead. (Nelms ¶ 5). Being a relatively less experienced Café Manager, Nelms works in conjunction with her Store Manager to carry out her hiring responsibilities. Specifically, she and her Store Manager will review resumes for potential candidates and then, after the interview process, will discuss the hiring decision and "collectively decide" whether to make an offer of employment. (Nelms ¶ 10). Nelms has also recommended the termination of an employee, which her Store Manager adopted. (*Id.*). Nelms reports that, although her Store Manager has the final say in hiring and terminations, the Store Manager "generally trusts my judgment in making these decisions." (*Id.*). Since the implementation of Dayforce, Nelms has had "little input" into preparing the café schedule, though the scheduler usually accepts any proposed adjustments that Nelms offers. (Nelms ¶ 12). Nelms also leaves ad hoc staffing decisions up to the MOD. (Nelms ¶ 13). Like other Café Managers, however, Nelms is still solely responsible for managing the financial performance of the Café (including "figuring out ways to increase sales"), managing the Café's product ordering, and, generally, "overseeing the operations of the café and supervising the Café Servers and Café Leads in the café." (Nelms ¶¶ 4, 9 & 7). And, Nelms has the authority and discretion to issue customer refunds. (Nelms ¶ 17).

- **Marissa Grenat**, (Ex. U), Store # 2372 in Indianapolis, Indiana. Grenat has been a Café Manager for twelve years. (Grenat ¶ 2). She has been in her current store for about three and-a-half years. (Grenat ¶ 3). Prior to that, she was the Café Manager in the Lafayette, Indiana store. (Grenat ¶ 3). Grenat has also served as a Café Training Manager for her District for the past six or seven years. (Grenat ¶ 8). In her store, she supervises eight to nine Café Servers and one Café Lead. (Grenat ¶ 7). In her current store, Grenat is primarily responsible for hiring café employees. (Grenat ¶ 11). She conducts the screening process and initial interview, and then determines whether the candidate will receive a second interview with the Store Manager. (Grenat ¶ 11). She and her Store Manager then discuss each candidate and make a "mutual decision." (Grenat ¶ 11). Grenat's experience in her current store is much different than when she worked in the Lafayette store, where her "Store Manager handled most aspects of hiring." (Grenat ¶ 11). Grenat also takes a unique approach to training new employees in that she always conducts the first two to three days of training, then delegates the rest of the training to a Café Lead or very experienced Café Server, while supervising the training overall. (Grenat ¶ 12). In her current store, Grenat has conducted and supervised significantly more training than she did in the Lafayette store, because the Lafayette store had significantly lower turnover among café employees. (Grenat ¶ 12). Grenat also handles all aspects of employee discipline with very little involvement from her Store Manager,

11

who has "never disagreed with [her] recommendation of issuing an improvement plan." (Grenat ¶ 14). Indeed, even where her Store Manager believes Grenat should make more use of improvement plans, he nevertheless "defers to [her] judgment on managing the café employees." (Grenat ¶ 14). Grenat's Store Manager or the Assistant Store Manager prepare the café schedule, but Grenat reviews the schedules and provides suggestions, which are always accepted, to provide optimal staffing based on her knowledge of the café employees skill sets. (Grenat ¶ 18). In her previous store, Grenat "did not do any scheduling." (*Id.*). Further, based on her observations as a Café Training Manager, Grenat states that "there are some Café Managers who have no input into the schedule, some who create the schedule themselves, and some, like me, who have a very active role in scheduling, though they do not create the schedule." (Grenat ¶ 18).

- **Tina Wakefield**, (Ex. V), Store #2832 in Lakewood, Washington. Wakefield has been a Café Manager for eight and-a-half years, working at two different stores. (Wakefield ¶ 2). She also serves as the Café Training Manager for her District. (*Id.*) Wakefield supervises nine Café Servers and one Café Lead. (Wakefield ¶ 7). Wakefield is responsible for hiring in her Café, including making the final hiring decision, which she usually does without getting managerial approval. (Wakefield ¶ 8). Wakefield tends to delegate the training of new café employees to her Lead or another certified trainer by pairing the new-hire with those employees, while still "managing the training." (Wakefield ¶ 9). Wakefield is the primary author of employee evaluations, which she bases, in part, on her "daily observations of café employees' growth and development." (Wakefield ¶¶ 11-12). Prior to issuing them, Wakefield shares the reviews with her Store Manager to "to make sure we are in agreement." (Wakefield ¶ 11). Wakefield also delivers the reviews to café employees and sometimes has her Café Lead assist in delivering the review as well. (*Id.*). The Assistant Store Manager creates the initial schedule in Wakefield's store, but she adjusts it herself based on "ensure appropriate coverage and to "optimize the strengths of my Café Servers." (Wakefield ¶ 10). When the café is short-staffed or overstaffed, Wakefield "makes the necessary adjustments" herself. (Wakefield ¶ 17).

