UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KELLY BROWN and TIFFANY STEWART, individually and on behalf of all others similarly situated, as Class/Collective representatives, | **ECF CASE** |
| | Case No. 16-cv-07333 (RA) (KHP) |
| Plaintiffs, | Oral Argument Requested |
| v. | |
| BARNES AND NOBLE, INC., | |
| Defendant. | |

---

**DEFENDANT BARNES & NOBLE, INC.'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CONDITIONAL
CERTIFICATION AND COURT-AUTHORIZED NOTICE**

---

DRINKER BIDDLE & REATH LLP

Daniel H. Aiken, Esq. (*pro hac vice*)
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103-6996
Telephone:  (215) 988-2942
Facsimile:  (215) 988-2757
E-mail:  daniel.aiken@dbr.com

Vik C. Jaitly, Esq.
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103-6996
Telephone:  (215) 988-2799
Facsimile:  (215) 988-2757
E-mail:  vik.jaitly@dbr.com

William R. Horwitz, Esq.
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714
Telephone:  (212) 248-3140
Facsimile:  (212) 248-3141
E-mail:  william.horwitz@dbr.com

Attorneys for Defendant
Barnes & Noble, Inc.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

PROCEDURAL HISTORY .......................................................................................... 2

STATEMENT OF FACTS ............................................................................................ 3

    A.    Barnes & Noble, Inc .................................................................................. 3

    B.    Café Managers Run Their Cafés ............................................................... 4

    C.    Classification of Café Managers as Exempt ............................................ 5

ARGUMENT ................................................................................................................ 6

    PLAINTIFFS CANNOT MEET THEIR BURDEN TO SHOW THAT
    PLAINTIFF BROWN IS SIMILARLY SITUATED TO OTHER CAFÉ
    MANAGERS AS VICTIMS OF A COMMON POLICY THAT VIOLATED
    THE FLSA ............................................................................................................ 6

    A.    The Heightened Post-Discovery Analysis ............................................... 7

    B.    Plaintiff and the Opt-Ins Were Not Victims of a Common Unlawful Policy ........ 7

        1.    Plaintiffs Have Misrepresented the Amount and Type of "Control"
            Barnes & Noble Sought to Exercise Over the Cafés Through
            Policies ............................................................................................ 7

        2.    Plaintiffs' Have Misrepresented the Record Concerning Training
            and Staffing Protocols .................................................................... 11

    C.    The Testimony of Plaintiff Brown and the Opt-Ins Amplifies the Absence
        of a Uniform Corporate Policy That Renders the Café Manager Position
        Non-Exempt ............................................................................................. 15

        1.    Plaintiffs' "Analysis" of Café Manager Schedules Does Not Weigh
            in Favor of Conditional Certification ........................................... 32

    D.    Proposed Notice ...................................................................................... 35

CONCLUSION ............................................................................................................ 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                            **Page(s)**

*Barfield v. New York City Health & Hosps. Corp.*,
537 F.3d 132 (2d Cir. 2008)................................................................................................15

*Brown*, 252 F.Supp.3d at 266 (*quoting Jenkins*, 853 F.Supp.2d at 322) ......................................18

*Brown v. Barnes & Noble, Inc.*,
252 F.Supp.3d 255 (S.D.N.Y. 2017)............................................................................ *passim*

*Donovan v. Burger King Corp.*,
675 F.2d 516 (2d Cir. 1982)................................................................................................10, 17

*In re Family Dollar FLSA Litig.*,
988 F.Supp.2d 567 (W.D.N.C. 2013) ..............................................................................11

*Guillen v. Marshalls of MA, Inc.*,
750 F.Supp.2d 469 (S.D.N.Y. 2010)................................................................................2, 3

*Hoffmann-La Roche Inc. v. Sperling*,
493 U.S. 165 (1989)................................................................................................................7

*Jacob v. Duane Reade, Inc.*,
289 F.R.D. 408 (S.D.N.Y. 2013) .......................................................................................18

*Korenblum v. Citigroup, Inc.*,
195 F.Supp.3d 475 (S.D.N.Y. 2016)................................................................................7

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010)................................................................................................7

*Reyes v. Goya Foods*,
549 F.App'x 876 (11th Cir. 2013) ....................................................................................16

*Scott v. SSP America, Inc.*,
2011 WL 1204406 (E.D.N.Y. 2011)................................................................................11, 15, 17

*Stevens v. HMSHost Corp.*,
2014 WL 4261410 (E.D.N.Y. 2014)................................................................................10

*Thomas v. Speedway SuperAmerica, LLC*,
506 F.3d 496 (6th Cir. 2007) ............................................................................................17

**S**TATUTES, **R**ULES **& R**EGULATIONS

29 C.F.R. § 541.100(a)............................................................................................................15

90779574

29 C.F.R. § 541.100(a)(2) ........................................................................................................15

29 C.F.R. § 541.100(a)(4) ........................................................................................................23

29 C.F.R. § 541.102 ......................................................................................................... *passim*

29 C.F.R. § 541.105 ..................................................................................................................23

29 C.F.R. § 541.106 ..................................................................................................................17

29 C.F.R. § 541.700 ..................................................................................................................17

29 C.F.R. § 541.700(a) .......................................................................................................15, 16

29 C.F.R. § 541.700(c) .............................................................................................................16

29 U.S.C. § 213(a)(1) ...............................................................................................................15

Fair Labor Standards Act ........................................................................................................1, 6

## PRELIMINARY STATEMENT

In their second attempt, plaintiffs cannot meet their burden of demonstrating that plaintiff Brown is similarly situated to other Café Managers with respect to a uniform policy that violates the Fair Labor Standards Act.  More than six months of extensive discovery has served only to confirm the Court's May 2017 ruling denying plaintiffs' initial motion for conditional certification. Plaintiffs still cannot identify an unlawful policy that rendered their positions non-exempt.  Rather, their renewed motion focuses on many of the same generalized anecdotes about performing customer service and other tasks, without any reference to a uniform policy that required them to perform such tasks and rendered them misclassified.  And, their attempt to identify policies that "closely control" Café Managers' tasks is based on a collection of misrepresentations concerning both the policies themselves as well as what Barnes & Noble's witnesses actually "admitted." Indeed, plaintiff Brown and many of the opt-ins who joined the lawsuit admitted that they possessed and exercised significant independent decision-making authority about the daily operations of the café, including whether and how to delegate tasks, and that Barnes & Noble's policies were used as guidelines, not mandates, to be applied using common sense and judgment, not robotically.  To the extent that those experiences differed from the alleged experiences of other opt-ins, the testimony reveals that the differences are attributable to individual circumstances including personal work ethic and working in different stores with different Store Managers, not a company-wide policy.

Because plaintiff Brown and other Café Managers are not similarly situated with regard to a common unlawful policy, the Court should not conditionally certify the action.

## PROCEDURAL HISTORY

Plaintiff Brown filed a Complaint on September 20, 2016, and, with plaintiff Stewart, an Amended Complaint on November 8, 2016.  (Dkt. 1, 17).  On November 22, 2016, before discovery began, plaintiffs moved to conditionally certify the collective action, requesting an Order permitting notices to be sent to current and former Café Managers.  (Dkt. 25).[1]  On May 2, 2017, the Court issued an Order denying the motion without prejudice and allowing the parties to pursue discovery.  (Dkt. 51).

In reaching its decision, the Court focused on the controlling question of whether Plaintiffs demonstrated that "they and potential plaintiffs together were victims of a common policy or plan that violated the law.'"  *Brown v. Barnes & Noble, Inc.*, 252 F.Supp.3d 255, 261 (S.D.N.Y. 2017) (*quoting Guillen v. Marshalls of MA, Inc.*, 750 F.Supp.2d 469, 475 (S.D.N.Y. 2010)).  The Court rejected plaintiffs' contention that Barnes & Noble's policies dictated how Café Managers performed their jobs, explaining that "many of the policies" had "no apparent nexus to Plaintiffs' claim that Defendant improperly classified Café Managers as exempt employees."  *Id.* at 264-65. In this regard, the Court drew a distinction between "a policy that describes the steps a barista should follow in making a latte and a policy that instructs Café Managers to spend their days making lattes instead of performing managerial responsibilities."  *Id.* at 265.  The Court also rejected plaintiffs' contention that, in order to reduce labor costs, Barnes & Noble followed a policy of understaffing its Cafés and relying on Café Managers to perform the work of non-exempt employees.  The Court explained that plaintiffs did not present "any evidence that such a policy exists."  *Id.*  Nor did plaintiffs explain "what the alleged 'lean staffing' practice specifically entails,

---

[1]  Barnes & Noble incorporates by reference its opposition to plaintiffs' initial Motion for Conditional Certification.  (Dkt. 36, 37).

how it is implemented, or whether it is even a company-wide practice (*i.e.*, whether it is applicable to all CMs)." *Id.* The Court observed, moreover, that café staffing is "inextricably intertwined with café hiring," which is specific to each Store Manager and, therefore, not part of a uniform policy. *Id.* Overall, the Court concluded that plaintiffs had failed to present sufficient evidence that "they and the other potential members of the collective 'together were victims of a common policy or plan that violated the law.'" *Id.* at 267. (*quoting Guillen*, 750 F.Supp.2d at 475).

