```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2

 3   ---------------------------------------X
                                           :
 4   KELLY BROWN,                          : 16-CV-07333 (RA)
                                           :
 5                         Plaintiff,      :
                  v.                       :
 6                                         : 500 Pearl Street
     BARNES AND NOBLE, INC.,               : New York, New York
 7                                         :
                         Defendants.       : January 31, 2018
 8   ---------------------------------------X

 9
             TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
10          BEFORE THE HONORABLE KATHARINE H. PARKER
                 UNITED STATES MAGISTRATE JUDGE
11

12
     APPEARANCES:
13
     For the Plaintiff:      MICHAEL J. PALITZ, ESQ.
14                           Shavitz Law Group, PA
                             830 3rd Avenue, Fifth Floor
15                           New York, New York 10022

16                           MARC S. HEPWORTH, ESQ.
                             Hepworth, Gershbaum & Roth, PLLC
17                           192 Lexington Avenue
                             New York, New York 10016
18
     For the Defendant:      DANIEL H. AIKEN, ESQ.
19                           WILLIAM R. HORWITZ, ESQ.
                             Drinker Biddle & Reath, LLP
20                           1177 Avenue of the Americas, 41st Floor
                             New York, New York 10036
21

22
     Court Transcriber:      MARY GRECO
23                           TypeWrite Word Processing Service
                             211 N. Milton Road
24                           Saratoga Springs, New York 12866

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

1          THE CLERK:  Calling case 16-CV-7333, <u>Brown v. Barnes</u>

2  <u>and Noble</u>.

3          THE COURT:  Will counsel please make their

4  appearances for the record.

5          MR. PALITZ:  Good morning, Your Honor.  Michael

6  Palitz from Shavitz Law Group for the plaintiffs.

7          MR. HEPWORTH:  Good morning, Your Honor.  Marc

8  Hepworth; Hepworth, Gershbaum & Roth also on behalf of the

9  plaintiffs.

10          THE COURT:  How are you?

11          MR. HEPWORTH:  Very good, thank you.

12          MR. AIKEN:  Good morning, Your Honor.  Daniel Aiken

13  of Drinker Biddle & Reath for the defendant Barnes and Noble.

14  I have with me [indiscernible] from Barnes and Noble.

15          THE COURT:  Hi.

16          MR. HORWITZ:  Good morning, Your Honor.  William

17  Horwitz from Drinker Biddle & Reath also on behalf of Barnes

18  and Noble, Inc.

19          THE COURT:  All right.  Hello.  So we are here for

20  oral argument on the pending motion by plaintiffs for

21  conditional certification of the FLSA putative collective.

22  Since it's plaintiff's motion, why don't you start and then

23  I'll hear from Barnes and Noble.

24          MR. PALITZ:  Thank you, Your Honor.  May it please

25  the Court.  Your Honor's very familiar with these legal

1   standards at this stage so I won't go through that history but

2   I will say that in your first decision you identified certain

3   deficiencies that plaintiffs had with the motion for

4   conditional certification.

5        What we did through discovery which was streamline

6   conditional certification discovery, we focused on those

7   issues.  First issue was whether or not Barnes and Noble had

8   policies to train the café managers on nonexempt tasks.  We

9   presented evidence of that in a brief.  30(b)(6) witness

10  admitted that Barnes and Noble had training policies that

11  trained café managers on how to make coffee, how to clean, how

12  to display products, how to display products and how to

13  sanitize products and the coffee makers and machines.  We

14  identified those documents as Exhibit 2 in my declaration.  We

15  also showed evidence that they were trained on how to complete

16  the tasks on a weekly and daily checklist.  That was Exhibit

17  32.  That checklist as many nonexempt manual labor type duties

18  similar to cleaning, sanitizing, setting up products,

19  following the corporate planograms on how to display these

20  products.  We also showed there was a café manager curriculum.

21  The prerequisite to take that café manager curriculum was to

22  take the café server curriculum which is all nonexempt tasks

23  for the café service who are the hourly employees.  So that

24  was the first main issue, Your Honor, identified with the

25  training.

4

1        The second issue was whether or not Barnes and Noble
2   directed café managers to perform nonexempt work through their
3   policies and procedures.  We identified many policies and
4   procedures that Barnes and Noble's witness authenticated and
5   said apply to café managers nationwide.  In those policies and
6   procedures, for example Exhibit 37, Barnes and Noble required
7   café managers and other employees to make coffee, to serve --
8   told them how to serve customers, told them procedures for
9   making tea, steaming milk, setting up the products, how to
10  prepare soup, how to serve a slice of cheesecake.  They gave
11  them a three step process for that.  They also have a policy
12  called the daily activity checklist, which I mentioned.  Lists
13  the tasks that café managers have to perform.  Notably in that
14  document it says if one person is working, it is their
15  responsibility to complete all the tasks on the checklist.
16  Mr. Hepworth provided a declaration to Your Honor which
17  summarized the day force schedules that were provided to us
18  from Barnes and Noble.  In those schedules, 20 percent of the
19  time café managers worked alone.  So during those 20 percent
20  of the time at least they were doing activities on the daily
21  activity checklist.
