USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/25/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

KELLY BROWN and TIFFANY STEWART,
*Individually and on behalf of all others similarly
situated, as Class/Collective representative*,

                                  Plaintiffs,

              -against-

BARNES AND NOBLE, INC.,

                                  Defendant.

-------------------------------------------------------------------X

**OPINION & ORDER**

**1:16-cv-07333 (RA) (KHP)**

Plaintiffs, individually and on behalf of all others similarly situated, assert that

Defendant Barnes & Noble, Inc. ("BN") violated the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et*

*seq.* ("FLSA"), by failing to properly compensate its café managers ("Café Managers") for hours

worked in excess of forty hours per week from November 2013 through October 2016. On

November 22, 2016, Plaintiffs moved for conditional certification of their FLSA claims as a

collective action (the "First Motion," Doc. No. 25), which this Court denied without prejudice in

May 2017 (the "Order," Doc. No. 51). Plaintiffs and Defendant then engaged in discovery,

exchanging documents and conducting more than ten depositions. Plaintiffs now renew their

motion for conditional certification and Court-authorized notice pursuant to 29 U.S.C. § 216(b)

(the "Renewed Motion" or "Renewed Mot.," Doc. No. 105). For the reasons stated below,

Plaintiffs' Renewed Motion is DENIED.

## BACKGROUND

Defendant owns and operates 634 bookstores in all 50 states. (Defendant Barnes &

Noble, Inc.'s Memorandum of Law in Opposition to Plaintiffs' Renewed Motion for Conditional

Certification and Court-Authorized Notice (the "Opposition" or "Opp."), Doc. No. 114,

Declaration of Daniel H. Aiken ("Aiken Decl."), Ex. 1 ¶ 3.)  583 of these stores contain a café,

where BN offers its customers food and beverages.  (*Id.*)  Excluding California, Defendant has

employed approximately 1,100 individuals as Café Managers in the three years preceding the

filing of the complaint.  (*Id.* at ¶ 4.)  Defendant also employs hourly café employees, called

"Café Servers," at all of its locations, as well as one or two "Café Leads"[1] in many stores.  (*Id.* at

¶¶ 5-9.)  Café Servers and Café Leads report to the Café Manager.  (*Id.*)  It appears undisputed

that all Café Managers are the designated supervisors of the Café Servers and Café Leads and

have at least two individuals reporting to them.  (*Id.*)

According to Defendant, Café Managers are management employees who "are primarily

responsible for the management of the café, both operationally and financially."  (*Id.* at ¶ 11.)

The Café Manager job description summarizes the Café Manager position as follows:

> As a Café Manager, you are responsible for the daily operations of the Café, ensuring
> consistency with our bookselling culture, world-class customer service focus, digital
> initiatives, and merchandising standards.  You lead by example and foster an employee-
> centric environment and focus café servers on maximizing sales and productivity
> through the delivery of our four core service principles in the Café.  You select, hire, and
> develop café servers, ensuring a talent bench which reflects the communities we serve.

(Renewed Mot., Ex. 1, Declaration of Michael J. Palitz, Esq. in Support of Plaintiffs' Renewed

Motion ("Palitz Decl."), Ex. 27.)

---

[1] Café Leads work in an intermediate role between the Café Managers and the Café Servers.  Defendant asserts
that Café Leads are responsible for the same tasks as Café Servers, but that they also assist the Café Manager with
some administrative, supervising, or training functions depending on how the Café Manager chooses to delegate
tasks.  (*Id.* at ¶ 6.)

Prior to October 2016, Defendant classified Café Managers as exempt from the overtime provisions of the FLSA.[2] (Palitz Decl., Ex. 1 at 46:20-47:4.) Café Managers received an annual salary and were eligible for performance bonuses based on their café's performance. (Aiken Decl., Ex. 1 ¶¶ 12-13.) In October 2016, Defendant reclassified the Café Manager position as non-exempt under the FLSA and began paying Café Managers an hourly wage with overtime pay for hours worked in excess of 40 in a week. (Palitz Decl., Ex. 3 at 45:6-10.) BN states it reclassified Café Managers to hourly workers because of anticipated changes to the salary basis test for exempt executives announced during the administration of President Barack Obama. (Aiken Decl., Ex. 23 at 98:16-99:9; *see also* 79 Fed. Reg. 18737 (proposed Mar. 13, 2014).)

Plaintiffs each claim that when Café Managers were classified as exempt, they primarily performed the same work as their subordinates and were not, in fact, managing other employees or the café. They also all claim to have regularly worked more than 40 hours per week. Therefore, they contend they should have been paid on an hourly basis and received overtime pay for overtime work all along, like their subordinates, instead of being paid a salary and an annual performance bonus. They point to certain BN policies that purportedly bolster their individual claims and demonstrate not only that they performed primarily non-exempt work, but that all Café Managers nationwide performed primarily non-exempt work, rendering all Café Managers similarly situated with respect to being misclassified as managers and deprived overtime pay for hours worked in excess of 40 in a week.

---

[2] Due to the different standard for exemption from overtime under California law, Defendant has not classified Café Managers in California as exempt for more than three years. Thus, the term "Café Manager" as used herein excludes café managers who were employed in California during the three years prior to the start of this action.

There are two original plaintiffs in this action.  Named Plaintiff Kelly Brown was employed as a Café Manager in two of Defendant's Illinois stores from approximately September 2012 through February 2015.  (Palitz Decl., Ex. 5 at 30:1-6, 38:9-23; 48:25-49:16.)  Named Plaintiff Tiffany Stewart[3] (together with Kelly Brown, the "Named Plaintiffs") was employed as a Café Manager in two of Defendant's New York stores from approximately October 2010 through October 2013.  (Palitz Decl., Ex. 6 at 31:8-11.)  At the time the Named Plaintiffs first moved for conditional certification, eight additional Plaintiffs had consented to become a party in the action (the "Opt-in Plaintiffs").  Since then, 13 additional people opted-in to this action.  Currently, there are 21 Opt-in Plaintiffs who, together with the two Named Plaintiffs, worked in at least 16 states.[4]

After the Court denied Plaintiffs' initial motion for conditional certification, the parties engaged in six months of extensive discovery focused on issues pertinent to conditional certification.  (Renewed Mot. at 1; Opp. at 3; Discovery Order, Doc. No. 74.)  During discovery, the parties exchanged more than 25,000 pages of documents, conducted more than ten depositions (including of Defendant's corporate designees, Frank Morabito and Michelle Smith, and 12 Café Managers), and obtained written statements from Opt-in Plaintiffs concerning their respective experiences and views as to their primary duties.  (Renewed Mot. at 1; Opp. at 3;

---

[3] Plaintiffs acknowledge that Stewart did not work during the FLSA period, and therefore her claims are limited to New York wage and hour law claims.  (Renewed Mot. at 6 n.5.)

[4] Plaintiffs worked in Illinois, New York, Connecticut, Massachusetts, Arizona, Rhode Island, North Carolina, Virginia, South Carolina, Florida, Texas, Minnesota, Pennsylvania, New Jersey, Washington, and Hawaii.  Plaintiff Debra Faulhefer also worked in California, though the Court is excluding any analysis of Café Managers in California when reviewing the Renewed Motion.  In addition, three other Plaintiffs joined the action (Sanayah Underwood, Jessica Motsinger, and Jimmy Rivers Jr.); however, the Court has not been informed where these Café Managers were employed.

Palitz Decl. ¶ 43.)  Additionally, Defendant provided Plaintiffs with contact information for 200

Café Managers so that Plaintiffs could speak with them about their duties.  (Opp. at 3.)

Having now obtained complete discovery on all of the policies upon which they are

relying to support collective treatment, Plaintiffs have renewed their motion for conditional

certification.  (1/31/18 Trial Transcript, "1/31 Tr." at 32:13-17.)  In support of the Renewed

Motion, Plaintiffs provided the Court with more than 1,100 pages of exhibits, including: (1)

portions of deposition transcripts of the two 30(b)(6) witnesses and 12 Café Managers; (2)

samples of Daily Coverage Reports; (3) a declaration from Plaintiffs' counsel Marc Hepworth

analyzing Daily Coverage Reports for six Opt-in Plaintiffs; (4) Dayforce Workload Planning &

Scheduling documents; (5) Weekly Task Assignment Sheets; (6) Daily Activities Checklists; (7)

the Café Responsibilities document; (8) Café Operations and Café Services training materials;

and (9) sworn declarations from three Opt-in Plaintiffs.  Plaintiffs contend these various

documents reflect common policies showing that BN scheduled, directed, and trained Café

Managers nationwide to perform primarily non-exempt duties notwithstanding their job title as

managers and the managerial duties listed in their job description.  Plaintiffs do not point to any

common policies showing that Café Managers were expected to or directed to work more than

40 hours per week, but believe that other Café Managers likely did work more than 40 hours

per week.  During his deposition, Frank Morabito, Vice President of Retail Operations at BN,

testified that, up until October 2016, Café Managers were expected to work only 40 hours per

week and to get their work done within those 40 hours, but conceded there were probably

instances when Café Managers might "go over" 40 hours.  (Palitz Decl., Ex. 1 at 181:9-20.)