III.   **DISCUSSION**

Plaintiffs' motion does not present the Court with sufficient evidence of a de facto nationwide unlawful policy to justify the exponential expansion of this case, including notice and potential discovery with respect to 1,100 potential class members. Apart from their conclusory statements, Plaintiffs do not offer any evidence of how they performed their jobs on a daily basis or how the extensive management functions that are clearly set out in their job description are actually performed in their respective stores, let alone throughout the 1,100 person class they

seek to represent.  Courts have regularly denied motions for conditional certification based on evidence that is similarly generic and non-probative of the key issues as what Plaintiffs have presented here.

In contrast, Barnes & Noble has provided the Court with substantial detail and context concerning both the expectations of the Café Manager position and the varying, individual experiences of Café Managers across the country.  The performance evaluations of some of the Plaintiffs show a more complete, less generic picture of the actual experiences and job expectations of the Plaintiffs.  Consistent with the performance evaluations, the declarations of twelve non-Plaintiff Café Managers explain, specifically, how matters such as hiring, training, financial management, task delegation, and employee discipline in the café are handled in their specific stores.  Together, this evidence casts significant doubt on the evidentiary value of Plaintiffs' declarations and shows that, although they all operate with autonomy and discretion in managing their respective cafes, each Café Manager goes about managing the café in a different way, and under a different set of guidelines from their individual Store Manager.  Therefore, the only way to determine whether each Café Manager in the country is properly classified as exempt is to make individualized inquiries into their daily activities and the level of authority and discretion granted them by their Store Manager to run the café.

A.  **Plaintiffs' Evidentiary Burden When Seeking Conditional Certification**

Under Second Circuit precedent, Plaintiffs' burden at this stage is to demonstrate that "they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law." *Myers v. Hertz Corp*, 624 F.3d 537 (2d Cir. 2010) (citations and internal quotations omitted).  "[T]he mere classification of a group of employees . . . as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan or practice that renders all putative class members as 'similarly situated'" for purposes of

13

conditional certification.  *Jenkins v. TJX Cos. Inc.*, 853 F. Supp. 2d 317, 323 (E.D.N.Y. 2012) (citations and internal quotations omitted).  To succeed in establishing that they are similarly situated to the class they seek to represent, plaintiffs challenging their exempt classification must come forward with more than the mere fact that they, and others, worked under the same job description and corporate policies.  *Id.; Khan v. Airport Mgmt. Servs.,* No. 10–Civ–7735, 2011 WL 5597371, at *4 (S.D.N.Y. Nov. 16, 2011); *Guillen v. Marshalls of MA, Inc.,* 750 F. Supp. 2d 469, 476 (S.D.N.Y. 2010); *see also Heitzenrater v. Officemax, Inc.*, No. 12-CV-900S, 2014 WL 448502, at *3 (W.D.N.Y. Feb. 4, 2014) ("Plaintiff argues, 'Office Max has a 'uniform business practice' of treating ASMs similarly throughout the United States.' To the extent that Plaintiff asserts that no further evidence is needed, this Court disagrees.").

Where plaintiffs do not challenge the job description or other alleged common policy as unlawful (*i.e.*, a misclassification on its face), plaintiffs seeking conditional certification must point to evidence that they, and others, shared a common experience working under a de facto policy of requiring its exempt employees to perform a job that is non-exempt.  *Myers*, 624 F.3d at 555; *Jenkins*, 853 F. Supp. 2d at 323; *Heitzenrater*, 2014 WL 448502, at *3.  In reviewing a motion for conditional certification, courts consider all of the evidence submitted by the parties, including evidence that contradicts the plaintiffs' assertions.  *See Vasquez v. Vitamin Shoppe Industries, Inc.*, 10- cv-8820, 2011 U.S. Dist. LEXIS 74376, at *5-6 (S.D.N.Y. July 11, 2011) (considering defendants' evidence and declining to grant nationwide conditional certification).

Several courts in the Southern, Eastern, and Western Districts of New York have denied conditional certification when faced with motions similar in legal theory and lack of meaningful factual support as found in Plaintiffs' current Motion.  Despite the fact that each of these cases involved alleged misclassification of managers in a retail store, Plaintiffs do not cite them, let

alone attempt to meet the basic, controlling standards that are articulated in the courts' opinions. *See Jenkins v. The TJX Cos. Inc.*, 10-CV-03753, 2012 U.S. Dist. LEXIS 46394 (E.D.N.Y. Mar. 31, 2012); *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469 (S.D.N.Y. 2010) ("*Guillen I*"); *Guillen v. Marshalls of MA, Inc.*, 841 F.Supp. 2d 797 (S.D.N.Y. 2012) ("*Guillen II*"); and *Ahmed v. T.J. Maxx Corp.*, No. 10–Civ–3609, 2013 WL 2649544, at *7 (E.D.N.Y. June 8, 2013)

Together, these cases confirm that plaintiffs seeking conditional certification for alleged misclassification claims must persuade the Court that there is "significant evidence of a de facto illegal policy where an official legal policy existed" and that the plaintiffs are similarly situated to the "*employees [they] propose[] to include in the collective action* with respect to [their] claim that [they] performed non-exempt duties." *Ahmed,* 2013 WL 2649544 at *11-13 (citing, inter alia, *Guillen II,* 841 F. Supp. 2d. at 800-01; and *Jenkins,* 853 F. Supp. 2d. at 322-23).