Following the Court's decision, the parties conducted discovery for about six months. During discovery, plaintiffs and ten opt-ins testified at deposition. Barnes & Noble produced about 27,000 pages of documents, including emails written by plaintiffs and their Store Managers and District Managers, produced two corporate designees for deposition, and produced the names and contact information for 200 Café Managers. There were no restrictions on Plaintiffs' ability to take additional depositions. To date, there are sixteen individual opt-ins.[2]

## STATEMENT OF FACTS

Inasmuch as the Court is familiar with the essential background facts, Barnes & Noble presents only a brief recitation of facts. The portions of the record relevant to Plaintiffs' motion are discussed within the argument section, with specific record citations.

### A.   Barnes & Noble, Inc.

Barnes & Noble owns and operates 634 bookstores in fifty states.[3] (Ex. 1, Cardwell ¶12). Of those stores, 583 contain a Barnes & Noble Café, where Barnes & Noble offers customers coffee and other drinks, food, and baked goods. (Cardwell ¶3). Excluding California, Barnes &

---

[2] One of the opt-ins, Margaret Mann, has since withdrawn from the case and the Court recommended dismissal of the claims of another opt-in, Tabitha McDonald. (Dkt. 79, 95).

[3] Barnes & Noble includes California stores within this count, although CMs in California have not been classified as exempt within the statutory period and, therefore, including them in the putative collective action is inappropriate. These store and café counts are as of January 2017.

Noble has employed approximately 1,100 individuals as Café Managers in the past three years. (*Id.* at ¶4). Each café is managed by a Café Manager, who supervises hourly café employees called "Café Servers." (*Id.* at ¶5). Many, but not all, cafés also have a "Café Lead," which is an intermediate role between the Café Manager and Café Servers. (*Id.* at ¶6). Café Leads are responsible for the same tasks as Café Servers, but also assist the Café Manager with administrative, supervisory and training functions, depending on how the individual Café Manager chooses to delegate tasks. (*Id.* at ¶6). Some cafés have one Café Lead, while others have two. Some do not have a Lead at all. (*Id.* at ¶7). The number of Leads in a café depends on the sales volume of the Barnes & Noble bookstore within which the café is located, as well as the sales volume of the café. (*Id.* at ¶8). The Café Lead reports directly to the Café Manager. (*Id.* at ¶9). A Café Manager reports directly to the Store Manager ("SM"). There are no other layers of management between the Café Manager and the SM. (*Id.* at ¶10).

### B.    Café Managers Run Their Cafés

A Café Manager is primarily responsible for the management of his or her café, both operationally and financially. Each café is a separate profit center, and Café Managers are responsible for managing the café's P&L, including by driving sales and reducing product shrink and waste. (*See* Ex. 2, Diehl ¶ 11; Ex. 3, Dinh ¶¶ 20, 23; Ex. 4 Downs ¶¶ 15, 17; Ex. 5, Egan ¶¶ 13, 15; Ex. 6, Gleason ¶¶ 9, 10; Ex. 7, Green ¶¶ 11, 12; Ex. 8, Hites ¶¶ 12, 13; Ex. 9, Jensen ¶ 12; Ex. 10, Kannemeyer ¶ 10; Ex. 11, Lorbach ¶¶ 8, 9; Ex. 12, Martell ¶¶ 9, 12; Ex. 14, Neth ¶ 15; Ex. 15, Perleberg ¶¶ 9, 10; Ex. 16, Pignalberi ¶¶ 10, 12; Ex. 17, Pitts ¶¶ 11, 12; Ex. 18, Thielman ¶ 11; Ex. 20, Van Wagner ¶¶ 10, 12; Ex. 21, Wakefield ¶ 13.). Revenue for each café varies significantly, within a range of about $100,000 and $1.7 million. (Cardwell ¶12). The The average

CM salary in 2016 was $37,680, but each CM is also eligible for performance bonuses based on his or her success in meeting sales and gross margin goals. (*Id.* at ¶¶13-14).

Café Managers are responsible for hiring and training their teams, and continuously supervising and coaching their team members. (Ex. 22). Café Managers are empowered, and expected, to make all decisions necessary to ensure the successful management of their café. (*Id.*) Each individual Café Manager's specific authority and discretion varies depending on several factors including the SM's approach to supervising the Café Manager, the Café Manager's experience and ability level, the sales volume of the café, and the number of café employees. (*See* Exs. 2 to 21).

As set forth in the Job Description, a Café Manager is "responsible for the daily operations of the Café." The Café Manager is, among other things, supposed to "lead by example" and "focus café servers on maximizing sales and productivity." The Café Manager is also supposed to "select, hire and develop café servers" and "[p]repare and deliver performance reviews." (Ex. 22). In addition to the Job Description, Barnes & Noble provides Café Managers with a "Café Manager Competency Model" that identifies general descriptions of the types of behaviors that Barnes & Noble considers "important for successful job performance," as well as five competencies that are important for succeeding, specifically, in the Café Manager position: "Composure," "Delegation," "Directing Others," "Functional/Technical Skills," "Hiring and Staffing," and "Organizing." (*Id.*).

C.     **Classification of Café Managers as Exempt.**

In 2005, Barnes & Noble commissioned an outside company to review its exempt managerial positions to both evaluate the propriety of the exemptions and confirm that the managers in those positions were, indeed, performing the job in the manner that Barnes & Noble intended (Ex. 23, Smith 65:20-66:10; Ex. 24). Among other things, the survey revealed that, based

on a study of the activities of 90 Café Managers (selected by the third-party), Café Managers spent more than 50% of their time on management duties when viewing such duties in isolation, without considering multi-tasking (Ex. 24 at B&N-20642).   When multi-tasking was taken into account, the survey showed that Café Managers spent about 80% of their time on management tasks (*id.*; Smith 102:25-104:16).   The survey further confirmed that, although individual experiences varied, the majority of Café Managers participated in a significant way in making managerial decisions (Ex. 24 at B&N-20628; Ex. 23, Smith 104:17-105:4).   Following the 2005 survey, Barnes & Noble's Human Resources executives reviewed the classification of Café Managers annually by conferring with the Regional Vice Presidents responsible for all store-based employees to ensure that, in practice, Café Managers and other employees were performing the job duties set forth in their respective job descriptions (Ex. 23, Smith 39:3-40:2).   Barnes & Noble reclassified the Café Manager position to non-exempt in October 2016, in response to the Department of Labor's increase of the salary level required to meet the salary basis test for the executive exemption, scheduled to take effect on December 1, 2016 (Ex. 23, Smith 98:16-99:9).

## ARGUMENT

### PLAINTIFFS CANNOT MEET THEIR BURDEN TO SHOW THAT PLAINTIFF BROWN IS SIMILARLY SITUATED TO OTHER CAFÉ MANAGERS AS VICTIMS OF A COMMON POLICY THAT VIOLATED THE FLSA.

As set forth in detail below, plaintiffs have failed to carry their burden.  They cannot point to any Barnes & Noble policy that required the performance of a non-exempt position.   In the absence of such a policy, plaintiffs have attempted to re-cast Barnes & Noble's operating guidelines and tools as strict corporate mandates.   Their contentions in this regard are demonstrably false.   Similarly mistaken are plaintiffs' attempts to suggest that Barnes & Noble has a policy of understaffing due to its use of Sales Per Hour goals.   Finally, based on the now well-developed

record, it is apparent that each Café Manager has had a unique experience in managing the café, with several admitting outright that their primary duty was managing the café, and no evidence that a specific policy or set of policies required otherwise.

### A.  The Heightened Post-Discovery Analysis.

The decision to conditionally certify a collective action is left to the Court's discretion. *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989).  To gain conditional certification, plaintiffs must demonstrate that "they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law." *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (citations and internal quotations omitted).  Because plaintiffs filed their motion with the benefit of conditional certification discovery, the analysis is now more rigorous than when they filed their unsuccessful pre-discovery motion.  *See Korenblum v. Citigroup, Inc.*, 195 F.Supp.3d 475, 482 (S.D.N.Y. 2016) (rejecting the "modest" pre-discovery standard in favor of a "modest plus" standard after "discovery with respect to conditional certification has been completed").  As the *Korenblum* Court explained, "the additional evidence obtained in discovery should show that it is more likely that a group of similarly situated individuals may be uncovered by soliciting opt-in plaintiffs." *Id.* (citations and internal quotations omitted).  Plaintiffs cannot satisfy this burden.