22       The third policy that we identified was that café
23  managers have to count the product in the freezer storage
24  items and place items in the freezer for proper storage.  That
25  was the café prep sheet.  That was Exhibit 37.  We identify

1  other policies and procedures in our brief, Pages 12 and 13,

2  including the café food prep which is Exhibit 36 which also

3  talks about placing items in the freezer and dating them for

4  proper storage.

5          And then we also identified the job description for

6  the purpose of showing that it contains nonexempt job duties

7  and manual labor type tasks which as Your Honor is familiar

8  with the Ferrer v. Modell's case talked about how -- granted

9  conditional certification.  And one of the points in that case

10 was that the job description contained manual labor nonexempt

11 duties.

12         The third main issue, Your Honor, identified was if

13 Barnes and Noble directed café manages to perform nonexempt

14 tasks.  The way we present -- we obtained evidence of that

15 too.  We talk about the day force scheduling, a system that

16 Barnes and Noble uses to assign shifts to workers in the

17 store.  And one of the things they do through day forces they

18 tell their store manager when a café manager is performing

19 café service, assign them that task in the day force

20 scheduling program.  So for example, if they're doing cashier

21 duty, assign them cashier duty.  If they're doing barista

22 duty, assign them a barista duty.  And they can put that in

23 the schedule which was what Mr. Hepworth summarized.  The day

24 force schedules show 81 percent of the time the café managers

25 were assigned to cashier duties.  They showed only 1.8 percent

1    of the time were they assigned to do café management tasks.

2            In addition to that evidence, we've shown -- the

3    30(b)(6), Barnes and Noble's 30(b)(6) representative testified

4    that all café managers perform nonexempt tasks.  That was at

5    Exhibit 1, Page 186 to 187.

6            And then in addition to the documents I mentioned,

7    the daily activity checklist, the café prep sheet, the café

8    food preparation exhibit, there is also café responsibilities,

9    a document at Exhibit 33.  When the café manager is doing the

10   cashier role, they're supposed to take orders and payments,

11   serve food, drinks, clean the café, stock displays and

12   replenish supplies.  So that's how we address the three main

13   issues of Your Honor's first decision.

14           In addition to that, we have other evidence.  Barnes

15   and Noble admitted café managers all perform the same duties

16   including nonexempt tasks.  We had testimony from 15 café

17   managers who worked in 28 locations in 13 states saying they

18   all perform similar duties and 75 percent or more of their

19   time was on nonexempt work.

20           In total in this case we have 20 café managers.

21   They work in 33 locations in 15 states we identified in the

22   brief.  Barnes and Noble also testified that they classified

23   every café manager as exempt outside of California.  They

24   reclassified every café manager in October of 2016.  Barnes

25   and Noble testified it didn't matter what duty they performed,

7

1  they were all classified as exempt.  And that admission was

2  Exhibit 3, the Smith deposition at 37 to 38.

3        We think that this evidence shows that Barnes and

4  Noble -- that we meet the Myers standard of a similarly

5  situated individuals have performed the similar job duties,

6  subject to the same pay provisions, and they were all

7  classified as exempt pursuant to a simple common policy.

8        THE COURT:  All right.  Thank you.  I have a couple

9  of questions for you.  How would certification of conditional

10  certification be the most efficient way to proceed in this

11  matter?

12        MR. PALITZ:  I think it would be the most efficient

13  way because the courts look at the FLSA's remedial statute.

14  And one of the main purposes of it is to protect workers.  Our

15  request is to send out notice to all these individuals.  Once

16  these people join, the way these cases typically work you have

17  representative discovery.  So you're not having discovery over

18  everyone.  It's a group of sample and then both sides take

19  discovery and then later there's a next step where Your Honor

20  decides is this case really -- is everyone really similarly

21  situated?  There's a heightened standard at that point.  So

22  this is not a case where they were sending out notice where

23  there's going to be hundreds of depositions.  It would

24  probably be a small sample.  Usually my experience it's been

25  about ten, 15, 20, depending on the number of people who join.

8

1   So I think it would be the most efficient way.  It would also

2   protect the rights of these workers who largely are unaware of

3   this case.  These are individuals who are earning $35 to

4   $37,000 a year.  They're not following the court's dockets.

5   They don't know that this is going on with the exception of

6   some.  And most of them don't.  So sending a notice allowing

7   them to join and protect their rights would be the most

8   efficient way for us to proceed.

9        THE COURT:  And supposing that I grant the motion, I

10  take it that after this representative or supplemental

11  discovery that you just described it would be a position that

12  you could prove that the classification, the exempt

13  classification, was improper as to all of the 1,100 members of

14  the putative collective and that you could do so on summary

15  judgment or at trial.  Is that correct?

16       MR. PALITZ:  Correct, with the one caveat being that

17  in these types of cases the defendant bears the burden of

18  proof that the exemption applies as opposed to the plaintiff.

19  But I can say there are incidents that we've identified in our

20  brief, there's a Stillman v. Staples case which is an

21  assistant manager retain misclassification collective action.

22  That case went to trial as a collective action.  There was a

23  decision for all individuals who joined the case.  The same is

24  true for case called Morgan v. Family Dollar.  That's a store

25  manager misclassification case, similar situation on a

9

1    collective basis.  There was a collective trial and a finding.