In its Opposition to Plaintiffs' Renewed Motion, Defendant argues that the policies identified by Plaintiffs do not show that Café Managers performed primarily non-managerial functions in contravention of their job title and job description. Defendant concedes that Café Managers performed some non-exempt functions, but states Café Managers concurrently supervised their subordinates while performing non-exempt functions and that their primary duties were, in fact, managerial. Defendant denies that Plaintiffs were misclassified and argues that, to the extent any individual Plaintiff failed to perform managerial tasks as expected and described in their job description, this was a result of their individual situations and not pursuant to any common policy. BN points to the sworn testimony of the existing Plaintiffs who admitted that they possessed and exercised significant independent decision-making authority in their role as Café Manager. (Opp. at 1.) These admissions, Defendant argues, support its classification of Plaintiffs as exempt employees. (*Id.* at 15-32.) Defendant also points to Plaintiffs' deposition testimony demonstrating that each had a different experience as to the amount of time spent doing non-exempt functions, the degree to which they were involved in the managerial functions described in the Café Manager job description, and the deference given to their recommendations on café personnel decisions. BN argues that the variations in Plaintiffs' individual experiences on a core issue – *i.e.*, whether their primary duties were managerial – supports a finding that Plaintiffs themselves are not similarly situated and that there was no policy common to all Café Managers nationwide from which the Court could conclude that all Café Managers nationwide are similarly situated as to their primary duties. (*Id.* at 17.) BN also produced sworn declarations from 18 non-party Café Managers who stated that their primary duties were managerial. Some of these non-party Café Managers also stated

in their declarations that they never worked overtime, while others stated that they

"occasionally" worked overtime, but only at their own "discretion," not pursuant to a policy or

direction by Defendant.  (Aiken Decl., Ex. 2 ¶ 23; Ex. 3 ¶ 29; Ex. 4 ¶ 31; Ex. 5 ¶ 26 Ex. 6 ¶ 23; Ex.

7 ¶ 25; Ex. 8 ¶ 30; Ex. 9 ¶ 11; Ex. 10 ¶ 9; Ex. 11 ¶ 21; Ex. 12 ¶ 30; Ex. 15 ¶ 29; Ex. 16 ¶ 22; Ex. 17

¶ 21; Ex. 18 ¶ 19; Ex. 20 ¶ 25; Ex. 21 ¶ 23.)

## LEGAL STANDARDS

### A.  The FLSA And The Executive Exemption

The FLSA states in relevant part that:

no employer shall employ any of his employees who in any workweek is engaged in
commerce or in the production of goods for commerce, or is employed in an enterprise
engaged in commerce or in the production of goods for commerce, for a workweek
longer than forty hours unless such employee receives compensation for his
employment in excess of the hours above specified at a rate not less than one and one-
half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).

The statute sets forth a number of exemptions from its overtime pay requirement

including one for individuals employed in a "bona fide executive . . . capacity."  29 U.S.C.  §

213(a)(1).  To be a bona fide executive exempt from overtime pay, an employee must be

compensated on a salary basis and meet the "duties" test, which requires (1) the employee's

primary duty to be "management of the enterprise  . . . or of a customarily recognized

department or subdivision thereof;" (2) the employee to "customarily and regularly direct[ ] the

work of two or more other employees;" and (3) the employee to "ha[ve] the authority to hire

or fire other employees" or make "suggestions and recommendations" on personnel decisions

that "are given particular weight."  29 C.F.R. § 541.100(a)(1)-(4); *Myers v. Hertz Corp.*, 624 F.3d

537, 548 (2d Cir. 2010) (citing 29 C.F.R. § 541.100(a)(1)-(4)).  The executive exemption is an

affirmative defense for which an employer ultimately bears the burden of proof.  *See Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012).  As discussed below, the major focus of the Renewed Motion concerns the first prong of the test for the executive exemption and whether there are common, nationwide policies indicating that Café Managers primarily perform non-exempt work.[5]

When analyzing an employee's primary duties, "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. . . . Time alone, however, is not the sole test, and nothing in [the FLSA] requires that exempt employees spend more than 50 percent of their time performing exempt work." 29 C.F.R. § 541.700(b).  Additionally, "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met."  29 C.F.R. § 541.106(a).

In April 2018, the Supreme Court rejected the longstanding notion that FLSA exemptions should be construed narrowly.  Instead, the Court advised that FLSA exemptions should be given a "fair" reading.  *See Encino Motorcars, LLC v. Navarro, et. al.*, 138 S. Ct. 1134, 1142 (2018).  Although the Court does not determine whether any of the Plaintiffs are exempt or

---

[5] There is no dispute that Café Managers nationwide have two or more individuals reporting to them.  Thus, the second prong is not pertinent to any future analysis of whether Plaintiffs or Café Managers in general were properly classified as exempt.  As to the third prong, some Opt-in Plaintiffs have stated that they did not have the authority to hire or fire employees or recommend hires and fires (Palitz Decl., Ex. 8 at 11:10-25; Ex. 10 at 32:4-25, 203:22-204:9), even though the Café Manager job description states that an "essential function" of a Café Manager is to "select, interview, and recommend the hiring of new café servers."  (*Id.*, Ex. 27.)  In contrast, other Plaintiffs and Opt-in Plaintiffs testified that they were involved in the hiring process.  (Aiken Decl., Ex. 26 at 138:21-142:16, 146:25-147:3; Ex. 27 at 45:6-46:7, 95:22-96:13, 101:5-102:10; Ex. 32 at 47:17-49:14, 51:5-20, 52:2-25.)  This conflicting testimony does not assist Plaintiffs in obtaining conditional certification because Plaintiffs have not demonstrated common, nationwide policies that counter the job description's grant of authority to take and recommend personnel actions relating to their direct reports (Cafe Servers and Café Leads).  Rather, it appears that certain Plaintiffs did not actually fulfill this aspect of their job duties for reasons specific to them or the store in which they worked.

non-exempt on a motion for conditional certification, it nevertheless is cognizant of the Supreme Court's recent pronouncement about FLSA exemptions when evaluating whether Plaintiffs have met their burden of demonstrating the existence of common nationwide policies suggesting that other Café Managers across the nation may be similarly situated with respect to being misclassified as exempt, notwithstanding their job title and duties contained in their common job description.

### B. Collective Action Certification

Employees who have not been paid overtime compensation as required by the FLSA may bring a civil action against their employer to recover wages due on their own behalf and on behalf of "other employees similarly situated." 29 U.S.C. § 216(b). A proceeding brought under Section 216 is traditionally referred to as a "collective action." *Jenkins v. TJX Cos. Inc.*, 853 F. Supp.2d 317, 320 (E.D.N.Y. 2012). Although the FLSA itself does not prescribe the process for collective action approval, "district courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) . . . by facilitating notice to potential plaintiffs." *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989). Orders authorizing notice to potential collective action members are often referred to as orders conditionally "certifying" a collective action, even though the FLSA itself does not mandate certification. *See, e.g., Myers*, 624 F.3d at 555 n.10; *Guillen v. Marshalls of MA, Inc.*, 750 F.Supp. 2d 469, 474-75 (S.D.N.Y. 2010).

The dissemination of notice in an FLSA collective action is a "case management tool" that courts may employ in "appropriate cases," where notice will facilitate swift and economic justice. *See Myers*, 624 F.3d at 555 (quoting *Hoffman-La Roche, Inc.*, 493 U.S. at 169). At the same time, this Court is mindful that the 1947 amendments to the FLSA, which added the

requirement that an employee file written consent to join a lawsuit, were intended by Congress to combat "excessive litigation spawned by plaintiffs lacking a personal interest in the outcome." *Hoffman-La Roche, Inc.*, 493 U.S. at 173 (citing 93 Cong. Rec. 538, 2132 (1947) (remarks of Sen. Donnell)). Thus, the Court's power to manage actions before it must be balanced against the purpose of the consent requirement and the general principle that courts should not "use their power for a purpose that neither achieves nor assists the resolution of claims before them." *Id.* at 178. The ultimate question is whether conditionally certifying a collective action and permitting Plaintiffs to send a court-authorized notice will "make for more efficient and economical adjudication of cases." *Id.* at 180; *see also Myers*, 624 F.3d at 555 (declining to exercise pendent appellate jurisdiction over the district court's ruling denying plaintiffs' motion for conditional certification).

Courts in the Second Circuit apply a two-step process when deciding whether to certify a collective action under 216(b). *Myers*, 624 F.3d at 554-55 (advising that the two-step process is "sensible," though noting that the process is not required by the terms of the FLSA or the Supreme Court's cases). First, the Court evaluates whether there are other potential plaintiffs "similarly situated" to the named plaintiff(s) with respect to the alleged FLSA violation such that court-authorized notice would be appropriate to alert others to the action so that they may opt-in and so that the Court can efficiently manage common discovery and resolve common issues in one proceeding. *Id.*; *see also Warman v. Am. Nat'l Standards Inst.*, 193 F. Supp.3d 318, 323 (S.D.N.Y. 2016). Second, following discovery, the Court reconsiders its preliminary determination as to whether the opt-ins and named plaintiffs are, in fact, similarly situated and may "de-certify" the collective if it finds that individual issues preclude resolution on the merits

as to all members of the collective as a whole. *Myers*, 624 F.3d at 555; *McEarchen v. Urban Outfitters*, No. 13-CV-3569 (RRM) (JO) (E.D.N.Y. Mar. 7, 2017) (R&R) (recommending decertification of collective where discovery revealed significant variations among the named and opt-in plaintiffs as to both the amount of exempt work they performed and the level of managerial authority they exercised), *adopted by* 2017 WL 3912345 (E.D.N.Y. Sept. 6, 2017). When representative or common proof cannot be used by the Defendant to demonstrate the affirmative defense that employees are properly classified as exempt or by Plaintiffs to develop common testimony regarding their primary duties and weight given to their personnel recommendations, collective treatment for a merits determination is not warranted. *See McEarchen*, No. 13-CV-3569 at *16-17 ("Urban is unable to mount a class-wide exemption defense not because some of the plaintiffs were non-exempt, but because the disparities among the plaintiffs make it impossible for Urban to prove each plaintiff's exemption through representative evidence") (citing *Stevens v. HMSHost Corp.*, No. 10-CV-3571 (ILG) (VVP), 2014 WL 4261410, at *7 (E.D.N.Y. Aug. 27, 2014) ("Defendants cannot be expected to come up with 'representative' proof when the plaintiffs cannot reasonably be said to be representative of each other") (citing *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 587 (E.D. La. 2008))); *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1104 (D. Kan. 2012) (decertifying class where "deposition testimony shows that it is not possible to develop common testimony from the Store Managers regarding their daily responsibilities and duties, or the weight given their recommendations regarding hiring, firing and discipline").