Indeed, in *Guillen I* the Court rejected the plaintiff's attempt to anchor a motion for conditional certification of assistant store managers ("ASMs") with arguments and evidence that were almost identical to what Plaintiffs present here:

> Guillen's conclusory statement that 'Marshalls employed a high degree of standardized operational practices at [his] store including the use of a standardized management training program, standardized employment policies and . . . an identical hierarchical management structure,' . . . does little to add to the inference that ASMs nationwide were similarly situated to Guillen with respect to his claim that he was required to spend a majority of his time performing non-exempt tasks. There is no information provided as to the nature of these 'standardized operational practices' and how they relate to the claim that Marshalls' ASMs are required to perform non-exempt tasks for a majority of their workweek in contravention of the ASM job description . . . . . Essentially, plaintiff's argument on this point boils down to the proposition that where there is a corporate management structure that applies to all regions of the country – as is likely true for many, if not most, companies that operate nationally – any single employee may plausibly assert that employees throughout the country are similarly situated with respect to that employee's day-to-day job

15

> activities even if those job activities contravene the company's
> stated requirements.

*Guillen I*, 750 F. Supp. 2d at 477-78 (denying conditional certification); *see also Guillen II,* 841

F.Supp. 2d at 800 (denying renewed certification motion that "added virtually no evidence

suggesting that Guillen is similarly situated to ASMs in Marshalls stores nationwide with respect

to the main contention in the case:  that he was required to perform tasks that rendered him non-

exempt from the FLSA's overtime requirements."); *Vasquez,* 2011 U.S. Dist. LEXIS 74376 at *4

(denying certification despite plaintiff's claim that he "spent 80% of his time as an SM

performing non-managerial tasks, such as stocking shelves and assisting customers in locating

products[,]" and that "his duties did not include managerial responsibilities or the exercise of

independent business judgment).

### B.  Plaintiffs Have Failed to Meet Their Burden of Either Establishing an Unlawful Policy or Proffering Sufficient Evidence of a De Facto Unlawful Policy.

Plaintiffs in this case have not met their burden, however lenient.  Foremost, Plaintiffs

have not articulated whether they are challenging an unlawful policy or attempting to establish a

de facto unlawful policy that contravenes the Café Manager job description.  The thrust of their

argument is that they are similarly situated to Café Managers throughout the country because

"[a]ll salaried exempt CMs are subject to the same or similar job description, corporate policies,

training, and work rules regardless of their location." (Pl. Br. p. 12).  Yet, Plaintiffs do not offer

any evidence or argument suggesting that Barnes & Noble's policies with respect to Café

Managers are unlawful.  Nor could they.  The Café Manager job description opens by stating

plainly, "[a]s a café manager, you are responsible for the daily operations of the Café . . ."  (Ex.

A); *see Murray v. Stuckey's Inc.*, 939 F.2d 614, 618 (8th Cir. 1991) ("[T]he person 'in charge' of

a store[3] has management as his primary duty . . .").  It then lists almost exclusively managerial tasks such as "[m]anage and execute the daily operations of the Café"; "[p]lan and assign work to optimize payroll budget"; "[d]eliver positive financial results"; [s]elect, interview and recommend the hiring of new café servers'"; and "[p]repare and deliver performance reviews." *See Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1151 (D. Minn. 2005) ("[T]he Court notes that this is not a case in which Plaintiffs can rely on a common job description as evidence that a collective action is the appropriate method of bringing their mis-classification claims. The job description governing Plaintiffs' positions as Store Managers sets out mainly managerial tasks.").

On the other hand, if Plaintiffs are attempting to claim that they worked under a de facto unlawful policy, then Plaintiffs have fallen well-short of meeting their burden.  They have failed to offer any meaningful evidence that, despite the content of the job description, Barnes & Noble's true policy was to require Café Managers to perform a non-exempt role.

### 1.     Plaintiffs' Declarations Do Not Provide Meaningful Evidence For the Court to Consider With Respect to the FLSA's Executive Exemption

To understand the deficiencies in Plaintiffs' evidence, it is helpful to review the regulatory framework under which they are claiming to be misclassified.  These regulations are instructive for the dual purposes of highlighting Plaintiffs' failure to meet their "minimal" burden, as well as the highly individualized inquiries into each Café Managers' experience that will be necessary to adjudicate their exempt status.

The FLSA exempts from its overtime requirements "any employee employed in a bona fide executive ... capacity." 29 U.S.C. § 213(a)(1). Under the DOL's implementing regulations, an employee fits the executive exemption if (1) the employee is compensated on a salary basis at

---

[3] In this case, a store within a larger store.

a rate of no less than $455 per week; (2) the employee's primary duty is management of the enterprise; (3) the employee customarily and regularly directs the work of two or more other employees; and (4) the employee has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.  29 C.F.R. § 541.100(a) (2004).

The DOL regulations provide that the term "primary duty" means "the principal, main, major or most important duty that the employee performs."  And, the determination of whether management is an employee's primary duty must be "based on all the facts in a particular case" taking into account "the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).  To aid in that analysis, the regulations provide a non-exhaustive list of activities that constitute "management":

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102

The DOL regulations further acknowledge that the performance of non-exempt duties does not disqualify a position from the executive exemption, particularly when the manager at issue has the discretion to decide whether to perform such duties and when:

> Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. An employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive.