### B.  Plaintiff and the Opt-Ins Were Not Victims of a Common Unlawful Policy.

Plaintiffs have failed to identify a common policy that contradicts their job descriptions, or their many admissions, which set managing the café as their primary duty or otherwise undermined their exempt classification.  In attempting to meet their burden, plaintiffs continue to rely on individualized anecdotes, demonstrable misrepresentations of the record, and unfounded accusations.  Thus, they have failed to meet their burden.

### 1.  Plaintiffs Have Misrepresented the Amount and Type of "Control" Barnes & Noble Sought to Exercise Over the Cafés Through Policies.

Plaintiffs argue that Barnes & Noble "has common, nationwide policies and procedures that direct all CMs to perform non-exempt work" (Pl. Brf. at 4). In support of that argument, plaintiffs point to company standards regarding "food preparation, cleaning, maintenance, and waste management" and personnel policies governing "promotions, discipline, and compensation" (Pl. Brf. at 12-13). Plaintiffs' arguments are misguided. First, despite plaintiffs' characterization of these company standards as "controlling," "mandating," "dictating," and "directing" how the Café should be run, the actual evidence is to the contrary. Second, the relevant question is not whether Barnes & Noble has policies controlling how tasks are performed but, rather, whether its policies specifically require Café Managers to perform café-specific tasks such that they invalidate the exemption.

Contrary to the claims in plaintiffs' brief, the Café Responsibilities document does not "dictate the duties" for each café employee nationwide. Frank Morabito (Vice President of Retail Operations and Regional Vice President) testified explicitly that this document provided "guidelines" and "recommendations" but that it was up to the Café Manger to "change [the guidelines] based on the complexity of the café." (Ex. 25, Morabito 126:21-127:24). Similarly, plaintiffs have misrepresented the evidence concerning handling and putting away merchandise by stating that Barnes & Noble's policy required Café Managers to perform specifically detailed tasks related to storage and product handling (Pl. Brf at 12-13). But Morabito testified that the "Food Prep Overview" document described "a process that happens differently in each store" depending on among other things "specific store needs" (Ex. 25, Morabito 115:12-116:22). And, in testimony that directly contradicts the statement at the top of page 13 of plaintiffs' brief, Morabito testified that "a café manager wouldn't be required to inventory the freezer or receive the food order" (*id.* at 116:23-117:11).

Plaintiffs have also inaccurately characterized the evidence concerning task lists and Café ISOs as "rules" and mandates.  Morabito explained that, although Barnes & Noble distributes a Weekly Task list, those lists merely set minimum standards for cleanliness.  Café Managers are free to create their own sheet, increase the frequency by which they require such tasks to be performed, and to add various weekly tasks that are needed in their café (*id.* at 127:25-129:15). Similarly, Barnes & Noble's café-related ISOs (there are ISOs related to all aspects of store operations) are "princip[les] to support operational excellence . . . But how they're executed would depend on the store." (*id.* at 157:5-12).  Specifically with respect to café and workroom layout, Morabito again refuted the notion that the ISOs represented "mandates," testifying, "[w]hat these are used for is—and not a mandate—but when things go south, this is how the store manager, the district manager, the FCOM follows up on how the café is being run." (*id.* at 158:9-19).  With respect to the ISO for workroom layouts, Morabito again explained their role as a guiding principle, not a mandate:  "It's the recommended setup for the cafés  . . .  A backroom of space can vary greatly.  So the way it's organized, sometimes they have built-in refrigerator freezers, sometimes they don't.  That would all vary, again, recommendation." (*id.* at 158:9-159:25).  The same is true for ISOs related to the café sales floor:  "The size of the café, the flow of the café. It's hard to find two alike, believe it or not" (*id.* at 160:2-9).

The testimony of plaintiff Brown directly undermines plaintiffs' other attempts to cast Barnes & Noble's guidelines and recommendations as strict "mandates" and controlling "directives."   For example, in the area of creating the café product order, Brown testified that, although the company suggested an order for each week based on past sales and current inventory, Brown applied her own knowledge, judgment and common sense in creating the order (Ex. 26, Brown 92:19-93:1).   Similarly, in creating her Café's schedule, Brown followed her own views

(based on experience) for staffing the café, including for scheduling trainees, and agreed that there was no policy that she followed in doing so (*id.* at 64:5-65:1, 86:10-87:10, 104:2-105:13, 259:22-26:19, 265:13-20, 333:8-14).  Nor are there policies controlling how to "upsell" customers or otherwise to engage in an outstanding customer interaction, or for what tasks to delegate to a café lead (*id.* at 202:21-203:16, 221:11-25, 241:13-242:2).

In any event, plaintiffs' focus on Barnes & Noble's operational guidelines misses the point, again.  As this Court instructed with its initial opinion in this case, there is a critical distinction between a corporate policy that describes how to make a latte and "a policy that instructs CMs to spend their days making lattes instead of performing managerial responsibilities."  *Brown*, 252 F.Supp.3d at 265; *see also Stevens v. HMSHost Corp.*, 2014 WL 4261410, *5 (E.D.N.Y. 2014) (decertifying collective action where "the policies in question prescribe how to perform discrete tasks such as ringing a cash register, lifting heavy items, and serving food," but "do not dictate the particular job duties of each [manager]").  Plaintiffs have again failed to present evidence of the latter type of policy.  Moreover, several courts, including the Second Circuit have acknowledged the good business practice of setting uniform standards and have rejected the notion that a manager who follows and enforces those standards is somehow not exempt, especially when, as is the case here, there is still room for the exercise of discretion.  *Donovan v. Burger King Corp.*, 675 F.2d 516, 521-22 (2d Cir. 1982) ("We fully recognize that the economic genius of the Burger King enterprise lies in providing uniform products and service economically in many different locations and that adherence by Assistant Managers to a remarkably detailed routine is critical to commercial success . . . but judgments must still be made. In the competitive, low margin circumstances of this business, the wrong number of employees, too many or too few supplies on hand, delays in service,

the preparation of food which must be thrown away, or an underdirected or undersupervised work force all can make the difference between commercial success and failure").

Plaintiffs still "fail to … explain how [Barnes & Noble's policies] relate to Plaintiffs' claim that CMs primarily perform non-exempt duties in contravention of the CM job description." *Brown*, 252 F.Supp.3d at 264. Conversely, plaintiff Brown and the opt-ins testified unequivocally that no policies required them to perform non-managerial work. For example, opt-in Corrado testified that he had the authority to delegate all of the non-managerial tasks he handled. He decided whether to perform a task himself or delegate it to someone else (Ex. 27, Corrado 238:3-239:19). Likewise, opt-in Hegelund testified that no policy prohibited her from delegating any task (Ex. 28, Hegelund 204:24-205:3). Warner, Orantes and DeVito were all unable to point to a single non-managerial task that company policy required them to perform personally or prohibited them from delegating (Ex. 29, Warner 316:24-317:9; Ex. 30, Orantes 208:7-16; Ex. 31, DeVito 323:21-324:9).[4]

## 2. Plaintiffs' Have Misrepresented the Record Concerning Training and Staffing Protocols.

Plaintiffs' arguments concerning the manner in which Café Managers are trained and the purpose for such training is misleading, as is their attempt to cast Barnes & Noble's use of Sales Per Hour ("SPH") goals as a nefarious plot to understaff Cafés.

Plaintiffs speculate that Barnes & Noble "trains CMs to do all this non-exempt work so it can control their labor budget and have the CM doing sales and service while on duty" (Pl. Brf. at 11). This is false speculation, directly contradicted by the record, including the lead plaintiff's

---

[4] Of course, the mere fact that exempt employees perform non-managerial work does not jeopardize their exempt classification. *See, e.g.*, *Scott v. SSP America, Inc.*, 2011 WL 1204406, *6 (E.D.N.Y. 2011) (granting summary judgment for employer where plaintiff spent 90% of her time performing non-exempt work, but her exempt work was more important to success of the business); accord *In re Family Dollar FLSA Litig.*, 988 F.Supp.2d 567, 570 (W.D.N.C. 2013).

testimony.  Frank Morabito testified that Barnes & Noble trains Café Managers to perform non-managerial tasks, such as making drinks and cleaning, so Café Managers can  (1) train Café Servers; (2) lead by example; and (3) "pitch in" when necessary (Ex. 25, Morabito 243:2-18). Similarly, plaintiff Brown testified that, when training her to be a Café Manager, her trainer explained that leading by example is a "big part of the job" (Ex. 26, Brown 57:6-8).  The trainer told Brown that learning about customer service was important so Brown would be able to demonstrate proper techniques to café employees and ensure they performed that function correctly (*id.* at 57:14-21).  In her experience as a Café Manager, Brown did, in fact, lead by example and "observed and supervised café servers on how they interacted" with customers (*id.* at 57:22-58:20). Performing customer service personally also allowed Brown to learn the business (*id.* at 108:11-14).  Similarly, opt-in Lauren Hurley agreed that, in addition to supervising employees to ensure outstanding customer service, she would also demonstrate such customer service:  "I would be that example" (Ex. 32, Hurley 55:12-22).  When she took over her café, Hurley decided to take on some of the less desirable or "gross" tasks herself to show her staff "that, hey, it's got to get done.  And then I feel like that helped with getting them on board to do and take care of those tasks that needed to get done that weren't before" (*id.* at 107:8-108:7).