2         THE COURT:  And how do you reconcile cases like this

3    that have been decertified, particularly some recent cases in

4    the Eastern District of New York?

5         MR. PALITZ:  Well I think at the second stage, which

6    we're not at at this stage, if the evidence shows that there

7    really are variances in the duties and they're material to the

8    classification of the position and people are saying material

9    differences, then I could see a situation where it could be

10   decertified.  But if they're not material, like for example we

11   cite in Jacob v. Duane Reade, and that was a Rule 23 decision

12   and it was denying decertification case, and there was

13   [indiscernible] Rite Aid, same case for store managers though.

14   Jacob v. Duane Reade was assistant.  In those cases, defendant

15   did like they did here.  They said some people did some amount

16   of management work, some people did less, some people did not.

17   And in those cases the courts held okay, no one is going to be

18   identical and that's not the standard that plaintiffs have to

19   show.  If they show that their duties are largely consistent

20   across the class, we could proceed to trial.  And that's what

21   I think is going to happen here.  That's what the evidence has

22   shown so far.  While we're not at the second stage, we don't

23   know what the opt ins who join later are going to say, I think

24   this will be similar to the Stillman type cases, the Morgan

25   type cases, the Jacob v. Duane Reade and [indiscernible] type

10

1   cases.

2          THE COURT:  And how would you deal with

3   individualized defenses in that case?

4          MR. PALITZ:  Well here I don't think there are

5   individualized defenses.  Barnes and Noble testified they

6   classified everybody as exempt.  Nothing that any café manager

7   did impacted how they were classified.  They raise executive

8   exemption and administrative exemption defenses.  And they all

9   apply.  That's what they're saying.  Those executive and

10  administrative exemptions apply to everyone.  They're not

11  saying we misclassified some of these individuals and so

12  plaintiffs are right on those people.  No.  They're saying

13  everyone's exempt and we were right and that's their defense

14  for everyone.

15         THE COURT:  All right.  Now, didn't some of the

16  named plaintiffs admit that they did perform exempt duties

17  consistent with the job description?

18         MR. PALITZ:  Your Honor, yes, there are admissions

19  that -- and we're not denying that there are some managerial

20  work that's performed.  Our issue is this is not their primary

21  duty and that's what you have to analyze here.  Just because

22  someone does some management work doesn't make them exempt if

23  they're spending most of their time doing cashier duties and

24  working alone.  So that's the main issue.

25         THE COURT:  So your theory then is that there's

1  common policy or policies that demonstrate café managers'

2  primary duty is not management and that they are performing

3  inconsistently with the job description?

4          MR. PALITZ:  Correct.  Although the job description

5  does contain nonexempt duties and manual labor tasks.  So

6  those tasks we're saying are really their primary duties.

7  They're listed on the job description.  It's not like they're

8  totally abandoned from the job description.

9          THE COURT:  Okay.

10          MR. PALITZ:  And I think one other point I'd like to

11  make is defendant has treated everyone the same.  They've had

12  the same policies for everyone.  They classified everyone as

13  exempt.  They've admitted they all perform the same duties.

14  And they're asking the Court to do what they didn't do

15  themselves.  They could have looked into this on an

16  individualized basis.  And they're telling Your Honor that you

17  have to do that, you have to look at this on an individualized

18  basis.  They didn't do that themselves.  So you have to take

19  that argument and look at it and say well, defendant, you did

20  not do this.  Why should the Court be burdened with taking

21  this individualized approach when you yourself did not do

22  that?

23          THE COURT:  All right.  Thank you.

24          MR. PALITZ:  Thank you.

25          THE COURT:  I'll hear next from defendant.

12

1          MR. AIKEN:  Thank you, Your Honor.  Is here fine or

2     would you like me to --

3          THE COURT:  Whatever you're comfortable with.

4          MR. AIKEN:  Thank you.  Your Honor, Your Honor's

5     question about would certification be efficient, I mean the

6     answer is no.  There is no common proof from the plaintiff of

7     what that policy is that they claim violations the FLSA.  You

8     have the named plaintiff, her testimony, and it goes down the

9     list.  Sure she says I did a high percentage of work.  The

10    case law is clear.  That high percentage especially in the

11    retail setting doesn't really matter that much.  What matters

12    is whether the primary duty is management.  So we look to the

13    regulations.  What do the regulations say about how do you

14    determine the primary duties?  And so we look at things like

15    delegating and directing work.  I'm just focusing on the named

16    plaintiff now, Your Honor, and our brief lays out

17    [indiscernible] among the plaintiffs.  The named plaintiff

18    says I delegated, it was completely my control to delegate

19    everything.  There wasn't a single thing I couldn't delegate.

20    Then we go to okay, are you training employees?  Absolutely.

21    I trained everybody.  Plaintiff Brown trained every café

22    worker, she trained the manager, she trained the store manager

23    in how to work in the café.  That was her job.

24          Hiring, she does not have ultimate authority to

25    hire.  We've never claimed that.  She has significant input

1  into hiring.  The examples we provided, she interviewed 50

2  some -- she made 50 some hires in her tenure and can't think -

3  - couldn't identify one instance where her recommendation

4  wasn't followed.  And if it was, maybe there are a handful.