The FLSA does not define the term "similarly situated." Courts generally require "that there be a factual nexus between the claims of the named plaintiff and those who have chosen

[or might potentially choose] to opt-in to the action." *Warman*, 193 F.Supp.3d at 323 (internal citation omitted). At the conditional certification stage, "[t]he relevant issue is not whether the named plaintiff and potential opt-in plaintiffs are identical in all respects, but, rather, whether they all allegedly were subject to a common employment policy that violated the FLSA." *Id.* In most cases, Plaintiffs can meet this burden by making "a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Guillen*, 750 F. Supp. 2d at 475 (quoting *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).

But when there has been substantial discovery, some courts in this Circuit have imposed a "modest plus" standard for determining whether plaintiffs have sufficiently demonstrated that they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law. *See Korenblum v. Citigroup, Inc.*, 195 F.Supp.3d 475, 481-82 (S.D.N.Y. 2015) ("[N]either law nor logic supports rigidly applying the same standard of review at all points prior to discovery's close – particularly where, as here, discovery with respect to conditional certification has been completed. The 'lenient' or 'modest' standard discussed in *Myers* did not set forth an inflexible burden of proof that is incapable of being increased in proportion to the discovery conducted by the parties"); *see also Torres v. Gristede's Operating Corp.*, No. 04-cv-3316 (PAC), 2006 WL 2819730, at *9 (S.D.N.Y. Sept. 29, 2006) ("Post-discovery, as is the case with the instant motion, the Court applies heightened scrutiny to this inquiry as compared to pre-discovery"); *McDermott v. Fed. Savings Bank*, No. 14-cv-6657 (JMA) (GRB), 2018 WL 1865916, at *5 (E.D.N.Y. Apr. 18, 2018) ("Here, where discovery has been conducted on the issue of conditional certification, the Court should consider all evidence relevant to that

determination"); *Glatt v. Fox Searchlight Pictures, Inc.*, 293 F.R.D. 516, 538 (S.D.N.Y. 2013) (granting motion for conditional certification and explaining that "[c]ourts apply 'heightened scrutiny' to motions for court-authorized notice made after discovery") (citing *Torres*, 2006 WL 2819370, at *9), *vacated and remanded*, 811 F.3d 528 (2d Cir. 2015)[6] (vacating district court's order conditionally certifying proposed collective action). In applying the "modest plus" standard,

> the Court will look beyond the pleadings and affidavits submitted by Plaintiffs and will consider the evidence submitted by both parties, albeit with an understanding that the body of evidence is necessarily incomplete. . . .That is, the Court still will not decide the ultimate merits of the case or issues better suited for a decertification motion. . . . But, the additional evidence obtained in discovery should show that it is more likely that a group of similarly situated individuals may be uncovered by soliciting opt-in plaintiffs – in other words, that Plaintiffs have, through discovery, advanced the ball down the field.

*Korenblum*, 195 F.Supp.3d at 482.

This Court agrees with the rationale of *Korenblum* for applying a higher standard for conditional certification based on discovery conducted.[7] In light of the substantial discovery already conducted in this case (Renewed Mot. at 1; Opp. at 3; Palitz Decl. ¶ 43; 1/31 Tr. at 3:5-7) and Plaintiffs' statement that no additional discovery is needed on common policies that purportedly violate the FLSA (1/31 Tr. at 32:-13-17), this Court will apply the "modest plus" standard when reviewing the Renewed Motion. *See Korenblum*, 195 F.Supp.3d at 482; *see also*

---

[6] The Second Circuit in *Glatt* certified for immediate review the question of whether a higher standard applies to motions to conditionally certify an FLSA collective made after discovery, but did not ultimately reach this issue. 811 F.3d at 540.

[7] The Court notes that, in their reply papers (Plaintiffs' Reply, Doc. 120), Plaintiffs point to other courts in this District that have considered and rejected applying a heightened standard to the first stage of conditional certification, even where discovery has commenced. *See, e.g., Kucker v. Petco Animal Supplies Stores, Inc.*, No. 14-cv-9983 (DF), 2016 WL 237425, at *9 (S.D.N.Y. Jan. 19, 2016); *Amador v. Morgan Stanley & Co.*, No. 11-cv-4326 (RJS), 2013 WL 494020, at *4 (S.D.N.Y. Feb. 7, 2013); *Winfield v. Citibank, N.A.*, 843 F.Supp.2d 397, 402 n.3 (S.D.N.Y. 2012), *class decertified* 93 F.Supp.3d 279 (S.D.N.Y. 2015); *Cunningham v. Electronic Data Sys. Corp.*, 754 F.Supp.2d 638, 645-46 (S.D.N.Y. 2010). However, this Court respectfully disagrees with these decisions and adopts the reasoning of the *Korenblum* decision.

*Creely v. HCR ManorCare, Inc.*, 789 F.Supp.2d 819, 827 (N.D. Ohio 2011) (noting "the absurd result of granting the parties time to do discovery on the conditional certification question but subsequently imposing no incremental hurdle in determining whether Plaintiffs may send opt-in notices"). Importantly, even under this standard, the Court may not "resolve factual disputes, decide ultimate issues on the merits, or make credibility determinations." *Id.* at 480. But it should deny conditional certification if it determines that the solicitation of additional opt-ins through court-authorized notice would not promote efficient resolution of common issues. *See Hoffman-La Roche, Inc.*, 493 U.S. at 169-70; *see also Korenblum*, 195 F.Supp.3d at 487.

## <u>DISCUSSION</u>

There are two components to Plaintiffs' case: (1) that they worked more than 40 hours per week without overtime pay and (2) that they do not fall under any recognized exemption from the FLSA. Plaintiffs bear the burden of demonstrating the former, and Defendant bears the burden of demonstrating that an exemption from overtime applies. Notwithstanding the fact that Defendant must prove the applicability of the executive exemption at the merits phase of the case, in order to justify their request that court-authorized notice be sent to Café Managers nationwide, Plaintiffs must point to common policies applicable to all Café Managers that show an identifiable factual nexus which binds the named Plaintiffs and potential class members together as victims of an alleged FLSA violation. *See Jenkins*, 853 F. Supp. 2d at 322. The alleged violation is the misclassification of Café Managers as exempt, which deprived them of overtime pay in violation of the FLSA. Thus, the common policies must speak to the criteria

for determining exempt status and permit an inference that all members of the proposed collective were misclassified as exempt managers.

In its first Order denying Plaintiffs' motion for conditional certification, the Court pointed out that Plaintiffs did not submit copies of any BN policies to the Court and failed to allege that BN's policies directed Café Managers to personally perform primarily non-exempt duties (such as run the register or prepare café food/beverages) rather than carry out the managerial responsibilities listed in their job description. (Order at 5, 15.) In their Renewed Motion, Plaintiffs provide BN policies scheduling and directing Café Managers to perform non-exempt tasks, but as discussed below, these policies fail to cure the deficiencies identified by the Court because the policies do not schedule or direct Café Managers to *primarily* perform non-exempt tasks. Where, as here, the job description sets forth largely managerial duties, under the modest plus standard, the common proof must demonstrate that, more likely than not, Café Managers' primary duties were not, in fact, managerial, such that efficiency would be served by nationwide notice so that the issue of Café Managers' classification can be decided in one proceeding for all Café Managers who opt in to the action.

There also should be evidence that other Café Managers (who indisputably were classified as exempt and not paid overtime) more likely than not worked more than 40 hours per week such that they were not paid properly, as the failure to pay overtime is a prerequisite to suit.

The Court first addresses whether the policies identified by Plaintiffs, together with their testimony, suggest that all Café Managers nationwide, including Plaintiffs, performed primarily non-managerial work, rendering them similarly situated as to their alleged misclassification as

managers.  The Court then addresses information presented on the overtime worked or not worked by Café Managers.  Finally, the Court addresses whether the solicitation of other Café Managers through Court-authorized notice would be an appropriate case management tool to promote the efficient resolution of this action.

### A. Café Managers' Primary Duties

Plaintiffs' Renewed Motion focuses on the first prong of the test for the executive exemption — Café Managers' primary duties.  Plaintiffs identify a number of nationwide policies purportedly showing that all Café Managers are similarly situated with respect to their primary duties, including BN's policies scheduling and directing Café Managers to perform non-exempt work and BN's training materials showing that Café Managers were trained on how to perform non-exempt work.  They also point out that the Café Manager job description contains some non-exempt duties and that BN has uniform standards pertaining to its cafes to demonstrate that Café Managers nationwide are similarly situated as to their primary duties.  They submit testimony from the two Named Plaintiffs and 13 of the 21 Opt-in Plaintiffs who testified that they each primarily performed non-exempt work.  Finally, they rely on Defendant's decision to classify Café Managers as exempt, and subsequently reclassify Café Managers as non-exempt, as well as the number and geographic distribution of the Plaintiffs who have joined the suit to argue that conditional certification of a nationwide class is appropriate.  This evidence is addressed below.

#### 1. BN's Policies Scheduling Café Managers' Work

Plaintiffs first point to a common policy scheduling Café Managers to perform non-exempt duties in the cafés and related documents to argue that Plaintiffs and Café Managers

nationwide primarily performed non-exempt duties. (Renewed Mot. at 8-10.) These documents include the Dayforce Workload Planning and Scheduling procedure and a sampling of Daily Coverage Reports, Weekly Task Assignment Sheets, and Daily Activities Checklists. Plaintiffs' counsel also conducted an analysis of 1,000 Daily Coverage Reports for six Opt-in Plaintiffs to determine how frequently these six Plaintiffs were scheduled to perform café service as opposed to café management duties. (Palitz Decl., Ex. 20 ¶¶ 3-7; 1/31 Tr. at 31:5-19.) Dayforce is a scheduling system implemented in 2015 (*i.e.*, for a portion of the relevant statute of limitations period) that is used by all cafés nationwide. (Palitz Decl., Ex. 1 at 72:2-72:5; Aiken Decl., Ex. 47 ¶¶ 4-5.) Daily Coverage Reports are daily schedules generated through Defendant's Dayforce system, which schedules employees in 15-minute increments. (Palitz Decl., Ex. 20 ¶ 2.) Prior to BN using Dayforce, Café Managers created a schedule for the café. (Aiken Decl., Ex. 41 at 166:3-14.)