29 C.F.R. § 541.106(a).

Of particular relevance to this case, the regulations also acknowledge that retail managers can spend a majority of their time assisting customers and performing other non-exempt tasks but may nevertheless be exempt, so long as they are also responsible for supervising employees, ordering merchandise, and managing the budget:

> [A]ssistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c). *See, e.g., In re Family Dollar FLSA Lit.*, 988 F. Supp. 2d 567, 570 (W.D.N.C. 2013) (finding manager exempt despite testimony that she spent "80% of her time [] performing nonexempt work" where evidence showed she had "authority and ability to direct others to perform this nonexempt work" and was "concurrently responsible for supervising her employees and handling customer complaints.").

Thus, Plaintiffs' claims of performing allegedly non-exempt duties are not meaningful without the context required by the regulations. But, Plaintiffs have not offered any evidence probative of the factors highlighted by the regulations. Rather, they make generic claims that

management was not their "primary" duty and that their "primary duties" were making drinks and waiting on customers.  These statements are unhelpful to the analysis, as they leave the relevant questions unanswered.  For example, if management was not their primary duty, who was responsible for the operation of the café and supervision of its employees?  Who conducted candidate screening and interviews?  Who prepared annual performance evaluations?  Who prepared the café work schedule?  Who managed the budget?  Who managed ordering and inventory?  Who trained newly-hired café employees?  Who initiated discipline of café employees?  Leaving aside the question of final authority, who made the decisions to hire café employees?  If an individual Café Manager did not have final authority, did the Store Manager follow their recommendations with respect to hiring or discipline?  Finally, despite claiming to have performed non-exempt duties, did Plaintiffs have the authority to delegate such duties?

Plaintiffs' performance evaluations, the documents produced by Plaintiff Brown, and the declarations of non-Plaintiff Café Managers strongly suggest that the answers to these questions lead to the conclusion that the Café Manager had authority over, or significant input into, most of these topics.  Further, as reflected in the non-Plaintiff Café Manager declarations, each Café Manager has a different experience, with a unique combination of authority, or lack of authority, with respect to these key questions.[4]

> ### 2.    Plaintiffs' Performance Evaluations Undermine the Probative Value of Their Declarations and Show that Management of the Café Was Their Primary Duty.

The Plaintiffs' performance evaluations—created years before this case was filed—tell a much different, and more detailed, story about Plaintiffs' roles as managers than they admit in

---

[4]  Barnes & Noble is mindful that the Court's role, at the conditional certification stage, is not to resolve the ultimate issue in this case.  Rather, Barnes & Noble offers this discussion of Plaintiffs' declarations, along with the discussion of other record evidence that follows this Section, in order to highlight and illustrate the significant deficiencies in the already scant evidence that Plaintiffs have put forward in attempting to meet their burden.

their declarations.  Specifically, the performance evaluations of Plaintiffs Kelly Brown, Chris

Corrado, and Margaret Mann show that they were evaluated based on their abilities as managers,

including whether they met the expectations set forth in the Café Manager job description and

the Café Manager Competency Model.

These evaluations also provide important context for Plaintiffs' claims of performing

supposedly non-exempt tasks.  Specifically, as noted above, DOL regulations allow for the

performance of non-exempt duties by an executive when the executive has the authority to

perform such duties on her own or to delegate them, in her discretion.  The Plaintiffs'

performance evaluations show that Brown, Corrado, and Mann were all empowered and

encouraged by their respective Store Managers to delegate such tasks, but they each exercised

their discretion differently.  These documents objectively contradict Plaintiffs' sworn statements,

thus reducing their evidentiary value to the Court.

### a.      *Kelly Brown's Performance Evaluation*

In Kelly Brown's performance evaluation for 2012/2013 (her first one as a Café

Manager), Ms. Brown's manager at the time identified her business acumen as an area for

improvement, writing, "In terms of knowing your business, you have some work to do . . . . As a

Café Manager, with your own team to manage, it is imperative that you know what to manage

and how to manage it."  In that same evaluation, Ms. Brown's manager also criticized Ms.

Brown for failing to properly delegate manual tasks to her subordinates:  "Delegation has been a

challenge for you.  You have struggled to keep the café cleaned, stocked and organized, mostly

because you have been doing it all yourself.  You have to train your servers to help you

accomplish your task-load or you're going to burn out . . . . You have to be relentless at holding

servers accountable to our standards"  (Ex. D).

In the following review period (2013/2014), Ms. Brown's manager praised her growth in the area of training, business acumen, and delegation: "You have a keen ability to analyze your sales and issues in your department. You know your café numbers . . . You worked diligently to ensure that the staff was trained and coached and developed and that operations were consistently performed to standard over the year. You learned to let the staff do their job and coach them to disengage from a task to help a customer instead of you jumping in to make sure the customer is taken care of correctly." (Ex. E).