Plaintiffs have also attempted to persuade the Court that Barnes & Noble has a policy of understaffing due to SPH goals based on a single email that says no such thing.  In doing so, plaintiffs ignore the record evidence showing that there is no such policy.  Staffing levels in a café generally correlated to the café's SPH, with some flexibility to ensure the "optimal customer experience" (Ex. 25, Morabito 195:10-197:15).[5]  Plaintiffs cannot point to an actual Barnes &

---

[5] Opt-in Hurley characterized the practice of linking café staff size to sales as "understandable" (Ex. 32, 126:12-24).

Noble policy of keeping staffing lower than sales warranted or, more important, of trying to save money on staffing by requiring Café Managers to perform non-managerial work. The email they have presented to the Court falls well-short of showing such a policy and, to the contrary, demonstrates that cutting staffing is an extraordinary step. (Pl. Brf. at 11).

First, there is no indication that the author of the e-mail, a SM, considered "bare bones" to mean—as plaintiffs baselessly interpret it—that Café Managers would perform the non-managerial work of non-exempt employees. Second, the e-mail exchange focused on bookstore sales and staffing, not on cafés within the bookstores. It is unclear how any particular café or Café Manager was going to be affected, if at all. Third, even if a SM reduced a café's scheduled staffing, several Café Managers testified that, when needed, they could obtain extra coverage from cross-trained booksellers. (*See*, *e.g.*, Ex. 27, Corrado 86:10-23, 87:20-25; Ex. 32, Hurley 57:19-25). Finally, it appears from the e-mail exchange that low store SPH was unusual and isolated. Indeed, the SM indicated that "sales have been terrible this week." Thus, the District Manager was addressing an unusual, short-term problem limited to one district (and possibly related to a miscalculation regarding future sales), not a long-term, nationwide circumstance. In sum, plaintiffs have shown, at most, that an undefined period of "bare bones" staffing occurred for only two weeks in one bookstore, though not necessarily in the bookstore's Café.

On the other hand, another email in the record, involving a store in Connecticut, shows a store that responded to the same potential problem—*i.e.*, not meeting her store's SPH—by focusing its efforts solely on increasing "top line" revenue in all departments including the Café, but not cutting payroll. Specifically, opt-in DeVito's SM, Ann Marie Kirby, was asked by her District Manager to present a plan for meeting her store's SPH target. In response, Kirby presented her strategy in a detailed chart outlining the actions each department would take to meet SPH goals

without changing payroll.  For the café, the SM identified five methods for increasing sales in the Café and assigned opt-in DeVito as the primary manager responsible for overseeing that part of the plan.  Nowhere in this plan did Kirby suggest lowering staffing levels.  (Ex. 33).  Kirby's approach reflects the real-world implementation of the testimony of Barnes & Noble's corporate designee, Frank Morabito, who explained that there is a flexible approach to meeting SPH that includes looking at sales trends and increasing the available SPH by increasing overall sales (Ex. 25, Morabito 196:21 to 197:15).[6]

In short, plaintiffs still lack evidence that Barnes & Noble's "operational policies directed CMs nationwide to perform principally non-exempt work."  *Brown*, 252 F.Supp.3d at 265.  As in their initial motion, plaintiffs still have not "explained what the alleged 'lean staffing' practice specifically entails, how it is implemented, or whether it is even a company-wide practice (*i.e.*, whether it is applicable to all CMs)."  *Id.*

---

[6]  Plaintiffs falsely cite Morabito's testimony to state that Store Managers are disciplined if they miss their SPH.  Morabito explained that discipline would likely occur only if it appeared the manager had "no process" and was "recklessly spending" (Ex. 25, Morabito 202:8-11).  And, he could offer only one example of discipline for mismanaging payroll, which was given to a District Manager working under Morabito who had several stores miss their SPH target and was not sufficiently involved throughout the year with payroll budgeting (Ex. 25, Morabito 203:20 to 204:7).

C.  **The Testimony of Plaintiff Brown and the Opt-Ins Amplifies the Absence of a Uniform Corporate Policy That Renders the Café Manager Position Non-Exempt.**

Determining whether an employee is exempt from the FLSA's overtime requirements is inherently a "highly fact intensive inquiry that must be made on a case-by-case basis in light of the totality of the circumstances." *Scott v. SSP America, Inc.*, 2011 WL 1204406, *6 (E.D.N.Y. 2011) (citations and internal quotations omitted); *see also* 29 C.F.R. § 541.700(a) (the determination of whether management is an employee's primary duty must be "based on all the facts in a particular case" taking into account "the character of the employee's job as a whole"); *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008) (citations omitted).  The record evidence confirms as much, revealing vast disparities in the experiences of plaintiff Brown and the opt-ins, with no prevailing uniformity that would support conditional certification.

During the time period at issue, Barnes & Noble classified Café Managers as exempt from overtime pursuant to the executive exemption.  *See* 29 U.S.C. §213(a)(1).  This exemption applies to employees as long as:  (1) they are "[c]ompensated on a salary basis at a rate of not less than $455 per week"; (2) their "primary duty is management of the enterprise … or of a customarily recognized department or subdivision" of the enterprise; (3) they "customarily and regularly [direct] the work of two or more other employees"; and (4) they either have "the authority to hire or fire other employees" or their "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. §541.100(a).  The regulations list examples of activities that a Court may consider in determining whether an employee's "primary duty is management."  29 C.F.R. §§541.100(a)(2), 541.102.

"Primary duty" means the "principal, main, major or most important duty that the employee performs." 29 C.F.R. §541.700(a). In this regard, plaintiffs essentially argue that Café Managers performed the same work as Café Servers (*see*, *e.g.*, Pl. Brf. at 1). However, that argument is contradicted by the testimony of opt-ins Corrado and Roman that it would have been more disruptive to a café's business to lose a Café Manager than a Café Server (Ex. 27, Corrado 241:12-17; Roman 202:3-11). Indeed, several opt-ins either admitted that their primary duty was managing the café or conceded that, as set forth in the Job Description, Barnes & Noble expected them to spend a majority of their time managing the café (*see*, *e.g.*, Ex. 28, Hegelund 199:21-200:11, 268:18-269:12; Ex. 27, Corrado 154:12-155:5, 155:25-156:6; Ex. 41, Roman 123:16-124:9; Ex. 30, Orantes 184:4-9; Ex. 22). With regard to employer expectations, an employee cannot render himself or herself misclassified by refusing to perform required exempt responsibilities. *See Reyes v. Goya Foods*, 549 F.App'x 876, 878 (11th Cir. 2013) (employer expectations for an exempt position are dispositive even if an employee fails to meet them). As detailed below, opt-ins Souza and DeVito testified most extensively about *not* performing managerial work. Significantly, Souza was fired for poor performance and DeVito resigned after receiving a final warning (DeVito 330:18-331:3, 343:15-344:6; Ex. 34; Ex. 35, Souza 206:23-207:7).

Plaintiffs' main contention is that plaintiff Brown and the opt-ins allegedly spent a significant percentage of their time on "non-exempt" tasks such as customer service. However, in a retail setting, an employer may properly classify as exempt managers who spend a majority of their time assisting customers and performing other non-exempt tasks such as "running the cash register," as long as they are also responsible for managerial work such as supervising employees and ordering merchandise. 29 C.F.R. §541.700(c). In fact, courts have consistently held that citing

to a high percentage of customer-focused and other tasks has little relevance in the retail management setting when such duties are often performed simultaneously with supervisory duties. *See Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 504 (6th Cir. 2007) ("More importantly, however, the time factor is less momentous, and might even be somewhat misleading, where the employee's management and non-management functions are not clearly severable … where an employee manages while at the same time performing non-exempt tasks normally assigned to subordinate employees [] we refuse to give undue weight to the time factor of the 'primary duty' inquiry") (internal citations, quotations and alterations omitted); *Donovan*, 675 F.2d at 521 (because, *inter alia*, "much of the oversight of the operation can be carried out simultaneously with the performance of non-exempt work, we believe the principal or most important work of these employees is managerial").