5  The most important hire she made, the café [indiscernible],

6  her district manager which one witness described as an

7  overwhelming [indiscernible], this particular district

8  manager.  The district manager and the store manager both

9  disagreed with Plaintiff Brown on the café [indiscernible].

10  She's not ready, we're not ready.  Plaintiff Brown won the day

11  on that.  Her recommendation on the hiring is what won.  So

12  that goes for the hiring.  Her input is without a doubt, and

13  there's no contrary evidence given significantly.  And we are

14  not -- Your Honor, I want to be very clear because this has

15  been put out in the papers, we are not arguing merits here.

16  We're arguing that when you try to make a case based on

17  percentage of time what you really need to do is say well what

18  were they doing in that time?  Were they doing two things at

19  once?  Because that is the nature of retail and the

20  regulations recognize that.  And so we're saying Your Honor

21  there are extremes.  Plaintiff Brown, if we are talking about

22  summary judgment, Plaintiff Brown is I think so far our best

23  case for summary judgment in our favor.  There are others

24  frankly that are weaker cases based on the their own

25  admissions.  We identify opt in Devito and opt in Susa [Ph.].

1   I mean they claim not to have done anything.  I think in our
2   favor, Your Honor, if you were to look at the merits, we held
3   them accountable for that.  And the case law supports that if
4   you hold your employees who aren't doing the job accountable
5   to the managerial standards, then you don't lose the
6   exemption.  But I think that's for another day.  But there are
7   extremes here.

8           And then you move on to discipline, termination.
9   Brown admitted yes, I was constantly coaching.  I gave out
10  lots of verbal warnings.  The one termination that Brown was
11  involved in, she and her store manager worked together and
12  they worked with this district manager and they all agreed on
13  termination.  So her view was given weight in that situation
14  as well.  I will note plaintiffs haven't really offered any
15  evidence of terminations really being a significant part of
16  the job.  I can't think of, and this isn't part of the record
17  -- I'll say there's been no evidence that terminations
18  happened with any frequency whatsoever to make it a
19  significant part of the analysis.

20          THE COURT:  I want to ask you a question about
21  efficiency and also the common policies that plaintiffs have
22  raised.  As I understand plaintiff's argument, they pointed to
23  things like the daily activities checklist for the CMs and the
24  day force schedule as applying commonly across the job and
25  that those policies essentially deprive the CMs of their

15

1   managerial discretion such that they're really not exercising

2   the kind of decision making that somebody would exercise under

3   the executive exemption.  And how do you reconcile those

4   policies which as I understand do apply across the board with

5   your argument that this is insufficient for certification at

6   this stage?

7        MR. AIKEN:  Thank you, Your Honor.  So they actually

8   haven't identified a policy that dictates that a café manager

9   perform any of those tasks.  These are company guidelines that

10  they are tools, this is what the testimony is, they are tools

11  and guidelines to help the café manager, to guide them.  Now,

12  they identified the café responsibilities document.  And we

13  put -- most of this argument is at 8 to 11 of our brief, Your

14  Honor, and the café responsibility document.  And the

15  testimony was these don't dictate the duties and café

16  managers, there are guidelines and recommendations, and café

17  managers are free to change the guidelines based on the

18  complexity of the café.  So no one -- and what's telling, Your

19  Honor -- I'll stop there.  And I want to address Mr.

20  Hepworth's declaration which I think is just fundamentally

21  flawed and I'd like to address that.  Just to stop there,

22  there's not been a single plaintiff who says I wasn't allowed

23  to direct the work and tell café workers where to go.  So you

24  have these policies and not one plaintiff has said that policy

25  took away my discretion.  And we submitted a significant

1  amount of evidence that the café managers had managerial

2  discretion in all areas of managing the café.  And we're

3  talking about directing employees, delegating tasks.  That

4  relates to the weekly task list, Your Honor, so I'll come back

5  to that.  That relates to running their own contest to boost

6  sales, how to manage their profit margin.  Not a single

7  plaintiff could identify a policy that dictated, that didn't

8  give them discretion in any of these areas.

9          So then you turn to the notion that the other policy

10  that said that the café managers had to count inventory.  And

11  this is in our brief really clearly, that Mr. Moribido

12  testified no, actually that's not management work.  They don't

13  need to do that.  That guideline showed how it needs to be

14  done.  And Your Honor, we have 600 plus stores and like many

15  retail locations, we're trying to have some national standard.

16  That doesn't create grounds for class certification.  We have

17  standards and we have guides to help these people that are

18  hired in.  In fact, you don't have any plaintiffs that say

19  they even used those guides because they are just guides.  A

20  lot of what they learned happens in training, their own

21  experience, all of that stuff.  But none of what the

22  plaintiff's experience that was testified to even relates,

23  there's no nexus between what the plaintiff's experiences were

24  and these policies.

25          And so just to keep going on that, the ISOs that

1  they identified, store managers, district managers, they all

2  see these ISOs.  These are just kind of basic operating

3  principles.  Again, the testimony was not they have to follow

4  these, these are mandated.  Mr. Moribido's testimony was these

5  are guidelines and really you have to see what happens at the

6  store.  It's all kind of a store level thing.  None of these

7  policies say there's only one way to run your café.