The Dayforce Workload Planning & Scheduling procedure ("Dayforce Procedure") directs Store Managers ("SMs") to schedule Café Managers using the "Café Management" legend "when the café manager will be placing or receiving an order, or conducting inventory, for example. When a café manager is performing Café service, change their activity to update the demand curve and prevent Dayforce from assigning too many café servers during that time." (Palitz Decl., Ex. 29.) The Daily Activities Checklists and Weekly Task Assignment Sheets require that an employee working alone in the café must complete all listed tasks, including cleaning tables and cabinets, cleaning the mop sinks, brewing iced coffee and iced tea, draining

the dishwasher, and sweeping and mopping.  (*Id.*; Ex. 32.)[8]  The Daily Activities Checklist also notes that the Café Manager is responsible for maintaining and assigning specific tasks in the café, and signing off once each task is completed.  (*Id.*)  Plaintiffs argue that the Dayforce Procedure, Daily Activities Checklists, and Weekly Task Assignment Sheets show that Plaintiffs and other potential Café Manager opt-ins were scheduled to perform non-exempt tasks for the majority of their time.

Plaintiffs' counsel's analysis of the Daily Coverage Reports for the six Opt-in Plaintiffs purportedly shows that these six Plaintiffs were never listed on the schedule as performing café management duties, but rather only were scheduled using the legends "CA," meaning "Café 1 POS" ("Point of Sale" or cash register), "CAB" meaning "Café 1 Barista," "MTG" meaning "Meeting," "I" meaning "Inventory," and "CAP" meaning "Café Projects."[9]  (*Id.*, Ex. 28).  Further, according to Plaintiffs, the six Opt-in Plaintiffs were scheduled to work as a Café 1 POS for 81% of the total hours worked, and were scheduled to perform management tasks for only 1.8% of the total hours worked.[10]  (*Id.*; Ex. 20 ¶¶ 4-6.)  The six Opt-in Plaintiffs also worked entire shifts in the Café 1 POS or Café Barista positions.  For example, of the sample Daily Coverage Reports provided, opt-in Christopher Corrado was scheduled to work as Café 1 POS for his entire shift five times, Anthony Roman was scheduled to work as Café 1 POS for his

---

[8] Plaintiff Brown testified that, in her performance review, she was not "din[g]ed" for not specifically completing the non-exempt tasks on the Daily Activities Checklist, even for shifts when she was the only employee in the café, and, instead, her supervisor wanted her to hold other café employees accountable for handling these tasks.  (Palitz Decl., Ex. 5 at 302:1-15.)

[9] Café Projects include delivery, food delivery, cleaning, checklists, merchandising, interviewing, and performance evaluations.  (Palitz Decl., Ex. 1 at 74:7-18.)

[10] The Daily Coverage Reports provided show that Corrado, DeVito, and Warner were sometimes scheduled as Café Projects and Inventory, meaning they could have been scheduled to perform exempt tasks (including interviewing and performance evaluations) sometimes.  (Palitz Decl., Ex. 28.)

entire shift seven times, Rosa DeVito and Danielle Warner were both scheduled to work as Café

1 POS for their entire shifts three times each, Kimberly Hegelund was scheduled to work as

Café 1 POS for her entire shift twice, and Tamira Murphy was scheduled to work as Café 1

Barista during her entire shift once.  (*Id.*, Ex. 28.)  Finally, according to Plaintiffs, the six Opt-in

Plaintiffs purportedly worked alone 20% of the time.

Defendant contends that Plaintiffs' interpretation of the Daily Coverage Reports and the

other scheduling-related documents is inaccurate because the code "CA" was used merely to

identify that an employee was assigned to the café and does not indicate the specific duties

being performed.  (Aiken Decl., Ex. 25 at 67:22-68:8; Ex. 47 ¶¶ 7, 10.)[11]  In addition, Defendant

argues that even if Café Managers were scheduled to perform non-exempt tasks (such as Café

1 POS), they were often concurrently supervising the other employees in the café.  Consistent

with this assertion, Plaintiff Brown and opt-in Plaintiffs Corrado, Hegelund, Hurley, and Roman

admitted in their depositions that they supervised the café and its employees, regardless of the

task they were handling in the café.[12]  (Aiken Decl., Ex. 26 at 56:13-57:13, 71:19-25, 174:8-18,

236:11-237:11, 277:10-279:12; Ex. 27 at 132:1-16, 246:24-248:9; Ex. 28 at 149:2-13, 152:18-24,

153:16-21; Ex. 32 at 86:19-87:21, 122:7-123:3, 145:6-146:16; Palitz Decl., Ex. 9 at 123:25-124:9;

*see also* 1/31 Tr. at 22:8-22 (Defendant's counsel explaining that Café Managers are scheduled

on a shift supervising multiple café workers even where the Café Manager is assigned "CA" and

_____

[11] Defendants submit a declaration from Amy Fitzgerald, Director of Store Operations, who declared that Plaintiffs' analysis of the Daily Coverage Reports is based on the "false assumption" that all SMs used the "CA" code in the same way and that the "CA" code reflects a purposeful choice and assignment in the café.  (*Id.*, Ex. 47 ¶ 10.)

[12] Opt-in Plaintiff Souza testified that she understood it was part of her job as Café Manager to supervise café servers to make sure they were providing outstanding customer service.  (Aiken Decl., Ex. 35 at 54:3-6.)  In contrast, three Opt-in Plaintiffs stated in their declarations that "the primary duties of the [Café Manager] position did not involve management of any other employees of [BN]," notwithstanding the job description assigning Café Managers this responsibility.  (Palitz Decl., Ex. 14 ¶ 11; Ex. 15 ¶ 16; Ex. 16 ¶ 15.)

indicating that it is an "absurd" result to assume "that they're all at the cash register and no one's assigned to make drinks, no one's managing, no one's doing anything except for on the cashier.").)

For purposes of the Renewed Motion only, the Court accepts Plaintiffs' counsel's analysis of the Daily Coverage Reports of the six Opt-in Plaintiffs. Nevertheless, the analysis together with the other documents and testimony do not justify conditional certification and issuance of notice to Café Managers nationwide. Plaintiffs' heavy reliance on the proportion of time they were scheduled to perform non-exempt tasks is but one consideration in assessing their primary duties. 29 C.F.R. § 541.700(b) ("Time alone . . . is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.").

In fact, applicable regulations and case law, including from the Second Circuit, make clear that the amount of time a manager in a retail setting spends on non-exempt tasks is not very meaningful in determining the manager's primary duty. This is because retail managers often provide supervisory oversite while simultaneously performing non-exempt work alongside their direct reports. 29 C.F.R. § 541.700(c) ("assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise . . . may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register."); 29 C.F.R. § 541.106(a) ("Concurrent performance of

exempt and nonexempt work does not disqualify an employee from the executive exemption. . . . Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing nonexempt work"); *Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir. 1982) (because, *inter alia*, "much of the oversight of the operation can be carried out simultaneously with the performance of non-exempt work, we believe the principal or most important work of [the Assistant Managers] is managerial"); *see also Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 504 (6th Cir. 2007) ("More importantly, however, the time factor is less momentous, and might even be somewhat misleading, where the employee's management and non-management functions are not clearly severable . . . where an employee manages while at the same time performing non-exempt tasks normally assigned to subordinate employees [] we refuse to give undue weight to the time factor of the 'primary duty' inquiry") (internal citations and quotations omitted).

Thus, even though the six Opt-in Plaintiffs were scheduled to work alone 20% of the time when they clearly were not supervising anyone, for 80% of the time they were working alongside other café employees whom they were tasked with supervising. Given their job responsibilities as set forth in various documents provided by the parties, including the Café Manager job description, it appears these six Opt-in Plaintiffs were managing, or at least expected to manage, their direct reports while simultaneously performing non-exempt tasks for a substantial portion (80%) of their working time. Some of the Plaintiffs' own testimony, noted above, also indicates they concurrently performed supervisory and non-exempt work. Although three Opt-in Plaintiffs conclusorily stated that they did not manage café staff, this is

not based on any common policy.  Indeed, no common policy indicates that Café Managers were not (or should not) concurrently managing their direct reports when scheduled in supposedly non-exempt position codes (or, in fact, performing non-exempt duties) during the same shifts as their subordinates.  Even if the Court assumes that all Café Managers worked alone 20% of the time and performed no supervisory responsibilities 20% of the time, this is not very meaningful if the rest of their work time consisted of supervising direct reports while concurrently performing non-exempt work.

While the Dayforce Workload Procedure's directive to change the Café Manager's "activity to update the demand curve and prevent Dayforce from assigning too many café servers" during the time a Café Manager is performing café service suggests that BN contemplated that Café Managers would perform non-exempt tasks, it does not establish the proportion of time Café Managers spent exclusively performing non-exempt tasks, or the proportion of time Café Managers spent concurrently managing and performing exempt tasks.

Other documents provided by Plaintiffs, including the Daily Activities Checklists and Weekly Task Assignment Sheets, and Plaintiffs' own testimony indicate that Café Managers were ultimately responsible for the daily operations of the café.  (Palitz Decl., Ex. 5 at 291:15-292:11, 324:3-11; Ex. 7 at 149:9-150:10, 151:16-19; Ex. 27; Ex. 32; Aiken Decl., Ex. 27 at 70:1-5; Ex. 41 at 200:11-13.)  Further, Plaintiffs testified that no BN policy prohibited them from delegating all non-managerial tasks and that they had the authority to delegate all non-managerial tasks, though some purportedly never delegated non-managerial tasks.  (Palitz Decl., Ex. 5 at 264:18-265:20, 324:23-325:7; Ex. 6 at 296:20-24; Ex. 7 at 243:15-25; Ex. 9 at 213:5-8; Ex. 10 at 168:2-5; Aiken Decl., Ex. 27 at 238:6-239:19; Ex. 28 at 204:24-205:3; Ex. 29 at

316:2-7; Ex. 30 at 208:7-16; Ex. 31 at 323:21-324:11.)  This testimony undermines Plaintiffs' reliance on the scheduling-related documents as common proof that Café Managers' primary duties were not managerial.