Brown's 2013/2014 evaluation also highlighted her primary responsibility for hiring and developing her team: "As some hiring decisions have turned out to not be good for the store, you have shown that you are honing your skills at determining the right hires for our café. You do seem to learn from each mistake and take what you learned into the next hire . . . .You effectively use the [training] curriculum and I can see that you and your staff are invested in the process. Your staff is trained thoroughly and they are cognizant about where they are in the process." (Ex. E). In concluding the evaluation, Brown's manager encouraged her to continue exercising her managerial discretion: "It is clear to me that in your analysis of the café, you will figure out what worked and what did not work and apply that analysis to your next decision." (Ex. E).

### b.   *Christopher Corrado's Performance Evaluation*

Similar to Brown, Christopher Corrado's 2013/2014 performance evaluation focused on his need to delegate more daily tasks to his staff, not do them by himself: "[Y]ou have shown room for growth in Delegation and Directing Others. You have been inconsistent in delegating routine and important tasks clearly . . . You have also shown a tendency to want to take on too many tasks by yourself, which is impossible for a Café Manager. When you do not effectively delegate, you run the risk of time sensitive tasks taking too long . . . ." (Ex. F). Corrado's

22

evaluation also encouraged him to be a more proactive member of the store's management team:
"As Café Manager, you should be the person who brings new initiatives and standards to the
management team rather than having to be reminded by the MOD. "  (Ex. F).

The following year, Corrado was promoted to a larger volume store and experienced
different challenges.  His 2014/2015 evaluation praised Corrado for leading by example and
coaching his café servers to provide outstanding customer service.  But, the same evaluation
pointed out Corrado's struggles in transitioning to managing a higher volume café:  "A couple of
times you have spoken to feeling overwhelmed and needing to manage your time better now that
you oversee a café more than twice the volume of your previous café."  The evaluation went on
to criticize Corrado for not maintaining a consistent presence in the café, which the evaluation
pointed out was critical to understanding the needs of the café and conducting "workload
planning."  (Ex. G).

c.    *Margaret Mann's Performance Evaluation*

Mann's performance evaluations and other documents show that she initially struggled
with hiring and developing her own team but that, over time, she began to excel in this area and
was praised accordingly.  Mann's evaluations also highlight her high level of responsibility for
managing the café's operations.

In Mann's 2011/2012 performance evaluation, her manager gave Mann high praise for
her ability to train and develop her team and effectively delegate tasks.  Specifically, the
evaluation states, "[y]ou are a strong delegator and use your Lead Maria to help you build a
strong and self-functioning café and recognize the importance of working through subordinates.
You train and empower your team to effectively complete tasks . . ."  (Ex. H).  One area that the
evaluation noted for improvement, however, was in reducing employee turnover through good
hiring decisions:  "You run a high volume café and have built a strong team but we continue to

23

struggle with turnover . . . We have spoken several times . . . about hiring the right candidate and not just hiring because we are in a pinch . . ." (Ex. H).  Accordingly, following her 2012 evaluation, Mann received a learning plan with the development goals of "improv[ing] turnover and the ability to hire, train and develop long term Barista[s]." (Ex. I).

Mann's 2013/2014 performance evaluation shows that Mann had strengthened her ability to hire and train, and she was praised accordingly:  "By and large the biggest hurdle you had to overcome was to create an entirely new staff.  While we had some hiccups with some transfers early on, you were able to create a brand new team." (Ex. C)  The same evaluation highlighted the many areas of strength and independent accomplishments by Mann in running and improving a café that had been operating poorly, including (1) "Business Acumen is your strength.  You drive results to behaviors, create a plan of attack and follow through with it."; (2) "You took over a café that was operating poorly and you took several steps to fix the problems you encountered. You have recognized the need to develop our staff into order creators not order takers."; and (3)"You prepare individuals for the challenges they face and that is a strength that comes from your ability to navigate through many agenda items at once." (Ex. C).

    **3.**       **Plaintiff Brown's Document Production Also Undermines Her Declaration and Reveals Significant Evidence of Her Performing Managerial Duties.**

In addition to her own performance evaluations, Plaintiff Brown has produced several documents showing that she had significant involvement in managing her direct reports and the overall management of the café.  These documents further undermine the evidentiary value of the boilerplate denials of performing managerial duties that are set forth in Brown's declaration.

For example, Brown was the sole author of the performance evaluations for her café staff. On August 17, 2013, Brown wrote an email to her Store Manager, Nora Whitlock, in which she attached the performance evaluations, stating "[h]ere are the numerical ratings that Dave and I

went through and assigned to each person on the café staff.  The notes next to each subsection are mine alone based on what I've seen working with everyone."  (Ex. J).  The substance of each evaluation shows Brown's detailed performance feedback for each café employee, with notes for improvement and praise.  (Ex. J).

Brown also created the schedule for her café.  Brown's document production contains over twenty emails in which Brown sent a full café schedule to her Store Manager or Assistant Store Manager.  Several emails show Brown creating the schedule for the dedicated café employees and then asking the fellow manager to fill in various open slots with Booksellers who are trained to also work in the café.  (See, generally, emails attached at Ex. K).  For example, on October 24, 2014, Brown wrote, "[a]ttached is the café schedule for the week of November 9-15, 2014.  There are 3 days where I will need some type of assistance from Derek and/or another café trained person and/or a manager to help cover breaks in the café when we have newer people there . . . Generally, I've put the breaks where I would like to have them, but if we need to tweak that in order to provide coverage at those times, make the decision and roll with it."  (Ex. K, Plaintiffs00041).