In such cases—especially in the retail setting—courts focus on whether the job at issue is primarily one of managing. *See, e.g.*, *Donovan*, 675 F.2d at 521; *Scott*, 2011 WL 1204406, *6; *see also* 29 C.F.R. §§541.106, 541.700; *Brown*, 252 F.Supp.3d at 263-64. To answer this question, courts examine evidence concerning, for example, the employee's role in (1) delegating work, (2) training employees, (3) interviewing job applicants, (4) making personnel decisions, (5) disciplining employees, (6) creating work schedules, and (7) making business decisions. 29 C.F.R. §541.102. Discovery has produced a robust record concerning all of these issues. That record shows that the lead Plaintiff and several opt-ins handled these duties exactly as prescribed in their job descriptions, with abundant discretion and authority. Other opt-ins denied performing such duties or claimed more limited discretion and authority. Read together, this testimony demonstrates the lack of a uniform policy negating the Café Manager's primary duty of managing the café. Thus, conditional certification is not warranted because plaintiffs cannot demonstrate an

"'identifiable factual nexus'" that "'binds the named plaintiffs and potential class members together as victims' of a particular practice." *Brown*, 252 F.Supp.3d at 266 (*quoting Jenkins*, 853 F.Supp.2d at 322).

Plaintiffs' reliance on *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 421 (S.D.N.Y. 2013), is misplaced.  Although *Jacob*, like this case, involved putative class members who performed tasks that other putative class members "may never do," the differences in that case were only "at the margins." *Jacob*, 289 F.R.D. at 420-21.  Here, in contrast, the differences exist at the foundation of the classification inquiry.  Thus, *Jacob* is inapposite and the differences in the experiences of plaintiff Brown and the putative collective action members preclude conditional certification.

### (i)      Supervising Staff, Delegating Tasks.

According to the Department of Labor ("DOL"), "management" includes such responsibilities as "directing the work of employees," "planning the work" and "apportioning the work among employees." 29 C.F.R. §541.102.  It is clear from the plaintiff and opt-in deposition testimony that no company-wide policy prevented Café Managers from handling those responsibilities.  Indeed, Brown and other opt-ins testified that they did handle them.  For example, Brown testified that she decided how to apportion weekly tasks in the café and had the authority to assign herself zero tasks or several tasks.  It was her prerogative, as long as the tasks were completed (Brown 247:4-19, 254:19-255:3, 311:25-312:20, 324:18-22; Ex. 36).  Brown further testified that, in terms of delegating tasks to her Café Lead, she was told that she would just need to use her own judgment on what worked best for her and "the needs of [her] business."  Brown agreed that what a Café Manager delegates to a lead and how much one delegates will vary from Café Manager to Café Manager "because it is going to depend on the people involved." (*id.* at

221:11 to 222:9).  Likewise, opt-in Roman testified that he had the authority to delegate all non-managerial tasks but sometimes decided to handle them himself because he determined that doing so was in the best interests of the business.  In that regard, he would effectively delegate work to himself because he found that "more efficient" (*id.* at 75:1-6, 137:12-21, 139:23-140:2, 171:10-14, 213:5-21, 230:25-232:15).

Opt-in Corrado also testified that he had authority to delegate all of the non-managerial tasks he handled but sometimes determined that doing a task himself was in the best interests of the business.  Corrado preferred to do more work himself because he was a "perfectionist" and "like[d] to keep busy," but after receiving feedback from his SM to delegate more, Corrado tried to delegate more and, in his next Performance Review, his rating in this area improved (Ex. 27, Corrado 136:12-15, 161:5-24, 175:15-176:11, 179:5-181:17, 182:4-7, 183:5-9, 238:3-239:19, 243:15-17).

Similarly, opt-in Hegelund admitted that it was her responsibility to direct the work of café employees both when she was present and when she was not present, and that there was no Barnes & Noble policy governing what could or could not be delegated to a Café Lead or Café Server (Ex. 28, Hegelund 33:13-24, 89:25-90:3, 204:24-205:7, 206:7-207:1).  On the other hand, opt-in Hurley testified that her particular SM permitted her to delegate all tasks but preferred that she not delegate the tasks of placing the café order or inputting financial results (Ex. 32, Hurley 65:12-66:9).

In contrast, some opt-ins denied handling those managerial responsibilities—though no one attributed his or her failure to handle those responsibilities to a company-wide policy.  For example, opt-in DeVito testified that, in her roughly five years as a Café Manager, she "didn't delegate any work to anybody."  She testified, "[t]here wasn't really work to delegate ….

Everything was predetermined by corporate or by the store manager …. So it was all predetermined beforehand." However, DeVito's SM repeatedly urged her to delegate tasks and DeVito repeatedly received low ratings in the category of "delegation" for failing to do so (DeVito 79:3-9, 155:13-24, 163:8-164:21, 171:10-16, 182:13-184:6, 185:5-187:25, 188:10-19; Exs. 37, 38, 39). Opt-in Warner also insisted that she did not delegate. Warner testified that "there [weren't] things to delegate" and "[t]here was no time to delegate anything." Warner conceded that Barnes & Noble policy did not prevent her from delegating the non-managerial tasks she performed (Ex. 29, Warner 273:16-21, 296:24-297:10, 316:2-9). Similarly, opt-in Murphy claimed that she did not direct café employees on what to do, did not delegate tasks and, even when café employees were taking over a shift, would not offer any instruction for the rest of the day, except "don't burn the place down" (Ex. 40, Murphy 159:3-15, 219:12-17).

(ii) <b><u>Training Employees.</u></b>

The DOL regulations identify "training of employees" as part of "management" responsibilities. 29 C.F.R. §541.102. No company-wide policy prevented Café Managers from handling that responsibility and, in fact, plaintiff Brown and opt-ins testified at length about their responsibility for training employees. Brown testified that it was her responsibility to ensure that café workers were "properly trained" (Ex. 26, Brown 289:19-290:3, 328:10-16). She trained Café Servers, MODs and cross-trained booksellers (*id.* at 241:4-12). She would either train employees herself or delegate part of the training to her Café Lead (*id.* at 200:6-18). Further, despite disagreements with one particular SM about the proper way to train Café Servers, Brown decided to train and coach her café employees according to her own preferences and judgment for what was best for the café, effectively ignoring her SMs preferences (Ex. 26, Brown 219:20-221:10, 240:11-241:18, 331:3-332:12, 332:25-333:7).

Opt-in Hurley testified about developing one of her Café Servers into a Café Lead, explaining: "I was taking her through [the Barnes & Noble] curriculum to make sure that she understood how the lead position works. It's a very hands-on process, because not only am I having to tell her how to do it, I'm having to show her how to do it. And then later on, I would check her off for proficiency of understanding" (Ex. 32, Hurley 28:10-29:4). Hurley spent a significant amount of time training new employees, including on drink making (*id.* at 29:8-16, 61:19-62:5, 62:22-63:3, 62:5-63:22, 82:8-19, 83:3-16).

Opt-in Roman trained new employees, booksellers, servers who transferred to his café, and one Assistant Store Manager (Ex. 41, Roman 113:12-23, 114:14-20). Roman would spend two to four weeks training a new Café Server (*id.* at 116:18-25). He also developed for advancement a Café Server, Marcia, by giving her managerial responsibility, hoping she would leave and become a manager at another location (*id.* at 245:5-246:17).

Opt-in Corrado "provide[d] formal training" to Café Servers, Café Leads, "members of the MOD team" and some booksellers (Ex. 27, Corrado 40:18-41:5, 183:10-185:8). As a Café Manager, Corrado developed the skills of Café Servers and "played a big role in developing the café lead to someday become a café manager" (*id.* at 70:25-71:2, 113:15-25). On an "ongoing" basis, Corrado trained the café staff to watch out for theft (*id.* at 120:16-121:10). Corrado also monitored the progress of that training "to make sure that [employees] were getting the training that they were supposed to receive" (*id.* at 146:15-24). Corrado decided whether and to what extent to he would delegate to training to his staff (*id.* at 147:1-148:15). As an estimate, he spent a few hours each week on formal and informal training of his Café Lead and an hour each week training each new Café Server (*id.* at 64:6-19, 141:20-142:21, 144:2-12, 145:10-146:19).

Opt-in Orantes understood that Barnes & Noble expected her to "play an active role in training" other employees (Ex. 30, Orantes 86:15-20).   Accordingly, she both trained employees and oversaw their training, including with respect to using the register, assisting with inventory, making beverages, and baking products to company standards (*id.* at 88:19-21, 89:20-90:3, 93:23-94:7, 110:8-111:23, 217:13-218:4).