8          THE COURT:  So why -- what is your strongest case

9  that you want me to rely on for finding that plaintiffs didn't

10  meet the relatively low standard for condition certification

11  here?

12          MR. AIKEN:  We don't believe it is low at this

13  point, Your Honor, given the extent and the amount of

14  discovery that's happened.  But our strongest case, and I

15  think Your Honor's initial opinion really sets out the

16  standard well, but I think our strongest case as I read, this

17  was cited in plaintiff's brief and there are others, but

18  Warman v. American National Standards Institute.  In that

19  case, conditional certification was denied because the

20  plaintiff couldn't come up with common proof to demonstrate

21  that he and the others that he wanted to represent were going

22  to meet the standards to demonstrate that they're employees

23  versus trainees across the board.  And the way the court

24  looked at it was okay, this is the way we have our brief,

25  okay, let's look at what it takes to prove that you're an

18

1    employee versus a trainee, and they look at the economic

2    realty test and all that.  And then the court said well, you

3    don't have a common way of proving that.  You have vast

4    differences in the evidence that you're going to present

5    between yourself, plaintiff, and the other people that you

6    look to represent.  And that's what we have here, Your Honor.

7          THE COURT:  So how is this the standard that you're

8    urging me to apply, how does that differ from the standard

9    applied on a decertification?

10          MR. AIKEN:  It's a good question, Your Honor, and I

11   think it's a question of when you look at the evidence, what

12   is the sort of -- what's the reality of the case now?  Now I

13   think this standard requires you to look more into where are

14   the differences?  And if this case is certified, is it very

15   likely to be decertified?  And I think in this case it is very

16   likely to be decertified.  You already have, as we said, vast

17   differences in their experiences.  Plaintiff Brown, the named

18   plaintiff, can't point to her testimony and say this testimony

19   is going to prove lack of an exemption for everyone because

20   she's the best of the extreme and she agrees that she

21   delegated, she agrees that she hired and fired, supervised,

22   truly acted as a supervisor and took ownership of it.  So that

23   standard asks the Court to look okay, we had this low bar, and

24   that's really what plaintiff's banking on here.  We set the

25   low bar and we think we can just get over it.  They don't

19

1  offer the testimony of their own people.  They try to point to

2  policies and say hey, there's a policy that applied to

3  everyone, just let us have conditional certification.  They

4  don't take on the extensive record evidence that says this

5  case can never be proven with common proof.

6          THE COURT:  If you're moving for summary judgment,

7  do you believe that there would be common proof that this

8  position is properly classified as exempt?

9          MR. AIKEN:  Not with respect to the plaintiff, not

10  as it exists now.  We have, we believe, strong summary

11  judgment cases with respect to definitely Brown, definitely

12  Haglin [Ph.], definitely Hurley, definitely Caroto [Ph.] and

13  definitely Roman.  Those would be plaintiffs that come to mind

14  right now, Your Honor, as people that have just admitted that

15  they were truly the managers and that was their primary duty.

16  They admitted it outright.

17          And I will say there's no evidence of a plaintiff

18  testifying that this job description wasn't more or less

19  accurate.  No one denied that they were the primary

20  responsible, and there's no evidence in the record, they were

21  the primary person responsible for the café.

22          THE COURT:  So is my understanding correct that your

23  view is that you have to move for summary judgment as to each

24  individual manager to determine whether they are satisfying

25  the job description which you contend describes an exempt job?

1          MR. AIKEN:  Yeah.  At this point there are managers

2   I think that [indiscernible] it would be appropriate to grant

3   summary judgment.  There are managers where I think that would

4   be a much closer call and we would not rely on common proof.

5   We would rely on the evidence relating to their experience.

6   And --

7          MR. PALITZ:  [Inaudible]?

8          THE COURT:  No, that's --

9          MR. AIKEN:  And so what I was going to do, Your

10  Honor, is just refer to the Hepworth declaration.  And there's

11  just a pretty obvious flaw and we point it out in our papers.

12  So if you go through the first page of the time sheets, it's

13  really difficult to read, but if you start with the second

14  one, it just becomes really clear, and this is consistent with

15  the declaration that we submitted, that CA was used for

16  everyone who worked in the café, period.  So if you look at

17  02178, you have Tamra Murphy and Elizabeth Riley.  She was in

18  the bookstore area.  They're both scheduled at the same time

19  on October 12, 2015 and they both have the CA designation.

20         THE COURT:  Hang on a minute.  I want to go there.

21         MR. AIKEN:  Yeah.  Sure.

22         MR. PALITZ:  What day and which exhibit?

23         MR. AIKEN:  It's your declaration.

24         MR. PALITZ:  No, you said whose name?  Sorry.  In

25  the --

1          MR. AIKEN:  Tamira Murphy.

2          MR. PALITZ:  Thank you.

3          THE COURT:  So I'm going to exhibit again?

4          MR. AIKEN:  I believe it's 28 to Mr. Hepworth's --

5   Mr. Palitz's declaration and it relates to Mr. Hepworth's

6   declaration and the --

7          THE COURT:  Just getting there because I've had his

8   --

9          MR. AIKEN:  Your Honor, I'm happy to provide my copy

10  although it has highlights.