On balance, the scheduling-related evidence supplied by Plaintiffs merely supports the idea that Café Managers nationwide performed some exempt and non-exempt work concurrently (potentially up to 80% of their working time) and may have performed solely non-exempt work at least 20% of their working time.  But the federal regulations explicitly call out retail managers as examples of managers that can be treated as exempt even if they concurrently perform non-exempt duties.  The pertinent provision states:

> [A]n assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management.  An assistant manager can supervise employees and serve customers at the same time without losing the exemption.  An exempt employee can also simultaneously direct the work of other employees and stock shelves.

29 C.F.R. § 541.106(b).   Accordingly, the scheduling-related evidence submitted by Plaintiffs does not suggest that all Café Managers nationwide are similarly situated with respect to their primary duties being non-managerial.

### 2.  BN's Policies Directing Café Managers' Work

In addition to being scheduled to perform non-exempt tasks, Plaintiffs identify policies showing that BN directed Café Managers to perform non-exempt tasks.  For example, Plaintiffs point to the Café Food Preparation policy, which discusses tasks, such as (1) placing food orders, (2) receiving food orders/inventory, and (3) dating and storing food inventory (including

placing the items in the freezer for storage promptly) under the "Café Manager" heading.[13] (Palitz Decl., Ex. 37 at B&N-03286.)  Not all of these tasks are non-exempt.  Applicable regulations indicate that ordering inventory and controlling the flow and distribution of supplies and merchandise is a non-exempt, management task.  *See* 29 C.F.R. §§ 541.102; 541.700.  And, as discussed above, some Plaintiffs admitted that they were authorized to delegate non-managerial duties.  Similar to the scheduling documents, nothing in the Café Food Preparation policy requires or directs that Café Managers primarily perform non-exempt duties or perform non-exempt duties to the exclusion of supervisory duties that may be carried out simultaneously.

Other BN policies submitted by Plaintiffs appear to direct Café Managers to perform exempt tasks while simultaneously performing non-exempt tasks and to delegate non-exempt tasks.  For example, the Weekly Task Assignment Sheets require that Café Managers maintain *and assign* weekly tasks on the Daily Coverage Reports and sign off on tasks once the tasks are completed.  (Palitz Decl., Ex. 32.)  In other words, pursuant to this policy, Café Managers were assigning tasks and determining whether they were satisfactorily completed, indicating accountability for the weekly operations in the cafe.  The Weekly Task Assignment Sheets also support the proposition that Café Managers were directed to complete certain non-exempt tasks when they worked alone and perform non-exempt tasks simultaneously with exempt tasks when working together with their direct reports.  (*Id.*)  Similarly, the Workload Planning Process policy notes that "[s]pecialty managers in the Café and Music/DVD Departments

---

[13] Other tasks, such as (1) count prepped product, (2) waste log, and (3) pull/prep items from freezer, fall under the heading "Café Server."

partner with the store manager to review the workload plan, make sure it supports their areas, and monitor the DAS and e-Planner to ensure that assigned tasks are completed, breaks and lunches are taken on time, and daily fluctuations in the business are addressed." (*Id.*, Ex. 25.) Thus, the above-described documents (submitted by Plaintiffs) indicate that Café Managers were involved in setting and adjusting hours of work and ensuring the café schedule will enable the efficient and appropriate running of the café. This necessarily requires appraisal of the length of time tasks take and the productivity and efficiency of café workers. These documents also show that Café Managers were expected to be accountable for completion of café tasks and compliance with personnel policies applicable to the staff they manage. Apportioning and directing work, appraising productivity and efficiency, and monitoring or implementing legal compliance measures (such as taking breaks and lunches on time) are management functions according to applicable regulations. *See* 29 C.F.R. § 541.102.

As they did in their First Motion, Plaintiffs also point to BN's ISOs, planograms, and visual standards in support of their argument that BN directed Café Managers to primarily perform non-exempt duties. These documents, which strive for some uniformity across BN stores, contain detailed instructions on how products must be displayed, prepared, sampled, and how the café must be organized. (Palitz Decl., Exs. 26, 34-35, 37-38.) Nothing in these policies even remotely requires that Café Managers primarily perform non-exempt duties, and Plaintiffs fail to meaningfully explain how the policies relate to Plaintiffs' claim that Café Managers primarily performed non-exempt duties. As the Court previously articulated, "[f]or certification purposes, there is certainly a distinction between a policy that describes the steps a barista should follow in making a latte and a policy that instructs Café Managers to spend

their days making lattes instead of performing managerial responsibilities." (Order at 15.) The Court also notes that, under federal regulations, the authority to implement management policies and operating practices is described as an exempt function for exempt administrative employees. 29 C.F.R. § 541.202(b). The management of a "recognized department," a criterion for the executive exemption, likewise assumes responsibility for implementation of corporate policies and practices within the department. *See* 29 C.F.R. § 541.103.

Defendant has attempted to discredit Plaintiffs' reliance on BN's policies scheduling and directing Plaintiffs to perform non-exempt tasks by quoting testimony from Morabito that these various policies were merely "guidelines" and "recommendations," which were to be applied differently in each store depending on "specific store needs." (Aiken Decl., Ex. 25 at 115:12-116:22, 126:21-127:24, 127:25-129:15.) The Court does not draw any conclusions as to the flexibility Café Managers had in interpreting and implementing the uniform standards policies for purposes of the Renewed Motion because such determinations must wait until a later stage of the litigation. At the conditional certification stage, the Court assumes that Café Managers had no discretion to vary from these policies and were responsible for ensuring that BN's uniform standards were followed in the cafes they managed. But this assumption, together with the other policies provided to the Court, does not suggest that Café Managers nationwide are similarly situated because they primarily performed non-exempt functions.

Finally, Plaintiffs rely on the Café Manager job description as evidence that they are similarly situated to potential opt-in plaintiffs regarding their primary duties. In their First Motion, Plaintiffs appeared to concede that the job description described an exempt job. Now, they point to certain duties in the job description that are non-exempt to show that BN directed

Café Managers to perform non-exempt functions and support an argument that Café

Managers' primary duties were not managerial.  (Renewed Mot. at 16-17; 1/31 Tr. at 5:5-11,

11:4-8 ("So those [non-exempt] tasks we're saying are really their primary duties.  They're listed

on the job description.  It's not like they're totally abandoned from the job description.").)

Plaintiffs quote language in the Café Manager job description stating that Café Managers must

"provide timely and friendly café service, upsell, maintain product presentation standards, and

maintain Café cleanliness."  (Renewed Mot. at 17 (citing Palitz Decl., Ex. 27).)  But, Plaintiffs

have selectively and incompletely quoted the job description by omitting the following directly

preceding language: "[d]rive sales by **coaching and counseling café servers to deliver the four**

**core service principles in the Café**:[.]" (Palitz Decl., Ex. 27 (emphasis added)).  Coaching and

counseling are managerial duties under the applicable regulations.  29 C.F.R. § 541.102

(including appraising employees, disciplining employees, and training of employees as

management duties).  The complete provision from the job description, therefore, does not

suggest that Café Managers primarily perform non-exempt duties.  Plaintiffs also claim that the

job description contains non-exempt duties because it requires "physical activity" and

"prolonged standing and lifting."  But, being a manager does not preclude physical activity or

prolonged standing.  Plaintiffs ignore the many duties in the job description that applicable

regulations state are management duties such as managing and executing the daily operations

of the Café, and selecting, interviewing and recommending hiring of new café servers.  29 C.F.R.

§ 541.102; (Palitz Decl., Ex. 27.)  At best, the job description supports the contention that Café

Managers were required to perform a mix of exempt and non-exempt duties, not that their

primary duties were non-exempt.  *See Nabi v. Hudson Grp. (HG) Retail, LLC,* 310 F.R.D. 119, 124

(S.D.N.Y. 2015) ("The mere fact that Defendants created a uniform job description for this position and that operations managers may perform some of the same tasks at commuter station newsstands nationally is insufficient to create an inference that operations managers are generally misclassified.").

To the extent Plaintiffs rely on *Ferreria v. Modell's Sporting Goods, Inc.* for the proposition that a job description requiring a manager to perform non-exempt duties at least some of the time is sufficient to justify conditional certification, their reliance is misplaced. *Ferreria* is distinguishable because the court in that case was applying a modest standard, not a modest-plus standard, when determining whether conditional certification was appropriate. *See* No. 11-cv-2395 (DAB), 2012 WL 2952922, at *1-2 (S.D.N.Y. July 16, 2012). Additionally, the plaintiff in *Ferreria* was an assistant manager, not a manager with sole responsibility for an entire department like the Café Managers here. Additionally, the plaintiff in that case testified that 90% of his time was spent performing non-exempt duties and not managing or concurrently managing. *See id.* at *2. Here, the common policies and Plaintiffs' own testimony appear to show that Café Managers performed managerial and non-exempt duties concurrently.

In sum, even accepting as true that BN scheduled and directed Café Managers to perform non-exempt tasks, the evidence presented by Plaintiffs does not demonstrate that it is more likely than not that Plaintiffs were subject to a common policy applicable to all Café Managers nationwide requiring them to primarily perform non-exempt duties. It is not enough for Plaintiffs to present policies that BN scheduled or directed Café Managers to perform some non-exempt tasks, because the core issue is whether Plaintiffs have raised an inference that

Café Managers' *primary* duties were non-managerial. Thus, none of the "common" scheduling policies that Plaintiffs have presented come close to satisfying the modest plus standard justifying conditional certification.