In addition to undermining Brown's declaration, these documents, along with the performance evaluations, show significant differences between Brown's experience and the experiences of the other Plaintiffs, who uniformly deny any managerial responsibility.  And, as discussed in greater detail below, the Plaintiffs' declarations stand in stark contrast to the detailed declarations of the non-Plaintiff declarants who have provided detailed descriptions of their daily activities and managerial responsibilities.

> **4.      The Declarations of the Non-Plaintiff Café Managers Cast Even More Doubt on the Evidentiary Support for Plaintiffs' Motion.**

While a review of the applicable regulations and the objective, documentary evidence in the record casts significant doubt on the evidentiary value of the Plaintiffs' declarations, the declarations of the non-Plaintiff Café Managers solidify the conclusion that Plaintiffs have not offered meaningful evidence to support their Motion.

Each of the Non-Plaintiff declarations confirms that Café Mangers are responsible for the overall management and success of their respective cafés, including financial performance, employee supervision, and product management.  (See, generally, Exs. L-W).  Nevertheless, there is significant variation among Café Managers with respect to several key management functions, thus precluding any finding that Café Managers throughout the country are similarly situated to the Plaintiffs.

> **a.      *Café Managers Have Diverse Experiences and Authority in the Area of Hiring for the Café.***

The non-Plaintiff declarations show that, although they each play a significant role in hiring, the non-Plaintiff Café Managers have widely varying experiences concerning their own involvement in the hiring process for their respective cafés.  The permutations of specific authority are almost endless.  At least ten of the non-Plaintiff Café Managers either have the final say in hiring or their Store Manager relies heavily on their opinion.  And yet, even among those ten, their roles vary with respect to selecting and interviewing candidates varies.  Some of the non-Plaintiffs acting as gatekeepers to a second interview, while others do not hold that specific authority, or their Store Manager is the one who handles the initial screening.  Others, such as Lorbach, hold an effective veto over any new-hires, even when she disagrees with her Store Manager.  Finally, as Grenat states in her declaration, she currently handles all aspects of hiring, but she was not involved in hiring in her previous store, where her Store Manager handled it.

In stark contrast to this extensive detail that Barnes & Noble has submitted concerning the Café Managers' roles in the hiring process, Plaintiffs' declarations focus solely on whether they have "final" authority in hiring for their cafés. Although the evidence reflects that many Café Managers do have such "final" authority, Plaintiffs have thus misplaced their focus and left a misleading impression about the importance of final authority.

The DOL regulations do not require final authority in hiring, or any other personnel matter. Rather they state that an exempt executive is one with "the authority to hire or fire other employees <u>or</u> whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4) (emphasis added). The regulations further provide that,

> [t]o determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.

29 C.F.R. § 541.105. The regulations go on to emphasize that "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision . . ." *Id. See Gellhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1082 (E.D. Tex. 2011) (collecting cases) ("If final decision-making authority were the test for determining whether a person was an executive or administrative employee, one would rarely, if ever, qualify as such an employee under the regulations.").

Thus, Plaintiffs' declarations, which fail to provide any details concerning how hiring decisions were handled in their particular stores, are unhelpful to the Court. They are not

probative of the issues relevant to the exemption analysis, as set forth by the DOL, and are, in some cases, squarely refuted by objective evidence.

> **b.** **_Café Managers Also Have Varying Degrees of Responsibility and Involvement in Creating the Café Schedule and Addressing Staffing Issues._**

Another key management duty that Plaintiffs have failed to address—and on which Café Managers have similarly variable experiences—is their involvement in creating or influencing the employee schedule for their respective cafés. The non-Plaintiff Café Managers testify to a wide range of involvement in handling scheduling and other staffing issues. As Grenat pointed out in her declaration, "there are some Café Managers who have no input into the schedule, some who create the schedule themselves, and some, like me, who have a very active role in scheduling, though they do not create the schedule." (Grenat ¶ 18). Indeed, Grenat was not involved at all in scheduling at her pervious store but is now actively involved in such planning. Grenat's observations are also borne out in the other eleven non-Plaintiff declarations, which reflect varying levels of involvement in scheduling, including some who are only sparsely involved, and some who used to be solely responsible for scheduling but now review the schedules and suggest changes, which are usually accepted.