In contrast, some opt-ins denied training employees.   Again, their own failures or the circumstances of the store are to blame, not a policy.   Opt-in DeVito contended that she played virtually no role in training.   She testified that she never even "had the ability to really focus [her] attention on an employee and show him or her how to make a drink" (Ex. 31, DeVito 199:2-12). DeVito was "supposed to" cross-train bookstore managers to work in the café—"it was a corporate directive"—but "it just didn't happen" (*id.* at 200:18-201:5).   DeVito's SM criticized her for "inconsistent training" and lack of follow up (*id.* at 252:15-253:14).   The SM asked DeVito to schedule time to train Café Servers, but DeVito did not train them.   DeVito's SM directed her to train employees weekly but, according to DeVito, doing so was not "feasible" (id. at 16:12-25, 23:2-8, 27:11-14, 198:21-25, 255:2-256:9, 281:18-282:8).

Although opt-in Warner acknowledged that she was responsible for training new hires, her store had "very little turnover" and "a lot of people that came to the store were transfers" who already had skills (Ex. 29, Warner 53:7-19, 114:8-115:1, 122:3-10, 121:22-25).   Warner's SM also directed her "to handle [café] training for all full-time employees" in the bookstore.   However, according to Warner, she never did it (*id.* at 225:19-21, 226:12-14).

### (iii)    Personnel Decisions.

Responsibilities such as "interviewing" and "selecting" employees and "recommending promotions" are among the "management" responsibilities set forth in DOL regulations.   29 C.F.R.

§541.102.  According to the regulations, an exempt executive is one who has "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight."  29 C.F.R. §§541.100(a)(4), 541.105.  Based on the testimony of plaintiffs and opt-ins, many had a significant role in hiring, while others did not.  Individual circumstances in each store, not a policy, explain the lesser role that some took in hiring.

Brown testified that she was a "gatekeeper in terms of … the phone screen and first interview on whether the person … got through the process" (Ex. 26, Brown 139:7-140:11, 141:25-142:16).  Brown conducted over 50 interviews for Café Server positions and found that her SM was likely to follow her recommendations (*id.* at 138:21-139:3, 146:25-147:3).  In selecting a Café Lead, both the SM and the District Manager were unenthusiastic about a particular candidate, but they deferred to Brown and the candidate was hired, with Brown admitting that her SM gave her opinion "a significant amount of weight" (*id.* at 153:9-155:5, 155:23-156:8, 195:10-20, 321:12-17).

Opt-in Corrado also conducted "phone screen" and first round interviews of job candidates (Ex. 27, Corrado 45:6-49:10).  He reviewed job applications and resumes, and he and the MOD decided who should be interviewed (*id.* at 95:24-96:5).  Corrado "of course" asked questions during interviews "that weren't on the guide" provided by the company (*id.* at 101:24-102:10).  Corrado recalls no instance in which any SM did not follow his hiring recommendation (*id.* at 46:5-48:14).  In hiring for the Café Lead position, Corrado's SM gave "extra deference" to Corrado's preference (*id.* at 114:1-9).  The managers in Corrado's store sought his input into the number of employees they should hire and gave weight to the input he provided (*id.* at 96:25-98:19, 99:4-25, 105:15-107:2, 112:14-113:6, Ex. 43).

After the first six or seven months of her employment as a Café Manager, opt-in Hurley began conducting the initial review of job applications (Ex. 32, Hurley 47:21-49:14).  Following the initial review, when Hurley recommended not inviting an applicant for an interview, her SM followed the recommendation (*id.* at 51:16-20).  Hurley "hired two or three café servers within the first quarter" that she was working as a Café Manager at one location (*id.* at 26:7-8).  Hurley explained that, because the staff at her café included a lot of college students, which created a lot of turnover, "maybe every three months, I was looking to hire" (*id.* at 26:10-24).  Every three months, Hurley hired two or three Café Servers (*id.* at 27:12-15).  After Hurley conducted an in-person interview, if she recommended an applicant for a second-round interview, the SM always followed the recommendation (*id.* at 52:4-10).  With two or three exceptions, every applicant who Hurley wanted to hire received a job offer (*id.* at 52:11-25).

Unlike plaintiff Brown and the opt-ins set forth above, other opt-ins contended that they did not play a managerial role in hiring, though they did not attribute their lack of participation a company-wide policy.  For example, opt-in DeVito never reviewed applications or decided which candidates to bring in for job interviews (Ex. 31, DeVito 100:11-21).  She made initial calls to candidates solely to confirm their availability.  During those calls, she read questions from a script, because her SM told her she was not "allowed" to ask her own questions (*id.* at 101:7-102:8, 107:21-108:5).  DeVito sometimes expressed an opinion about which candidates should or should not be hired, but she claims her opinion "didn't make a difference either way" (*id.* at 108:12-23).  DeVito claims she never conducted an actual job interview but sat in the room during interviews that other managers conducted, but she never asked questions, though no policy prohibited her from asking them (Ex. 31, DeVito 110:16-111:9, 112:17-113:10, 113:3-115:6, 115:21-116:17; Ex. 42).

Opt-in Souza never reviewed applications to decide which candidates to invite for interviews (Ex. 35, Souza 22:15-21). For candidates invited to interview, Souza conducted the "first part of the first interview." She never conducted the entire first interview (*id.* at 24:9-10, 29:15-17). Souza used a guide with suggested questions that she could select and ask. According to Souza, her Store Manager told her not ask follow up questions but just "stick to the guide" (*id.* at 25:3-11, 25:18-26:6). Souza would not make hiring recommendations, but just tell the SM whether an applicant was a "strong candidate" (*id.* at 30:22-31:4). One time, Souza expressed her opinion that someone would not be a "good fit," but the person was hired. Barnes & Noble hired "a lot" of Café Servers for Souza's café that she did not interview (*id.* at 31:17-32:20, 33:25-34:9).

No policy or widely applicable practice explains why Brown, Corrado, and Hurley had so much influence over the hiring for the café while Souza and DeVito had so little.

### (iv)   Disciplining Employees.

The DOL lists "disciplining employees" as another "management" responsibility. 29 C.F.R. §541.102. Again, no Barnes & Noble policy prevented Café Managers from performing that responsibility. Indeed, plaintiff Brown and opt-ins did perform that responsibility. For example, Brown decided when to give an employee verbal counseling, which she could do without anyone's approval (Ex. 26, Brown 280:13-281:1). She decided when to coach an employee and when to issue verbal counseling, which she recorded in a log (*id.* at 281:8-19). She issued verbal counseling "a lot" to an employee whom she and her SM ultimately agreed to terminate (*id.* at 281:21-23). Specifically, Brown, her SM and District Manager partnered and agreed to terminate that employee (*id.* at 282:6-8, 282:15- 283:8, 284:12-14, 285:2-11).

Opt-in Tharpe also had authority to issue verbal warnings to employees, which were recorded in a log. She issued verbal warnings, but not often, because she felt that less formal

coaching was more effective.  As a Café Manager, Tharpe also issued written warnings (Ex. 44, Tharpe 116:15-117:13, 118:17-120:13, 121:13-21).  Opt-in Corrado had authority to issue verbal counseling on his own, which was then logged.  He used his discretion in deciding whether to issue that discipline (Ex. 27, Corrado 57:17-25, 77:19-78:7, 78:24-81:1).  Corrado worked with the SM twice to prepare and deliver an Improvement Plan to a café employee.  Corrado believed the Improvement Plans were warranted (*id.* at 58:10-59:22, 60:12-19).

It was up to opt-in Hurley to decide whether to issue a verbal warning to an employee, as long as she informed the SM.  She would later log the warning (Ex. 32, Hurley 99:21-101:12).  One employee in Hurley's café received an Improvement Plan.  Hurley recommended the Improvement Plan and her SM then asked her to draft it.  Before issuing the Improvement Plan, Hurley provided a lot of coaching to that individual.  Hurley believed that informal coaching was her most effective tool and, as a result, she rarely resorted to verbal warnings (*id.* at 101:18-105:2, 106:11-17).

Other opt-ins alleged that they did not issue discipline, but they did not attribute their failure to any company-wide policy.  For example, opt-in DeVito testified that she "had no authority in any sort of corrective action" (Ex. 31, DeVito 272:20-273:3).  However, she was unable to point to a policy that limited her authority in this area (*id.* at 273:4-11).  DeVito does not recall ever bringing to the SM's attention an instance in which corrective action was needed (*id.* at 273:12-22, 306:25-308:13).