11         THE COURT:  Yes, why don't you do that?  Because

12  this is -- oh wait, here we go.  I think I have it now.  Let

13  me make sure it's the same thing.  Okay.  I'll just look at

14  this.  All right.  So go ahead.

15         MR. AIKEN:  So Your Honor, and the highlights were

16  for me, Your Honor, but if you go through each page, and I

17  started on Tamira Murphy on the first page --

18         THE COURT:  Right.

19         MR. AIKEN:  -- every person who's in the café has

20  that CA designation.  It's not as if there's evidence that

21  they were using all of these other designations.  It's the

22  only designation except for, Your Honor, café projects which

23  was sometimes used.  I mean very rarely.  And I don't believe

24  in that sample there is a CM for café manager because I don't

25  believe it was used.  But if that's not correct, then it only

22

1    happened in one or two occasions.  And so the declaration

2    offered by Mr. Hepworth has really -- is not useful to the

3    discussion to determining what the people did on their shift.

4    And that's consistent with every plaintiff's deposition.  And

5    to be clear, no plaintiff claimed to be stuck at the cash

6    register and assigned to the cash register.  It just didn't

7    happen and there's no proof of that.

8           Mr. Moribido, when shown these designations, said

9    no, you'd have to see what happened on the store level.  All

10   that tells me is that they're in the café.  Despite that,

11   despite the -- and if you go, Your Honor, and for the record

12   it's not in front of Your Honor anymore, if you go to like

13   Plaintiff Anthony Roman's daily coverage report, and this is

14   at, just for the record, to site the Bates numbers BNN6669.

15   It's 11/28/2015 which is a Saturday.  He's on a shift

16   supervising six café workers and they all are -- they are all

17   assigned CA and no other designation.  It's an absurd result

18   assumption to think, truly absurd, that they're all at the

19   cash register and no one's assigned to make drinks, no one's

20   managing, no one's doing anything except for on the cashier.

21   The declaration and the analysis doesn't reflect even what's

22   on the schedule or the reality of the evidence.

23          THE COURT:  So you're saying what I'm looking at

24   with the schedule, the CA just means assignment to the café?

25          MR. AIKEN:  Yes.

23

1          THE COURT:  Okay.

2          MR. AIKEN:  And that's consistent with the testimony

3     as well as the declaration.

4          THE COURT:  Okay.  All right.

5          MR. AIKEN:  And Your Honor, just to tie it all

6     together, all of that is not to argue the merits.  I want to

7     be clear about that.  It's to show that the plaintiff's own

8     evidence, not our competing declarations which there are a

9     significant amount which are consistent with the named point

10    it's testimony as well as Heglin's [Ph.] and Roman, that they

11    managed, no matter what task they were performing they were

12    managing.  And that is exactly what the regulations say is

13    appropriate.  And all of that shows that there is no common

14    policy tying these plaintiffs together.  It is a collage of

15    different experience with extremes, and that is the point of

16    really 18 to 35 in our brief which is to highlight those

17    differences and highlight the lack of a common policy.  On the

18    key elements, this is not in the margins, Your Honor, key

19    elements of proof which is to go down the list to determine

20    what the primary duty was.  Was the primary duty management?

21    And we go through all of those in our brief and show that

22    there are extremes in that.  And that's all I have, Your

23    Honor.

24          THE COURT:  Okay.  Thank you.  I want to ask --

25          MR. HEPWORTH:  Your Honor, if I just say one thing?

24

1          THE COURT:  Yes.

2          MR. HEPWORTH:  Mr. Palitz will handle any potential

3    rebuttal only because I'm Mr. Hepworth so I want to obviously

4    address Mr. Hepworth.

5          THE COURT:  Yes.

6          MR. HEPWORTH:  At some point you can't just disavow

7    every document you submit to the Court.  And I'm just going to

8    read where Ms. Fitzgerald affirms under oath that as a matter

9    of default day force automatically fills in the daily

10   assignment sheet using CA.  However, their own day force

11   policy undermines this claim.  It actually says, and it's

12   Exhibit 30, the first activity on the list is what day force

13   will default to.  The first activity for CMs is CM, café

14   management and not CA as Mr. Aiken and Ms. Fitzgerald have

15   falsely claimed.

16         Moreover, if you notice in the one document that Mr.

17   Aiken just showed you he said it only says CA.  I went through

18   every single one.  There is listing of POS, point of sale; CA,

19   CAB, café barista; CAE, café e-planner; CAP, café project;

20   CSI, customer service; P, projects; I, inventory; CWI, cash

21   rep; MTG, meeting.  It's all on Page 9 of the brief.  So the

22   idea that it's only CA is mere silly, number one.  But the

23   most important thing, if you just take everything off the

24   table, we're now being told that counselor, here are our

25   documents we're exchanging in deposition.  Day force document

1   says all this.  But guess what?  When we put our motion before

2   the Court, we're now going to disavow all the documents that

3   we submitted to you.  And that's in the reply and that's in

4   our papers.  Just because he said Mr. Hepworth and I'm Mr.

5   Hepworth.  So to the extent you have other questions, Mr.

6   Palitz is happy to handle any other rebuttal.

7           THE COURT:  Okay.  Are there any other points that

8   you wanted to make?