### 3. BN's Policies Training Café Managers

Plaintiffs also allege that the primary duties of all Café Managers were non-managerial because Defendant trained all Café Managers to perform non-exempt tasks. (Renewed Mot. at 10-11.) BN's café operations and café service training manuals describe how to (1) prepare coffee and tea, (2) prepare espresso-based and blended beverages, (3) prepare and serve food, (4) display and maintain food and retail products, and (5) maintain a clean café. (Palitz Decl., Ex. 2.) These tasks in the training materials are all contained within pages marked as "Café Service." Plaintiffs completely ignore the pages in the training materials marked "Talent Management," which describe how to (1) recruit staff, (2) interview candidates, (3) write and deliver performance reviews, (4) conduct verbal counseling conversations, and (5) write and deliver performance improvement plans. (*Id.*, Ex. 39.) In fact, the training materials train Café Managers to perform both exempt and non-exempt tasks, and do not support Plaintiffs' argument that their primary duties comprised non-exempt tasks. Plaintiffs also argue that the Café Manager Curriculum, which requires that Café Managers complete the Café Server Curriculum, shows that Plaintiffs primarily performed non-exempt tasks. Morabito testified that BN trains Café Managers to perform non-managerial tasks so that Café Managers can "model[] the behavior that they expect from the people that are working for them, to be able to pitch in when necessary, to train [café employees]." (Aiken Decl., Ex. 25 at 243:10-18.) Consistent with this testimony, Plaintiff Brown testified that, when training to become a Café

Manager, she was told that leading by example is a big part of the job, which she found to be true in her experience as a Café Manager. (*Id.*, Ex. 26 at 57:6-24.) But even giving no weight to Morabito's testimony for purposes of the Renewed Motion, simply training Café Managers to perform non-exempt tasks — which there is no dispute they performed at times — does not raise an inference that Plaintiffs and other potential opt-ins *primarily* performed non-exempt tasks.[14]

In sum, none of the policies and procedures identified by Plaintiffs alone or in the aggregate are sufficient to satisfy the modest plus standard for conditional certification, particularly given Plaintiffs' own varying testimony about the extent to which they each performed managerial duties. This is because they do not show it is more likely than not that Plaintiffs and other potential opt-ins are similarly situated in being directed to perform primarily non-exempt duties in contravention of their common job description. Rather, based on the information before the Court, it appears more likely than not that the Court will need to evaluate each Plaintiff individually to determine his or her primary duties, as the applicable regulations contemplate. 29 C.F.R. § 541.106(a) (whether an employee's primary duties are managerial when performing concurrent exempt and non-exempt work "is determined on a case-by-case basis.").[15]

---

[14] To the extent Plaintiffs argue that BN scheduled and trained Café Managers to perform non-exempt tasks to understaff cafes and comply with payroll budgets (Renewed Mot. at 11), their argument is without support in the documents provided.

[15] At oral argument, BN stated that summary judgment might be appropriate as to some Plaintiffs, but that there may be factual disputes about others' primary duties based on individual experiences in Plaintiffs' respective stores. (1/31 Tr. at 20:1-5.)

#### 4. *Testimony of Plaintiffs and Opt-in Plaintiffs*

Fifteen Café Managers (Plaintiffs Kelly Brown and Tiffany Stewart, and Opt-in Plaintiffs Christopher Corrado, Rosa DeVito, Anthony Roman, Irene Souza, Sandy Tharp, Lauren Hurley, Leslee Orantes, Guadalupe Gonzalez, Debra Faulhefer, Thomas Verhagen, Kimberly Hegelund, Tamira Murphy, and Danielle Warner) testified that their primary duties included: making coffee and other beverages, selling pastries and food, preparing food, working the cash register, restocking and replenishing the café, and cleaning the cafe. These Café Managers, who make up 1.36% of all Café Managers nationwide, estimated that they spent between 75% and 98% of their time performing these tasks. (Palitz Decl., Ex. 5 at 107:25-108:3; Ex. 6 at 293:9-19, 331:17-333:24; Ex. 7 at 243:4-11, 267:2-269:3; Ex. 8 at 347:9-349:4; Ex. 9 at 70:17-25, 212:3-212:10, 241:20-242:19; Ex. 10 at 212:3-213:22; Ex. 11 at 259:10-22; Ex. 12 at 142:9-143:2; Ex. 13 at 240:19-242:7; Ex. 14 ¶ 9; Ex. 15 ¶ 14; Ex. 16 ¶ 13; Ex. 17 at 259:2-23; Ex. 18 at 311:22-313:24; Ex. 19 at 362:23-15.)

At the same time, Plaintiffs' testimony varied significantly as to the extent of the managerial tasks they performed.[16] For example, with regard to interviewing and hiring, Plaintiff Brown and Opt-in Plaintiffs Corrado, Roman, Tharp, Hurley, Orantes, Gonzalez, Faulhefer, Verhagen, and Hegelund testified that they played a role in the interviewing and hiring processes, though they indicated that they did not have the final decision on hiring, (Palitz Decl., Ex. 5 at 134:15-137:12, 138:23-140:11, 141:25-147:7 (I conducted over 50 café server interviews); Ex. 7 at 45:6-46:24; Ex. 9 at 59:9-16; Ex. 11 at 34:2-7, 68:4-18, 195:8-12; Ex.

---

[16] Defendant also provides declarations of non-party Café Managers who declared that they primarily performed managerial duties. (Aiken Decl., Ex. 3 ¶ 9; Ex. 8 ¶ 10; Ex. 9 ¶ 18; Ex. 10 ¶ 16; Ex. 11 ¶ 7; Ex. 15 ¶ 6.)

12 at 47:17-48:25; Ex. 13 at 58:11-25, 62:10-63:14; Ex. 14 ¶ 12; Ex. 15 ¶ 18; Ex. 16 ¶ 17; Ex. 17 at 17:2-19:16) while Opt-in Plaintiffs DeVito and Souza testified that they did not participate in the interviewing and hiring process (*id.*, Ex. 8 at 11:10-25; Ex. 10 at 32:4-25, 203:22-204:9). Federal regulations note that an exempt executive is one who has "the authority to hire or fire other employees, or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight." 29 CFR §§ 541.100; 541.105. Thus, a person does not need final authority to hire or fire to fall under the exemption. In portions of Plaintiffs' deposition transcripts provided by Defendant, Plaintiffs Brown, Corrado, and Hurley testified that their recommendations as to hiring were given weight by their SMs. (Aiken Decl., Ex. 26 at 140:3-11, 156:4-8; Ex. 27 at 45:20-46:7, 99:4-6, 106:5-18, 112:11-113:6, 114:1-9; Ex. 32 at 51:16-52:25.) None of the policies Plaintiffs provided to the Court provide any clarity about the frequency with which Café Managers engaged in interviewing and recommending personnel actions or the weight given to Plaintiffs' recommendations on café personnel matters. But, as noted above, the job description suggests that an essential function of the Café Manager role was making recommendations regarding personnel. (Palitz Decl., Ex. 27 ("You select, hire and develop café servers, ensuring a talent bench which reflects the communities we serve.").) At best, some of the Plaintiffs' testimony suggests that they individually were not doing an "essential function" of their job description – not that Café Managers nationwide did not, in fact, make personnel recommendations or that their recommendations were not given significant weight.

In addition, Plaintiffs' testimony differed as to whether they trained employees. The DOL regulations identify "training of employees" as part of "management" responsibilities. 29

C.F.R. § 541.102.  Plaintiff Brown and Opt-in Plaintiffs Corrado, Hurley, Roman, Tharp, and Orantes testified that they trained employees as part of their Café Manager responsibilities, (Palitz Decl., Ex. 5 at 331:3-333:23; Ex. 7 at 40:18-41:5 (I trained café baristas, members of the management team, booksellers who worked both on the floor and in the café, and café leads); Ex. 9 at 239:7-11; Ex. 11 at 73:17-74:25; Aiken Decl., Ex. 30 at 86:2-20, 93:23-94:7, 110:8-111:23, Ex. 32 at 28:19-29:22, 61:19-62:5, 62:22-63:3), while Opt-in Plaintiffs DeVito and Warner testified that they did not train employees (Palitz Decl., Ex. 8 at 12:13-23; Aiken Decl., Ex. 29 at 225:19-226:14 (I understood that my SM wanted me to handle training for all full-time employees but I never did).)  None of the policies that Plaintiffs provided to the Court address the frequency with which each Plaintiff or Café Managers generally engaged in training, though Plaintiff Brown indicated that she always led by example (*i.e.,* trained her subordinates).

Plaintiffs' testimony also differed as to whether they prepared schedules.  The DOL regulations identify "setting and adjusting" employee "hours of work" as a "management" responsibility.  29 C.F.R. § 541.102.  Plaintiff Brown and Opt-in Plaintiffs Corrado, Roman,[17] Tharp, Hurley, Orantes, Gonzalez, and Faulhefer testified that they prepared schedules for their cafés, though some indicated that their schedules were sometimes modified by their SMs (Palitz Decl., Ex. 5 at 48:2-7, 107:2-108:14, 258:13-25, 333:8-14; Ex. 7 at 165:1-22; Ex. 9 at 163:3-164:13; Ex. 11 at 89:9-25; Ex. 12 at 66:10-25; Ex. 13 at 106:2-6; Ex. 14 ¶ 9; Ex. 15 ¶ 17; Aiken Decl., Ex. 26 at 64:5-14, 87:8-10, 104:20-105:13, 128:7-13, 258:16-259:6; Ex. 32 at 59:10-64:14; Ex. 41 at 165:1-166:21), while Opt-in Plaintiffs DeVito and Verhagen testified that they

---

[17] The Court notes that Plaintiff Roman testified that "when [he] left the company, [he] had zero control over the scheduling," indicating that his responsibilities changed over time. (Palitz Decl., Ex. 9 at 164:20-22.)

did not create the schedules for the café (Palitz Decl., Ex. 8 at 10:16-11:5 ("I would create rough drafts of schedules as a suggestion of what to use. But most of the time it was not the same schedule that was then posted"); Ex. 16 ¶ 16.) Thus, Plaintiffs appear to have different experiences as to the extent and importance of scheduling to their roles as Café Managers, and the policies related to scheduling do not demonstrate that Plaintiffs and potential opt-ins are similarly situated with respect to the extent and importance of scheduling to their roles. If anything, the policies suggest that Café Managers generally were involved in scheduling.