In addition to creating the schedules, some Café Managers are responsible for handling staffing issues that arise throughout the week such as call-outs. Others take a team approach, or play no role at all. Specifically, Pitts, Scully, Downs, Grenat, and Wakefield, all state in their declarations that, in their stores, they are primarily responsible for handling employee call-out situations by arranging for alternative coverage. Perleberg, Egan, and Nelms all state that they will work with their Store Manager, or the Manager-on-Duty ("MOD"), but do not have primary responsibility for addressing call-outs. Finally, Bealer and Lorbach do not get involved in addressing call-outs at all, but, rather, the MOD handles the issue.

c.   *Café Managers Also Have Varying Experiences and Abilities with Respect to Delegating Tasks.*

The record reflects that the extent to which a Café Manager delegates tasks to subordinate employees depends on the availability of a Café Lead and whether the Café Manager also performs the role of a Café Training Manager.  As Downs reports in her declaration, she did not have a Café Lead in her Lewisville, Texas store, so she "took on more responsibility for day-to-day tasks that I currently delegate to a Lead."  The theme of delegating day-to-day tasks, as well as some important tasks, to Café Leads is prevalent throughout the non-Plaintiffs' declarations.  And, the Café Manager job description also lists such delegation as an essential function of the Café Manager position.  Naturally, such delegation is less likely to occur when the Café does not have a Café Lead, while having more Café Leads will lead to more.  Among others, Grenat, Wakefield, and Downs all report delegating significant amounts of work to their Café Leads, while each non-Plaintiff Café Manager reports some level of delegation to a Café Lead.

In addition, Café Managers who also serve as Café Training Manager duties tend to delegate more tasks to their Café Leads.  For example, Downs reports in her declaration that, because she is a Café Training Manager, she "tend[s] to delegate more responsibilities to my Café Lead so I can complete my responsibilities as the [Café Training Manager]."  (Downs ¶ 11). Specifically, Downs tends to delegate the training of new Café Servers to her Café Lead. (Downs ¶ 11).  Wakefield delegates training of café employees to her Leads and also involves her Lead in the hiring and employee review processes.  Grenat, on the other hand, handles the first three days of training and then delegates the rest of the training to a Lead or experience Café Server.

Again, these diverse experiences, which depend on a variety of individual factors, stand in stark contrast to the non-descript experiences set forth in Plaintiffs' declarations.  Indeed, even

29

though Plaintiff Mann is herself a Café Training Manager, Plaintiffs have not attempted to explain how they are similarly situated to Café Training Managers, whose job duties involve significantly more managerial duties than even the standard Café Manager position. This is yet another shortcoming in the evidence and, therefore, another reason the Court should deny the Motion for Conditional Certification.

     **C.**    **Plaintiffs' Proposed Notice is Deficient in Several Respects.**

Plaintiffs' proposed notice to putative class members is deficient in several ways. But, rather than litigate over the wording of the notice, Barnes & Noble respectfully suggests that, if the Court grants Plaintiffs' Motion, the parties should be given a reasonable time to meet and confer over the content of any notice. *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165 (1989) ("Both the parties and the court benefit from settling disputes about the content of the notice before it is distributed."); *Fernandez v. Sharp Management Corp.*, No. 16CV-0551, 2016 WL 5940918 at *6 (S.D.N.Y. Oct. 13, 2016) (requiring parties to "confer and make a good-faith effort to agree to the text of the proposed notice").

Nevertheless, Plaintiffs' proposed notice and related procedures are flawed in several respects. First, Plaintiffs' proposed notice improperly fails to inform potential opt-ins of their right to retain their own counsel. *See Hallissey*, 2008 WL 465112, at *4 (requiring consent forms to be mailed to the Court because of concerns that a contrary ruling might discourage opt-in plaintiffs from retaining their own counsel); *Rosario v. Valentine Ave. Discount Store, Co.*, 828 F. Supp. 2d 508, 521 (E.D.N.Y. 2011) (ordering that notice direct opt-in plaintiffs to file their consent forms with the Clerk of the Court and noting recent court decisions finding that returning forms to plaintiff's counsel "implicitly discourages opt-in plaintiffs from selecting other counsel"); *Hallissey v. Am. Online, Inc.,* No. 99-CIV-3785, 2008 WL 465112, at *4 (S.D.N.Y.

Feb. 19, 2008) (requiring consent forms to be mailed to the Court because of concerns that a contrary ruling might discourage opt-in plaintiffs from retaining their own counsel).

Second, Plaintiffs' proposed notice fails to inform potential plaintiffs that they may be obligated to participate in discovery. *See, e.g., Guan v. Long Island Bus. Inst., Inc.*, No. 15-CV-2215, 2016 WL 4257549, at *6 (E.D.N.Y. Aug. 11, 2016) (court authorizing the inclusion of defense counsel's contact information, and a statement advising that potential opt-in plaintiffs may be required to participate in discovery) (citing e.g. *Bah v. Shoe Mania, Inc.*, No. 08-CV-9380, 2009 WL 1357223, at *4 (S.D.N.Y. May 13, 2009)); *Rosario, Co.*, 828 F. Supp. 2d at 520 ("[A] neutral and non-technical reference to discovery obligations, to insure that opt-in plaintiffs understand that their participation would entail greater obligations than participation in some Rule 23 class actions." (citing Lujan v. Cabana Mgmt., Inc., No. 10-CV-755 ILG, 2011 WL 317984, at *11 (E.D.N.Y. Feb. 1, 2011)).