Opt-in Souza never issued a verbal warning or coached an employee, though she understood that she had the authority to do so on her own.  Nonetheless, she testified:  "I did not coach" (Ex. 35, Souza 54:14-55:7, 145:7-146:8, 148:4-13).  Souza claims her café was "very busy" and it was too difficult to "correct" employees and "have conversations" with them (*id.* at 55:8-

15).  Souza testified that, in four or five years as a Café Manager, "[n]ever once" did she coach a Café Server, claiming a lack of time—though she acknowledged that it would have taken her about 15 seconds to speak to an employee and, for a verbal warning, another 15 seconds to log it.  Souza's manager held her accountable for her shortcoming in this and other areas and, after issuing written discipline, terminated her for failing to coach employees and hold them accountable (*id.* at 55:13-20, 179:3-18, 206:23-207:7).

(v)      <u>**Scheduling.**</u>

According to the DOL, "setting and adjusting" employee "hours of work" is a "management" responsibility.  29 C.F.R. §541.102.  It is apparent from the deposition testimony that no company-wide policy prevented Café Managers from performing those responsibilities.  In fact, plaintiff Brown and opt-ins performed them.  For example, although Brown played no role in scheduling under one SM, under another SM she first offered opinions and then later drafted schedules, most of which were approved (Ex. 26, Brown 40:5-16, 45:6-46:2, 47:19-48:7, 78:14-18).  When creating schedules, Brown considered employee availability, the busiest days in the café, special events and the strengths of different staff members.  Brown took special events into account when scheduling, like a Northwestern football game against certain schools that she knew, by experience, increased the café's customer traffic.  Brown would also ensure she had extra staffing to cover a large incoming shipment (*id.* at 64:5-65:1, 86:10-87:10, 104:2-105:13, 259:22-260:19).  There were times when the SM made changes to the schedule and times when she did not.  Creating a schedule "took a significant amount of time" (one to three hours) and was not data entry, as she considered several factors, including availability and level of experience (*id.* at 128:7-13, 258:16-259:6).

Opt-in Hurley drafted schedules.  In doing so, she took into account each employee's availability, the timing of the food order, and events that might impact customer traffic.  Hurley would also consider training needs by scheduling a trainee to work with Hurley, the Café Lead, or a strong Café Server (Ex. 32, Hurley 59:10-62:5, 61:5-18, 62:17-21, 63:20-64:1, 64:4-14).  During Hurley's first six to eight months, her SM made "quite a few changes" to Hurley's schedules.  After that time, she did not (*id.* at 66:14-25).

Roman prepared a schedule every week, assigning employees "where [he] felt they needed to be" (Ex. 41, Roman 143:19-21, 166:3-14).  The schedule was a recommendation, but "the store manager would give weight to the schedule [Roman] made," though "may make some modifications" (*id.* at 165:1-4, 165:17-20).  In the event of unexpected developments, like a sick Café Server, Roman would adjust the schedule (*id.* at 162:19-22).  Roman also controlled work schedules outside the scheduling process.  For example, "if somebody was scheduled for lunch … and [was] in the middle of a project, I wasn't going to have them go to lunch and leave the project unfinished" (*id.* at 170:4-171:4).  Likewise, "[e]ven if the daily assignment sheet indicated that somebody should take a break at a certain time, [Roman] would sometimes decide that it didn't make sense for them to take a break then, and [he] would have them go a different time" (*id.* at 227:24-228:19, 229:2-5).

In contrast, some opt-ins denied playing any role in scheduling, though no one attributed the failure to a company-wide policy.  For example, opt-in DeVito testified that she created "rough drafts of schedules as a suggestion," but "most of the time" the draft "was changed by the Store Manager" (Ex. 31, DeVito 14:23-15:5).  Sometimes, DeVito's SM complained about DeVito's failure to draft the weekly schedule but, according to DeVito, "occasionally it didn't get done because there wasn't time to do it" (*id.* at 169:5-22, 311:6-14, 341:9-342:17, Ex. 38).

### (vi)     **Making Business Decisions.**

According to DOL regulations, "management" also includes such responsibilities as "planning the work" and "determining the techniques to be used" by the business.  29 C.F.R. §541.102.   Barnes & Noble policy did not prevent a Café Manager from performing those responsibilities.   Indeed, plaintiff Brown and opt-ins testified that they did perform them.   For example, Brown testified about trying to boost sales in her café by motivating employees to upsell, sell food items and promote more expensive items.   She also held contests.   For instance, she created bingo cards and challenged employees to sell items on the card, which encouraged upselling and sales of high profit-margin items.   She paid for the prizes out of her own pocket. The contest was her idea and it boosted morale and could result in a bonus for her at the end of the year (Ex. 26, Brown 205:13-207:16, 216:6-217:4 303:16-307:4, 307:23-308:7, 309:6-16).

Likewise, opt-in Corrado tried "to focus café servers on maximizing sales and productivity" (Ex. 27, Corrado 70:6-8).   He tried to increase sales, including by coaching and counseling Café Servers (*id.* at 74:15-20).   He was "confident" that sales increased, in part, because of his "coaching" of his staff "on selling behaviors" (*id.* at 75:21-76:11).   Corrado "always" tried to have the Café Servers receive coaching and counseling on an "ongoing" basis.   Toward that end, he provided coaching and counseling, and also encouraged the MODs and his Café Lead "to be involved and actively coaching" the Café Servers.   Under Corrado's approach, the Café Servers "were receiving coaching and counseling every day" (*id.* at 76:12-77:18).   Corrado "would coach and counsel employees where [he] saw opportunities to … increase revenues or increase profits for the café," such as when a Café Server missed an opportunity to "upsell" to a customer (*id.* at 77:8-18).   Corrado spent about an hour each week analyzing financial reports to "deliver positive financial results" for his café.   He accessed reports through the Company's intranet including Profit

& Loss Reports, Top 50 Reports, Unmodeled Best Sellers Reports.  They helped him "identify additional sales, in-stock, and trend opportunities" (*id.* at 83:7-85:24, 89:14-90:8).  In reviewing reports, if he saw an item that he thought should be selling better, he would take steps to increase its sales.  For example, he might "direct the café employees to try to promote that product to customers" (*id.* at 89:25-90:8).  Reviewing reports also allowed Corrado to discover theft.  If the Top 50 Report showed that an item was not selling well but he knew that the item was running low, he suspected theft.  He characterized this process as "detective work" (*id.* at 121:11-122:6).  Corrado tried to "identify opportunities to drive sales" by observing competitors.  In particular, in visits to competing Cafés, he would note especially good or bad customer service and keep it in mind for future coaching-in-the-moment opportunities with his staff (*id.* at 133:18-136:1).  Corrado oversaw the café's effort to cut costs by reducing waste especially with regard to food and beverages.  Corrado "tr[ied] to figure out ways to increase sales and reduce costs" (*id.* at 198:2-13).  Because of Corrado's hard work training café employees in upselling and other sales techniques, the sales in his café increased.  According to Corrado, a Café Manager can affect the sales in his or her café.  Corrado "work[ed] hard" to achieve positive financial results and succeeded in doing so (*id.* 202:21-204:21, 242:1-21, Exs. 45, 46).

Hurley attributes her café's success in achieving its sales goal to her work monitoring sales reports and coaching employees to promote the top selling items to customers (Ex. 32, Hurley 119:11-121:11).  As a Café Manager, Hurley was "responsible for coaching café servers."  She would "coach them on customer service."  When working in the café, she "would listen for whether they were engaging in appropriate or good selling conversations."  She would also demonstrate proper techniques, "leading by example" (*id.* at 55:5-22).  Hurley would coach café employees with regard to customer interactions based on what she saw on the sales reports and in the store.

Hurley coached café employees to have "good selling conversation" (*id.* at 119:11-121:4, 146:4-6). They would first practice with each other making "little upsells." Then Hurley would have them practice on regular customers. Next, Hurley would have them try to upsell to all customers (*id.* at 80:23-81:14). In Hurley's café, the employees were relatively young and inexperienced, so upselling felt particularly awkward for them. Hurley coached employees to promote to customers items that she thought should be selling better, especially in the case of food that would go bad if it was not sold. She wanted to avoid waste (*id.* at 81:21-82:7, 120:12-121:4). Hurley also exercised her discretion to offer free samples in her café. Samples were recorded in the waste log and cut into profits, but the idea was that they would generate bigger sales. Hurley made strategic decisions regarding sampling, choosing items to sample based on the customer population (Hurley 76:4-78:6, 78:20-24, 79:9-82:7).

According to Roman, "a café manager can affect the sales of his or her café" (Ex. 41, Roman 209:5-7). Roman coached "employees to try to sell more of the higher margin items" (*id.* at 210:1-3). One of his responsibilities as a Café Manager was "ensuring the maximum profitability of the café" (*id.* at 211:11-14). He was "responsible for the café" and received bonuses and was evaluated based on its performance (*id.* at 200:11-23, 210:1-3, 211:1-5).