9           MR. PALITZ:  Yes.  Briefly, Your Honor, if I may.  I

10  think the entirety of defendant's argument is these

11  individuals, café managers, performed exempt work, they were

12  correctly classified.  Almost all of their brief talked about

13  the executive exemption elements and that was the argument

14  today.  So while Mr. Aiken may say I'm not talking about

15  merits, he's talking about the primary duty, hiring and

16  firing, disciplining, interviewing.  And those are not

17  relevant at this stage.  Those are not -- we don't have to

18  show that plaintiffs all did not hire.  But you know what,

19  Your Honor?  We did because we anticipated this argument.

20  They cannot hire.  The defendant admitted that.  Mr. Aiken

21  said something else here that Ms. Brown can hire but that's

22  what their corporate representative admitted.  Also admitted

23  they couldn't fire.  But I think those are merits issues.

24          The other point I wanted to make in our brief there

25  was a case called Ibea v. Rite Aid, and in that case it was

26

1  similar to the arguments here, the court held that defendant

2  places an extreme burden on plaintiff and makes it almost

3  impossible to assert misclassification claims in a collective

4  action thereby defeating the stated purpose of the FLSA and

5  wasting judicial resources by requiring courts to consider

6  each individual plaintiff's claims in a separate lawsuit.

7  This goes to Your Honor's question of how is this sufficient?

8  That's how it's sufficient.  Judge Pitman explained it quite

9  clearly.  The FLSA is a remedial statute.  You have all the

10 claims together.  You proceed as opposed to having Your Honor

11 hear multiple claims and decide individual [indiscernible]

12 which I don't think is going to happen at the end of the day.

13 I think we have stacks of common policies the and procedures,

14 we have testimony from a group all testifying about the same

15 thing, defendant admitting that all the policies and

16 procedures are the same and that people perform the same job

17 duties.  This is not a situation where we have café managers

18 and then we have mechanics involved and there's a lot of

19 differences.  This is same group of core duties that are at

20 issue here.

21        Then I just wanted to address the guidelines

22 argument which you hear often in these retain

23 misclassification cases.  Well, we have stacks of policies and

24 procedures but they are only guidelines and café managers can

25 do as they please.  Well, that's contrary to their own

1    documents.   Exhibit 27 talks about how café managers must

2    follow store operating company standards.   They must adhere to

3    the operational guidelines when resolving the customer

4    complaints surfacing the issues to the store manager.   They

5    must follow brewed coffee recipes in accordance with Starbucks

6    standards.   They must comply at all times with the standards,

7    policies, and the code of business conduct and ethics set out

8    in the bookseller handbook.   So this guidelines argument is a

9    self-serving post litigation argument that was developed to

10   detract the Court, created a red herring, and ignore the

11   reality is that you have to comply with the policies and

12   procedures.   That's what Barnes and Noble tells its café

13   managers.   I'm happy to answer any other questions Your Honor

14   has.

15          THE COURT:   You're stating that I should disregard

16   certain declarations that defendant has put in including from

17   Fitzgerald and I'm wondering if I disregard those now,

18   wouldn't those individuals be testifying as to the same thing?

19          MR. PALITZ:   Your Honor, maybe but here's the issue.

20   Those individuals may not join this case, so they may not be

21   part of this at all.   Also what I found in these cases when

22   employers gather these declarations, there's this issue of are

23   they being coerced into doing this?   And this was expressed in

24   the Amadore v. Morgan Stanley case we cited.   And when you ask

25   individuals like this well what happened?   What happened with

28

1   this declaration?  Why did you sign it?  You find out some

2   interesting things.  And I'm not saying there was misconduct

3   here, but certainly in some other cases I've found that people

4   were told they have to sign their declarations or they might

5   lose their job.  They were told that they have to work with

6   the employer's counsel and they weren't given a full picture

7   of what was going on.  So we'll see what happens.  If some of

8   these people join, we'll deal with that at a later day.  But

9   right now they're not in the case, they may not join.  And the

10  issue at the second stage is is the group of people who join

11  similarly situated so this case could proceed to trial.  And

12  you'll analyze the three factors at that point.  So these

13  people may not be in so it may not be an issue.

14           As to Fitzgerald, again, it's more of a merits

15  issue.  You know, she is trying to say oh, the policy says

16  this but that's not how it happened.  And Mr. Hepworth already

17  talked about how for café managers the tasks you're assigned

18  is café manager automatically and then you have to be switched

19  to café cashier.  That's in their own policy.  So that

20  argument, you know, if she wants to disclaim the policy, the

21  jury is going to have to decide who's telling the truth here,

22  the policy or Ms. Fitzgerald because that's just a factual

23  dispute and at this stage, Your Honor, the Court does not

24  resolve factual disputes.  As Judge Abrams said, you know,

25  even if the Court found ambiguities in the paper seeking

1   collective status, all inferences must be in favor of the

2   plaintiff at this stage.  So I think Your Honor has to look at

3   what Mr. Hepworth said, has to look at what the policies are

4   and resolve it in plaintiff's favor as to the day force issue

5   now.

6           THE COURT:  Okay.  Thank you.  Anything further from

7   defendant?