Finally, Plaintiffs' testimony differed as to whether they had the authority to coach, counsel, and discipline employees. The DOL regulations identify "disciplining employees" as a managerial responsibility. 29 C.F.R. § 541.102. Plaintiff Brown testified that she would coach other employees in the café, and if she decided a verbal counseling was appropriate, she could do so without store manager approval. (Palitz Decl., Ex. 5 at 108:21-110:16; Aiken Decl., Ex. 26 at 280:23-281:23.) She also testified that she "partnered" with her SM on disciplinary action and that an employee she recommended be terminated was terminated. (Palitz Decl., Ex. 5 at 282:6-285:11.) Opt-in Plaintiff Corrado testified that he worked with his SM to prepare performance evaluations for café staff, and that when a performance review was final, it "more or less" resembled the initial draft that he had created. (Palitz Decl., Ex. 7 at 51:12-52:25.) He was encouraged to deliver performance improvement plans, but his SM was in the room anytime he delivered the improvement plan. (*Id.* at 58:20-24.) He also testified that he would coach and counsel employees, as well as conduct verbal counseling for employees who needed discipline, and that he would write down when the verbal counseling conversations took place in a log but would involve a store manager when it got to the level of a performance

improvement plan.  (*Id.* at 77:8-78:3.)  Opt-in Plaintiff Warner testified that she would provide coaching in the moment to café servers when she witnessed them doing something incorrectly. (Aiken Decl., Ex. 29 at 122:11-19.)  Opt-in Plaintiff Hurley testified that she was responsible for coaching café servers, and that she had authority to issue a verbal warning when she thought it was appropriate.  (Aiken Decl., Ex. 32 at 55:5-11; Palitz Decl., Ex. 12 at 100:6-14.)  She also testified that she once talked with her SM about how a café server needed a performance improvement plan, after which her SM asked her to write up the performance improvement plan and had Hurley sit in the room when she issued it.  (Palitz Decl., Ex. 12 at 102:3-21.)  Opt-in Plaintiff Tharpe testified that she had the authority to issue verbal and written warnings, but that she preferred to coach in the moment because she believed it was more effective. (Aiken Decl., Ex. 44 at 116:15-121:24.)  Opt-in Plaintiff Souza testified that she never coached an employee, though she understood that she had the authority to do so, (Aiken Decl., Ex. 35 at 55:1-20) while Opt-in Plaintiff DeVito testified that she "wasn't authorized to be able to give corrective action" (*id.*, Ex. 31 at 272:23-273:11), though she could not remember any BN policy that prohibited her from disciplining or counseling employees (*id.*).  The only policies that speak to Café Manager authority to discipline are the job description and Café Manager training materials, which explicitly contemplate that Café Managers will be involved in coaching and performance management.  Here again, Plaintiffs appear to have varying experiences in the extent to which they were involved in disciplining and coaching their direct reports.

The Court notes that BN submitted testimony of numerous non-opt-in Café Managers who stated their primary duties were managerial.  This supports a conclusion that all Café Managers are not similarly situated as to their primary duties.  However, the Court declines to

rely on their testimony about Plaintiffs' or other Café Manager's primary duties because it is not appropriate to make credibility determinations or weigh evidence at this point in the proceeding. Furthermore, these Café Managers are not part of this suit and are not going to be opt-ins, and the relevant inquiry at this stage of the litigation concerns the similarities between the as yet unidentified opt-ins and Plaintiffs. *See Ibea v. Rite Aid. Corp.*, No. 11-cv-5260 (JSR) (HBP), 2011 U.S. Dist. LEXIS 144652, at *6 (S.D.N.Y. Dec. 14, 2011).

Finally, Plaintiffs summarily argue in their motion papers that they are similarly situated to potential opt-in plaintiffs because Café Managers are not allowed to perform certain managerial tasks: they cannot make final hiring decisions, fire employees, determine the dress code, change the hours of operation, set the prices in the café, or decide the amount of the payroll budget. (Renewed Mot. at 14-15.) Accepting these assertions as true, they do not render conditional certification appropriate because the Court is concerned with what Plaintiffs actually did – their primary duties – not what they did not do. And, as discussed above, various documents and Plaintiff testimony indicate that a number of Plaintiffs appear to have performed, or at least were expected or directed to perform, many managerial functions contained in their job description and that are listed in the DOL regulations as being managerial, including, weighing in on hiring decisions, preparing schedules, disciplining and counseling employees, and training employees. *See* 29 C.F.R. § 541.102.

In sum, Plaintiffs' varying testimony suggests that some Plaintiffs may have performed more managerial duties than others, underscoring the likelihood that when determining the merits, the Court may need to evaluate each Plaintiff individually to determine their primary duties. Moreover, no Plaintiff could identify any common policy that prohibited them from

performing managerial duties, and instead some attributed their different experiences to their particular store managers and stores.  (Palitz Decl., Ex. 5 at 133:3-134:2; Ex. 7 at 45:24-46:15 ("Depending on the store manager . . . everybody works differently.  So there were some [store managers] that we got along incredibly well, and they would [take] my recommendations with a lot more weight than others"); Ex. 12 at 65:12-66:9 (explaining that her particular SM preferred that she not delegate tasks of placing the café order, but otherwise her SM allowed her to delegate tasks); Ex. 18 at 204:10-17.)  This further supports the Court's conclusion that conditional certification is not warranted.  *See Fraticelli v. MSG Holdings, L.P.*, 13-cv-6518 (JMF), 2014 WL 1807105, at *2 (S.D.N.Y. May 7, 2014) (denying conditional certification where the putative classes' "experiences appear[ed] to vary greatly . . . in ways that [were] highly relevant" to the determination of whether they were appropriately classified); *Warman*, 193 F.Supp.3d at 324; *Armendola v. Bristol-Myers Squibb Co.*, 558 F.Supp.2d 459, 467 (S.D.N.Y. 2008) (denying motion for Court-authorized notice of collective action to be sent to potential plaintiffs and explaining that, "[w]here a plaintiff fails to [show that she and the other putative collective action members were victims of a common policy or plan that violated the law] or where a defendant employer shows either that the potential recipients of the notice are not similarly situated to the plaintiff or that it will likely succeed at trial in proving that the employees are not entitled under the FLSA to overtime compensation, a court may refuse to authorize notice"); *cf. Damassia v. Duane Reade, Inc.*, No. 04-cv-8819 (GEL), 2006 WL 2853971, at *6 (S.D.N.Y. Oct. 5, 2006) (granting motion for conditional certification under modest standard; however, agreeing with defendant that plaintiffs' own testimony showed assistant store managers had varying amounts of authority and explaining that "[w]hether such

differences existed is plainly relevant to whether plaintiffs and potential plaintiffs are similarly situated with respect to the bona fide executive exemption") (citing 29 C.F.R. § 541.102)).

### 5. *Other Arguments*

Plaintiffs make two additional arguments in support of their Renewed Motion. First, they say that BN's decision to classify all Café Managers as exempt prior to October 2016, and the decision to reclassify Café Managers as non-exempt in October 2016 shows that Plaintiffs and potential opt-in plaintiffs are similarly situated because the decisions were made "regardless of the duties, tasks and responsibilities" that Café Managers actually performed. (Renewed Mot. at 17-18.) Numerous courts in this Circuit have held that "the mere classification of a group of employees – even a large or nationwide group – as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes." *Jenkins*, 853 F.Supp.2d at 323 (quoting *Vasquez v. Vitamin Shoppe Indus. Inc*, No.10-cv-8820 (LTS) (THK), 2011 WL 2693712, at *4 (S.D.N.Y. July 11, 2011) (collecting cases)); *see also Costello v. Kohl's Illinois, Inc.*, No. 13-cv-1359 (GHW), 2014 WL 4377931, at *4 (S.D.N.Y. Sept. 4, 2014). Similarly, Defendant's reclassification of the Café Manager position is also insufficient to justify conditional certification. *See Raniere v. Citigroup*, 827 F.Supp.2d 294, 322 (S.D.N.Y. 2011), *rev'd on other grounds*, 533 F. App'x 11 (2d Cir. 2013). Plaintiffs have not presented any evidence regarding why Defendant reclassified the Café Manager position. Although BN submitted evidence that the reclassification was due to anticipated regulatory changes, the Court does not draw any conclusions as to the truth of such assertion or deem the change in classification as an admission of improper classification – such determinations are not

appropriate at this stage of the litigation.  In this Court's view, the reclassification to a non-exempt position simply is not a fact that advances the ball in showing that Plaintiffs and potential opt-in Café Managers are similarly situated as to their primary duties when they were classified as exempt.  This is because reclassification to a non-exempt status involves no risk of misclassification or potential violation of wage laws and says nothing about primary duties at the time Café Managers were classified as exempt.  An employer can choose to treat managers whose primary duties are managerial as overtime eligible for the simple reason that it does not wish to prove the manager fits under an exemption.

Second, Plaintiffs suggest that their number and geographic dispersion support conditional certification.  But courts recognize that "the mere existence of a certain number of plaintiffs, covering a sufficiently widespread geographic area, should not be expected by itself to give rise to a legally sufficient basis to find that plaintiffs are similarly situated across the nation" absent "actual evidenced of a link between plaintiffs and those across the nation." *Costello*, 2014 WL 4377931, at *6 (internal citation omitted).  What is key to a determination that conditional certification is warranted is the existence of an "'identifiable factual nexus which binds the named plaintiffs and potential class members together as victims of a particular practice.'" *Jenkins*, 853 F.Supp.2d at 322 (quoting *Hoffman*, 982 F.Supp. at 261).  None of the policies or testimony presented by Plaintiffs provide a common factual nexus binding Plaintiffs and potential class members together as employees who primarily performed non-managerial tasks, and were therefore improperly denied overtime pay for hours worked above 40 in a week.  Moreover, in this case, Plaintiffs make up only 2.09% of the potential opt-ins and worked at only approximately 6.35% of the BN stores with cafés.