Third, Plaintiffs' proposed notice fails to identify and provide contact information for defense counsel, which courts recognize could serve as yet another source of information for notice recipients. *See, e.g., Guan*, 2016 WL 4257549, at *6; *Slamna v. API Rest. Corp.*, No. 12 Civ. 757, 2013 WL 3340290, at *5 (S.D.N.Y. July 2, 2013); *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 451 (S.D.N.Y. 2011).

Fourth, there is no basis for requiring the posting of a notice by Barnes & Noble. Inherently, posting a notice of a collective action is potentially disruptive to Barnes & Noble's operations and, given that there is only one Café Manager in each store, not justified or outweighed by the interest in reaching intended recipients. Further, a notice posted in the workplace will reach only current Café Managers, for whom Barnes & Noble necessarily maintains accurate address information. *See Hintergerger v. Catholic Health Sys.*, No. 08-cv-

380S, 2009 WL 3464134, at * 13 (W.D.N.Y. Oct. 21, 2009) (refusing plaintiff's request to post notice in workplace because plaintiff made no showing that defendant did not maintain up-to-date contact information for current employees); *Gordon v. Kaleida Health*, Civ. No. 08-cv-378S, 2009 WL 3334784, at *11-12 (W.D.N.Y. Oct. 14, 2009) (same).

Fifth, Plaintiffs' request for information is overly broad. There has been no showing in this case that mailing notices to the potential class members would be insufficient. Further, as reflected in their proposed notice, Plaintiffs are proposing that a third-party administrator handle the mailing and receipt of the notices, so there is no need to provide this information to Plaintiffs' counsel. Moreover, disclosing all of the information requested, including telephone numbers and email addresses,[5] is an unjustified intrusion into the privacy of non-parties, including many current Barnes & Noble's employees. *See Hintergerger,* 2009 WL 3464134, at *11 ("The Court agrees that, in the interest of privacy, CHS need not produce phone numbers, social security numbers, dates of birth, and e-mail addresses."); *Gordon*, 2009 WL 3334784, at *9 ("The Court agrees that, in the interest of privacy, Kaleida need not produce phone numbers, social security numbers, dates of birth, and e-mail addresses."); *see also Arevalo v. D.J.'s Underground, Inc.*, No. DKC 09-3199, 2010 WL 4026112, at *3 (D. Md. Oct. 13, 2010) (denying plaintiffs' motion to compel defendants to produce phone numbers for the putative plaintiffs); *Campbell v. PriceWaterhouse Coopers, LLP*, No. S-06-2376, 2008 WL 2345035, at *3 (E.D. Cal. June 5, 2008) (holding telephone and social security numbers should not be released unless notification of putative plaintiffs by first class mail is insufficient).

Finally, Plaintiffs' proposed notice is overly broad in its proposed class definition in that it does not specify that it applies solely to Café Managers who worked and were classified as

---

[5] Each store maintains only one email address for the entire management team. No individual receives a personalized Barnes & Noble email address. Thus, emails to "work email addresses" as Plaintiffs propose, would improperly reach other managers who are not proposed members of the class.

exempt at some point during their employment as a Café Manager.  For example, as Plaintiffs are aware, California-based Café Managers have not been classified as exempt and, thus, would not properly be included in the proposed class.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Barnes & Noble respectfully submits that the Court should deny Plaintiffs' Motion for Condition Certification and Court-Authorized Notice.   In sum, Plaintiffs have not met their burden of showing that they are similarly situated to the class of approximately 1,100 Café Managers that they seek to represent.  They have not submitted sufficient evidence of being similarly situated to Café Managers throughout the country with respect to a de facto unlawful policy of treating Café Managers as exempt employees while requiring them to perform a non-exempt position.  Their declarations do not offer meaningful evidence for the Court because they do not address the key issues relevant to the exemption analysis.  With respect to determining how the executive exemption would apply to the Café Manager position, the Court is no better-informed after reading Plaintiffs' declarations than it was prior to reading them. Further, the declarations of Mann, Brown, and Corrado are objectively refuted by their performance evaluations and other contemporaneous documents.  In contrast, Barnes & Noble has presented the Court with overwhelming evidence that Café Managers' primary duty is managing their respective cafés and, in any event, that there are substantial variations among the Café Managers concerning their authority and discretion in carrying out their duties, such that there is insufficient evidence of similarity between Plaintiffs and the proposed class.

Further, to the extent the Court authorizes notice, Barnes & Noble respectfully submits that the Court should direct the parties to confer over a proper notice, as Plaintiffs' proposed notice is deficient in several respects.

Dated:  January 25, 2017                    DRINKER BIDDLE & REATH LLP


                                            By: s/Daniel H. Aiken
                                                Richard J.L. Lomuscio
                                                1177 Avenue of the Americas, 41st Floor
                                                New York, NY 10036
                                                Telephone:  (212) 248-3140

                                                Daniel H. Aiken (admitted *pro hac vice*)
                                                One Logan Square, Ste. 2000
                                                Philadelphia, PA 19103-6996
                                                Telephone (215) 988-2942

                                                Vik C. Jaitly
                                                One Logan Square, Ste. 2000
                                                Philadelphia, PA 19103-6996
                                                Telephone (215) 988-2799

                                            *Attorneys for Defendant*