In contrast, some opt-ins denied performing this managerial role. Again, however, no one blamed a company-wide policy for his or her failure to perform this role. Opt-in DeVito testified that she was held accountable for her café's sales, but "had no way to really impact them" (Ex. 31, DeVito 232:12-20). She had the authority to hold motivational contests in her café to incentivize her team, but never did so (*id.* at 247:5-248:7). DeVito could access financial reports for her café, but spent, at most, 20 minutes each week reviewing them (*id.* at 236:8-11, 237:10-12, 240:6-21). According to DeVito, "I didn't have time to look at reports" (*id.* at 240:16-19). DeVito also never

made a decision to offer free samples to customers.  Instead, she followed the directive of her District Manager that the café offer samples once per shift.  When she was free to choose the sample to offer, she chose whatever the company was promoting or whatever was going to waste (*id.* at 242:23-243:9, 246:10-16, 247:5-250:3).

Likewise, Souza understood that other Café Managers held contests in their Cafés to drive sales and boost profits margins, but Souza did not do so because she did not have time (Ex. 35, Souza 87:25-90:12).  Souza also knew that she had the authority to coach café employees on having better selling conversations with customers, but she did not do so (*id.* at 49:2-18).  When asked what she did to improve the customer service skills of employees, Souza replied that she "did not do anything" (*id.* at 53:19-54:6).  Nonetheless, Souza did offer free samples to customers, which was one way that she could increase sales of a particular product.  Souza and her staff decided what samples to offer.  In deciding which product to offer, Souza considered which items had the highest profit margins.  She would also consider which seasonal products she needed to sell because the café would soon be receiving new seasonal products.  When offering a cheesecake sample, Souza "would put it in [the customer's] face" so the customer "couldn't resist to take a bite" (*id.* at 127:18-128:3, 128:14-129:8, 131:12-132:5, 196:4-20).

1. **Plaintiffs' "Analysis" of Café Manager Schedules Does Not Weigh in Favor of Conditional Certification.**

Plaintiffs argue that their analysis of "Daily Coverage Reports" reveals that "CMs were scheduled to work as cashiers 81% of the time" (Pl. Brf. at 9).  This argument misses the mark in several respects and does not provide any useful material for discussion.  First, the attempt by plaintiffs' counsel, Marc Hepworth, at interpreting the selected DAS Reports is inconsistent with the testimony he elicited in questioning Barnes & Noble's witness, Morabito.  Specifically, Morabito testified that the code "CA" means that an employee was assigned to the café but, beyond

that, the meaning depended on each individual Store Manager who used the code (Ex. 25, Morabito 67:22-68:8, 69:10-18).

Barnes & Noble has submitted the Declaration of Amy Fitzgerald, Director of Store Operations (and previously a District Manager), which clarifies the DAS Reports submitted to the Court.  Fitzgerald explains that Barnes & Noble has seen highly inconsistent uses by its SMs of Dayforce and its functions, especially in late 2015 through 2016, which is the first year that Dayforce was implemented.  Inconsistency continues today, but less so.  Some SMs use Dayforce merely to create placeholders for employee shifts and not to assign individual assignments.  Other SMs use Dayforce to assign specific tasks but, in order to do so in a café, they (or their designee) must manually populate the assignments with a different code because Dayforce auto-populates for the café using only the code "CA."  It would be typical, however, for a SM (or designee) to fill in the café management code "CM" for meetings or special events he or she knows are for management only, so that it is clear that the Café Manager must report for those events.  Otherwise, it is typical for the schedule to merely reflect assignment in the Café, leaving it up to the Café Manager to make day-to-day and shift-to-shift assignments.  (Ex. 47).

This declaration concerning the actual—as opposed to theoretical—use of Dayforce is reinforced by examining even the small sample of schedules that plaintiffs appended to their motion.  In doing so, one sees that almost every person assigned to a café is assigned through the code "CA."  (*See*, *e.g.*, Exhibit to M. Hepworth's Declaration).  Significantly, not even the opt-ins who went to great and not credible lengths to deny and minimize their managerial work experiences suggested that they spent virtually all of their working time on the cash register.

Simply stated, inertia provides the more reliable explanation for the prevalence of "CA" in the DAS Reports attached to plaintiffs' motion than the implausible explanation proposed by

counsel.  As Fitzgerald explains, Mr. Hepworth's analysis of the schedules is based on the "false assumption" that all stores were using the CA code in the same way and that the CA code reflects a purposeful choice and assignment in the café.  Such decisions, as reflected in the deposition testimony, and in Ms. Fitzgerald's Declaration, are "left up to the Café Manager."  And, the "importance of assigning a café-based code in the Dayforce planner is to both ensure adequate coverage in the café and to track payroll expenses properly allocated to the café" (Ex. 47, Fitzgerald ¶ 10).

In addition to being an inaccurate reading of the schedules, plaintiffs' arguments based on Mr. Hepworth's analysis are also misplaced and rely on a false assumption that is contradicted by the evidence.  In particular, as plaintiff Brown and several opt-ins testified, and as reflected in 18 declarations of non-party Café Managers, Café Managers are constantly supervising the café regardless of the task in which they are engaged (Ex. 26, Brown 56:13-57:13, 71:19-73:13, 174:8-18, 236:11-237:24, 277:10-279:1, 277:20-278:11; Ex. 27, Corrado 132:1-13, 246:24-248:9; Ex. 32, Hurley 86:25-87:21, 122:7-123:3, 145:6-146:16; Ex. 28, Hegelund 149:2-9, 152:18-24, 153:16-21; Ex. 2, Diehl ¶¶ 5, 20; Ex. 3, Dinh ¶¶ 7, 9; Ex. 4 Downs ¶¶ 9, 26, 27; Ex. 5, Egan ¶¶ 12, 21, 22; Ex. 6, Gleason ¶¶ 5, 12, 18; Ex. 7, Green ¶¶ 5, 14, 21, 23; Ex. 8, Hites ¶¶ 8, 10, 25; Ex. 9, Jensen ¶ 18; Ex. 10, Kannemeyer ¶ 14, 16; Ex. 11, Lorbach ¶¶ 6, 17, 18; Ex. 12, Martell ¶¶ 6, 24, 25, 26; Ex. 14, Neth ¶¶ 6, 19, 20; Ex. 15, Perleberg ¶¶ 6, 7, 23, 25, 26; Ex. 16, Pignalberi ¶¶ 5, 6, 9; Ex. 17, Pitts ¶¶ 15, 19; Ex. 18, Thielman ¶¶ 11, 12; Ex. 20, Van Wagner ¶¶ 5, 14, 20, 21; Ex. 21, Wakefield ¶¶ 7, 16, 19.).  Thus, even if evidence existed that SMs assigned Café Managers to the cash register (which it does not), such evidence would still not demonstrate the existence of an unlawful policy, as it does not take into account the inherent nature of retail operations, where

management occurs simultaneously with other tasks, as recognized by the DOL, the Second Circuit, and courts nationwide.

Finally, plaintiffs' attempted analysis of times in which a Café Manager may be scheduled alone (no more than 20%, according to plaintiffs' analysis) fails to account for the Café Managers' ability to use cross-trained bookstore employees, including booksellers and managers, when needed in the café.  As several plaintiffs acknowledged, they had the ability to obtain extra coverage for the café.  And, as Brown testified, she supervised and corrected whoever worked in the café—including Store Managers and Assistant Managers.

     **D.**    **Proposed Notice**

Because plaintiffs cannot satisfy their burden of demonstrating that they and potential opt-ins are victims of a common, unlawful policy, conditionally certifying the collective action and disseminating notice would be inappropriate.  However, in the event that the Court grants plaintiffs' motion, defense counsel respectfully requests an opportunity to meet and confer regarding the contents and other details.

## CONCLUSION

For the foregoing reasons, defendant Barnes & Noble, Inc., respectfully requests an Order: (1) denying plaintiffs' Renewed Motion to Conditionally Certify the Collective Action in its entirely; and (2) dismissing the opt-ins.

    Respectfully submitted,

    DRINKER BIDDLE & REATH LLP

    By: /s/ Daniel H. Aiken
        Daniel H. Aiken, Esq. (*pro hac vice*)
        One Logan Square, Suite 2000
        Philadelphia, Pennsylvania 19103-6996
        Telephone:  (215) 988-2700
        Facsimile:  (215) 988-2757

E-mail:  daniel.aiken@dbr.com


William R. Horwitz, Esq.
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714
Telephone:  (212) 248-3140
Facsimile:  (212) 248-3141
E-mail:  william.horwitz@dbr.com

Vik C. Jaitly, Esq. (*pro hac vice*)
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103-6996
Telephone:  (215) 988-2799
Facsimile:  (215) 988-2757
E-mail:  vik.jaitly@dbr.com

Attorneys for Defendant
Barnes & Noble, Inc.