8           MR. AIKEN:  If I might be brief, Your Honor.  It

9   sounds like every -- so this is with respect to Mr. Hepworth's

10  declaration -- every schedule they submitted is completely

11  consistent with what we went through which is that CA is used

12  exclusively.  It's only in the schedule that they didn't

13  submit that uses other ones, use the other designated.  What

14  I'll point out is the plaintiff's testimony is not consistent

15  with Mr. Hepworth's declaration.  So the premise here is rely

16  on our attorney's review of these declaration.  We've already

17  shown at least with respect to 31 of them doesn't really hold

18  water.  And then rely on the declaration with respect to the

19  ones that weren't submitted.  I'm not saying that there's any

20  misrepresentation of how he read it, but what I am saying is

21  whatever you want to do with that declaration it's just not

22  consistent with the plaintiff's own experience, and that's

23  much more valuable.  And we're not asking to weigh credibility

24  between plaintiff and their own counsel.  Right?  We're just

25  saying that we presented the plaintiff's own experience and I

30

 1   think in that way this case is not the same as the cases that

 2   you see in those other -- that are cited.  You don't have

 3   plaintiff saying well, I only did this, I didn't really do all

 4   that managerial stuff.  That's all consistent.  We have

 5   plaintiffs who admit all that.  So in that way this case is

 6   not unique.  It stands out, Your Honor, as a case that has a

 7   lot of evidence that runs contrary to the central core, the

 8   central theme.  And there's no one policy they point to.  It's

 9   just hey, you have some strict guidelines that we think you

10   need to follow.  No evidence that they actually do.  But

11   together that kind of shakes out that they might not be --

12   they might have had their discretion taken away but we have

13   plenty of evidence that discretion wasn't taken away.  And so

14   it's like there's a theory that they've attacked and tried to

15   limit this case to just these very neat admissions and the

16   questioning in the depositions is clear what the plan is if

17   Your Honor reads it.  The questioning is this is a policy that

18   doesn't apply.  And we say okay, they're guidelines.  Sure

19   they apply to everyone but they're guidelines.  They say we're

20   trying to disavow our documents, but we have the experience.

21   It's a national company.  We have standards for sure.  And

22   Your Honor recognized that in the first opinion which is yeah,

23   you're going to have standards for how to do these things.

24   The question is different than that.  And we believe we

25   presented a significant amount of evidence that there's no

1   common proof to answer that central question.

2           THE COURT:  One more question --

3           MR. HEPWORTH:  Your Honor, can I say one thing?

4           THE COURT:  Yes.

5           MR. HEPWORTH:  I did not -- although in my

6   declaration -- I want this clear as day based upon the

7   representation of Mr. Aiken.  I submitted samples of the

8   schedules.  I looked at every single schedule.  I'm more than

9   happy to submit to the Court every schedule.  And if you

10  notice, I even referenced in Paragraph 3 of my declaration by

11  way of example one of them were Bates stamped 630 to 704, 804

12  to 989.  They totaled up to I think 1,000 pages, 1,000 pages I

13  wasn't going to bother the Court with.  Based upon the

14  representation of Mr. Aiken that we only submitted some of

15  them, that was not the case.  We submitted for samples.  And

16  it says in my declaration sample I looked through every single

17  one.  In fact, it notes that they were scheduled for 6,814

18  hours.  That wouldn't match the 28 that I submitted.  I don't

19  want any misrepresentation.

20          THE COURT:  I understand.  I have one more question

21  for the plaintiffs which is if I were to grant conditional

22  certification, what additional common discovery do you believe

23  you would be seeking in order to move forward to trial?

24          MR. PALITZ:  Your Honor, we would need some

25  discovery as to damages for individuals who join.  We would

1   need discovery relating to affirmative defenses that defendant

2   has raised.  And then we would likely need discovery as to New

3   York class we pled and the Illinois class which may be just

4   obtaining discovery from putative class members or people who

5   join the case and it may overlap.  But I think that would be

6   probably -- there may be some email discovery, ESI from the

7   corporate level, and potentially from the store level for the

8   email boxes at the store.  We've seen that district managers

9   communicate with stores with directing some things.  So for

10  the representative group we'd probably seek that type of

11  evidence.  So for example, if there were ten people deposed,

12  we would seek the emails for those ten stores.

13          THE COURT:  So would you be seeking more information

14  on whether or not the individuals who joined are similarly

15  situated?

16          MR. PALITZ:  Well, we have all the policies I think

17  now so we wouldn't be seeking those.  We would just seek -- if

18  there's going to be discovery as to some people, we would seek

19  some email discovery and any documents relating to those

20  individuals.

21          THE COURT:  Okay.  Thank you.  I don't have any

22  further questions and I want to thank both sides for your

23  excellent briefing and argument and I will reserve judgment.

24          MR. PALITZ:  Thank you, Your Honor.

25          MR. AIKEN:  Thank you, Your Honor.

33

1                              * * * * * *

2          I certify that the foregoing is a court transcript from

3    an electronic sound recording of the proceedings in the above-

4    entitled matter.

5

6                                      *Mary Greco*
                                      _____

7                                          Mary Greco

8    Dated:   February 4, 2018

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25