**B. Overtime Worked**

An individual has standing to sue under the FLSA because he or she was improperly paid. A failure to plead "sufficient detail about the length and frequency of . . . unpaid work to support a reasonable inference that [the plaintiff] worked more than forty hours in a given week" is fatal to a claim for overtime pay. *See Nakahota v. New York-Presbyterian Healthcare System*, 723 F.3d 192, 201 (2d. Cir. 2013) (affirming dismissal of FLSA overtime claim) (citing *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106 (2d Cir. 2013) (same)); *DeJesus v. HF Management Servs.*, 726 F.3d 85 (2013) (same); *see also Amponin v. Olayan America Corp.*, No. 14-cv-2008 (TPG), 2015 WL 1190080, at *3 (S.D.N.Y. Mar. 16, 2015) (dismissing FLSA overtime claim where Plaintiff failed to specify a specific week during which she worked more than forty hours).

In this case, Plaintiffs assert in the complaint that Plaintiffs Brown and Stewart regularly worked more than 40 hours in a workweek without overtime compensation (Brown typically worked between 48 and 52 hours per week and Stewart typically worked between 46 and 50 hours per week). ("Complaint" or "Compl.," Doc. 18 ¶¶ 20, 26, 88.) Additionally, fifteen Opt-in Plaintiffs testified that they were scheduled to work 40 hours per week but often worked more than 40 hours (between 45 and 60 hours) per week without overtime pay. (Palitz Decl., Ex. 5 at 301:15-17; Ex. 6 at 331:7-11; Ex. 7 at 232:1-12; Ex. 8 at 343:18-23; Ex. 9 at 194:11-195:1; Ex. 10 at 211:20-212:2; Ex. 11 at 86:17-87:8; Ex. 12 at 132:9-11; Ex. 13 at 240:16-18; Ex. 14 ¶¶ 3, 6; Ex. 15 ¶¶ 7, 11, 13; Ex. 16 ¶¶ 5, 12; Ex. 17 at 115:3-116:13; Ex. 18 at 66:4-13, 312:12-15; Ex. 19 at 299:1-20.) Undoubtedly, this testimony is sufficient to show that Plaintiffs themselves worked

overtime.  *See Varghese v. JP Morgan Chase & Co*, No. 14-cv-1718 (PGG), 2016 WL 4718413, at

*2 (S.D.N.Y. Sept. 8, 2016).

However, Plaintiffs fail to raise an inference that other potential opt-ins worked

overtime.  Under BN's policies, Café Managers were scheduled to work 40 hours per week.

(Palitz Decl., Ex. 7 at 38:3-25, 232:1-4.)  No BN policy directed or required Café Managers to

work more than 40 hours per week.  Plaintiffs seek conditional certification of a nationwide

collective action with little to no evidence that other Café Managers worked overtime.

Plaintiffs had the contact information for 200 Café Managers, yet only 21 Café Managers have

opted into this action.  While it is possible that other Café Managers may have worked more

than 40 hours per week, it is far from clear how many did so or how frequently they did so.

Further, as discussed at length above, it is far from clear whether those potential opt-in Café

Managers who did work more than 40 hours in a week are similarly situated to Plaintiffs with

respect to their primary duties.  This too leads this Court to find that conditional certification is

not warranted.  *See Myers*, 624 F.3d at 555.

### C.  *The Modest Plus Standard and Case Management Considerations*

The question of whether Plaintiffs made a sufficient factual showing justifying

conditional certification is, admittedly, a close question because most of the precedent in this

District has called for a lenient standard in reviewing a motion for conditional certification.

However, this case has a unique procedural position:  the parties completed six months of

discovery targeted to conditional certification.  "A Court's initial review may properly grow

more exacting as discovery proceeds."  *Korenblum*, 195 F. Supp.3d at 482.

At oral argument, the Court asked Plaintiffs' counsel how granting conditional

certification would promote efficiency.  Plaintiffs responded that it would be most efficient because Plaintiffs require representative discovery.  (1/31 Tr. at 7:8-8:8.)  Yet, later in the argument Plaintiffs admitted that they would not be seeking any more information on whether future opt-in plaintiffs are similarly situated to Plaintiffs because Plaintiffs already have all of the common policies upon which they are relying.  (*Id.* at 32:13-20.)  The completion of discovery on common policies that might show Café Managers perform primarily non-exempt duties warrants application of a modest-plus standard in this case.

Plaintiffs' counsel also argued that the Court should adopt the reasoning of the court in *Ibea*, which granted conditional certification and cautioned against placing an "extremely heavy burden" on plaintiffs and "wasting judicial resources by requiring courts to consider each plaintiff's claims in a separate lawsuit."  2011 U.S. Dist. LEXIS 144652, at *7 (internal quotations and citation omitted).  In *Ibea*, there was evidence that the plaintiff and the six opt-ins had the same "primary duties."  *Id.* at *5.  The evidence presented by Plaintiffs here does not lead to the same conclusion.  Even if the Court were to accept for purposes of the Renewed Motion that Plaintiffs have provided sufficient evidence to raise a triable issue that they themselves were misclassified because they were not, in fact, performing primarily management duties (despite their job description), the policies they identify do not make it more likely than not that all Café Managers nationwide are similarly situated and likewise were not primarily performing management duties.  Additionally, *Ibea* was decided under the modest, not the modest plus, standard that this Court applies based on the discovery completed.  2011 U.S. Dist. LEXIS 144652, at *4.

Many of the other cases relied on by Plaintiffs in their papers are distinguishable

because they too were decided pre-discovery under the modest standard, rather than the modest plus standard that this Court is applying in analyzing the Renewed Motion. *See, e.g.*, *Hernandez v. City of New York*, No. 16-cv-3445 (RA), 2017 WL 2829816, at *3 (S.D.N.Y. June 29, 2017); *Varghese,* 2016 WL 4718413, at *5; *Sanchez v. El Rancho Sports Bar Corp.*, No. 13-cv-5119 (RA), 2014 U.S. Dist. LEXIS 66234, at *4 (S.D.N.Y. May 13, 2014); *Jacob v. Duane Reade, Inc.*, No. 11-cv-0160 (JPO), 2012 WL 260230, at *4 (S.D.N.Y. Jan. 27, 2012); *Indergit v. Rite Aid Corp.*, No. 08-cv-9361 (PGG), No. 08-cv-11364 (PGG), 2010 WL 2465488, at *3 (S.D.N.Y. June 16, 2010); *but see Costello*, 2014 WL 4377931, at *2-3 (granting motion for conditional certification and applying modest standard after parties had begun discovery where discovery was bifurcated to permit discovery related to the motion for conditional certification); *Damassia*, 2006 WL 2853971, at *3-4 (granting motion for conditional certification under modest standard where some discovery had occurred, but fact discovery was in early phases and only a portion of depositions were completed). The Court also notes that both times the Second Circuit has addressed conditional certification in the context of an alleged inappropriate wage payment classification, it found that denial of conditional certification was appropriate. *See Myers,* 624 F.3d at 556-57 (affirming district court's denial of motion for conditional certification in case involving exemption); *Glatt,* 811 F.3d at 540-41 (vacating district court's decision to grant conditional certification in case involving classification of individuals as interns).

The purpose of conditional certification is to determine whether there is an identifiable factual nexus which binds the named plaintiffs and potential class members together as victims of a particular practice — here, BN's failure to pay overtime worked by Café Managers by virtue of their misclassification as exempt managers. The information provided by Plaintiffs does not

provide that nexus because it does not prove the existence of common policies that would

allow the Court to determine that all of the Plaintiffs and potential opt-in Plaintiffs performed

primarily non-managerial duties. At best, the common policies identified by Plaintiffs show that

Café Managers were directed to and expected to perform managerial duties as well as some

non-exempt duties and were accountable for the operations of the café. None suggest that

more likely than not Plaintiffs' and Café Managers' primary duties were non-managerial. The

variations in the Plaintiffs' own testimony on this core issue underscores the likelihood that

Plaintiffs and potential opt-ins are not similarly situated as to their primary duties. Thus, this

Court concludes that solicitation of additional opt-ins will raise more questions and prolong the

resolution of this case — not lead to just and economic resolution. The size and scope of the

proposed collective also contributes to this Court's conclusion that solicitation of additional

opt-ins would undermine rather than promote efficiency. *See, e.g.*, *Guillen v. Marshalls of MA,

Inc.*, 841 F.Supp.2d 797, 803 (S.D.N.Y. 2012) (denying motion for conditional certification for a

proposed nationwide collective and rejecting plaintiff's argument that "in light of the FLSA's

broad remedial purpose any overinclusiveness in the scope of the collective action should be

corrected during the second stage of review following conditional certification . . . [because] it

would be a waste of the Court's and the litigants' time and resources to notify a large and

diverse class only to later determine that the matter should not proceed as a collective action")

(internal quotation marks and citations omitted); *Korenblum*, 195 F.Supp.3d at 487 (noting that

distributing notice to hundreds, if not thousands, of employees would not promote efficiency).

Testimony from Plaintiffs suggests that variations in stores, including the practices of individual

Store Managers, may have influenced the Café Managers' duties and responsibilities. This too

underscores the likelihood that Café Managers are not all similarly situated as to an alleged common FLSA violation. Accordingly, conditional certification is not an appropriate case management tool in this case and this Court – exercising its discretion – declines to conditionally certify a collective action.

<u>**CONCLUSION**</u>

For all the reasons set forth above, Plaintiffs' Renewed Motion for Conditional Certification is denied. The Court will, at a later stage, determine whether Plaintiffs and the current Opt-in Plaintiffs are, in fact, similarly situated and also whether a merits determination can be made on a consolidated basis.

**SO ORDERED.**

Dated: June 25, 2018
New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge